# EXHIBIT A

**LOAN AGREEMENT**

made between

NATIONAL HOUSING TRUST COMMUNITY DEVELOPMENT FUND

as Lender

and

NORTH EAST HOUSING INITIATIVE, INC.

as Borrower

Dated as of: March 7, 2022

**LOAN AGREEMENT**
**BETWEEN**
**NATIONAL HOUSING TRUST COMMUNITY DEVELOPMENT FUND**
**AND**
**NORTH EAST HOUSING INITIATIVE, INC.**

THIS AGREEMENT ("Loan Agreement" or "Agreement") made as of the 7th day of March, 2022, between **National Housing Trust Community Development Fund** ("NHTCDF"), a District of Columbia nonprofit corporation, with a primary place of business located at 1101 30th Street, NW, Suite 100A, Washington, DC 20007, (the "Lender"), and **North East Housing Initiative, Inc.**, a Maryland nonprofit corporation, having an office located at P.O. Box 11762, 5307 Belair Road, Baltimore, MD 21206 (the "Borrower") (collectively the "Parties").  The Parties agree that the effective date of this Agreement shall be March 7, 2022 ("Effective Date").

*R E C I T A L S:*

**WHEREAS**, Borrower desires to borrow from Lender and Lender desires to lend to Borrower the principal sum of up to SIX HUNDRED SEVENTY-FIVE THOUSAND AND 00/100THS DOLLARS ($675,000.00) as a revolving line of credit, plus interest, pursuant to and conditioned upon the terms and conditions in this Agreement and the terms of the Revolving Line of Credit Promissory Note of even date herewith.

**WHEREAS,** the Loan shall be used by Borrower exclusively for the purpose of acquiring and/or renovating a community land trust portfolio of at least five (5) single-family residential real properties located in Baltimore, Maryland (the "Property"), as more particularly described on Exhibit A attached hereto, and preserving the Property as affordable housing (the "Project");

**WHEREAS,** upon completion of renovations, Borrower intends to sell the homes comprising the Property to qualified homebuyers whose income does not exceed 50% of Area Median Income for the Baltimore, Maryland Area under a community land trust model;

**WHEREAS**, Borrower has obtained grant funding for the Project from the City of Baltimore Affordable Housing Trust Fund (the "AHTF Grant"), and such grant funds will be disbursed to Borrower for acquisition and renovation costs for the Project on a reimbursement basis;

**WHEREAS,** the amounts disbursed under the Loan shall be used by Borrower to acquire and renovate the Property and bridge financing from the AHTF Grant in the event that reimbursements from the AHTF Grant are delayed;

**WHEREAS,** as a condition of the Loan, Borrower shall execute this Loan Agreement, and the Revolving Line of Credit Promissory Note (the "Promissory Note" or "Note") of even date herewith, the terms of which are incorporated herein and made a part hereof (the Loan Agreement and Note are sometimes hereinafter referred to as the "Loan Documents"); and

*Loan Agreement*
*NHTCDF – NEHI*
*(Revolving Line of Credit)*

2

**WHEREAS**, as a condition to entering into the transaction, NHTCDF will require, that (i) Borrower represents and warrants certain matters, and (ii) the proceeds of the Promissory Note will be advanced in accordance with certain requirements set forth herein below.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements of the parties as hereinafter set forth, it is hereby mutually agreed as follows:

## ARTICLE I
## THE LOAN

1.1    Recitals.  The Recitals above are incorporated in this Agreement and made a part hereof.

1.2    The Loan.  Upon and subject to the terms and conditions set forth in the Promissory Note and this Agreement, the Lender agrees to lend to the Borrower and the Borrower agrees to borrow from the Lender the principal sum ("Principal Sum") of up to SIX HUNDRED SEVENTY-FIVE THOUSAND AND 00/100THS DOLLARS ($675,000.00) as a revolving line of credit (the "Loan").  The outstanding principal amount of the Loan shall bear an interest rate according to the rates set forth in the Note.

1.3    Payments and Maturity.  The unpaid Principal Sum, together with interest thereon at the rate or rates provided for above, shall be payable in accordance with the terms of the Note.

1.4    Fees.  Borrower agrees to and shall (i) pay to Lender upon execution hereof an origination fee equal to one and one quarter percent (1.25%) of the Principal Sum in the amount of Eight Thousand Four Hundred Thirty-Seven and 50/100ths Dollars ($8,437.50), and (ii) pay all reasonable out-of-pocket costs actually incurred to third parties in connection with the execution and consummation of this Agreement, the Loan and the Loan Documents, including, without limitation, the reasonable fees and expenses of Lender's counsel incurred by Lender in connection with this Agreement.  Borrower agrees that all such fees will be paid to Lender upon the execution of this Agreement.

1.5    Borrower knows of no, and so long as Lender or assignee holds an interest in the Note waives, releases and agrees to assert no, defenses, counterclaims or offsets to the Note, the liens and security interests securing the payment thereof, and any and all other instruments evidencing or securing said indebtedness, arising prior to or concurrent with the acquisition of the Note by Lender to the extent permitted under applicable law.

1.6    Lender has made this Loan to the Borrower based upon the Borrower's representation that the proceeds of the Loan will be used by Borrower for the sole purpose of supporting the Project as described in the Recitals above.

1.7    Borrower shall not assign its obligations hereunder to another or successor organization, whether for any purpose, except with Lender's prior written approval of such successor, which approval shall be given at Lender's sole discretion.

*Loan Agreement*
*NHTCDF – NEHI*
*(Revolving Line of Credit)*

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE BORROWER

Borrower represents and warrants to the Lender as of the date of this Agreement and agrees that on the date of any and all further commitments and disbursements of the Loan, the following shall be true and accurate:

2.1     Borrower is a nonprofit corporation duly organized, validly existing, authorized to do business, and in good standing under the laws of the State of Maryland.

2.2     Borrower has full power to enter into and perform its obligations under this Agreement and the Note.  The execution and delivery of this Agreement and the Note and the performance and observance of their terms, conditions and obligations have been duly authorized by all necessary action on the part of Borrower.  The Loan Documents constitute, and any other agreement required hereby shall constitute, when executed and delivered by Borrower to Lender, valid and binding obligations of Borrower enforceable in accordance with its governing documents.

2.3     The execution and delivery of the Loan Documents and consummation of all the transactions contemplated hereby and thereby, do not and will not conflict with, or be in contravention of any of Borrower's governing documents, any law, order, rule or regulation applicable to Borrower or any agreement or instrument to which Borrower is a party.

2.4     Borrower does not know of any material contingent liabilities affecting Borrower that are not disclosed in Borrower's most recent financial statements (if any).  Since the date of the most recent financial statements provided to Lender there has been no material adverse change in the Borrower's financial condition, assets, and liabilities.  Borrower is now solvent and no bankruptcy or insolvency proceedings are pending or contemplated by Borrower or, to the best of Borrower's knowledge, against Borrower.

2.5     There is no action, suit, legal proceeding or proceeding pending or, to the best of Borrower's knowledge, threatened (or to the best of Borrower's current actual knowledge any basis therefore) against Borrower in any court or before any arbitrator of any kind or before or by any governmental body.

2.6     Borrower does not know of any Event of Default as hereinafter defined, which exists at the time of the executing of this Agreement.

2.7     Borrower agrees the foregoing representations and warranties are continuing in nature and that Borrower is under an ongoing duty to disclose to Lender any modification to representations made under this Section.

2.8     Borrower represents that the proceeds of the Loan will be used by Borrower for the sole purpose of supporting the Project as described in the Recitals above.

*Loan Agreement*
*NHTCDF – NEHI*
*(Revolving Line of Credit)*

## ARTICLE III
## AFFIRMATIVE COVENANTS

Borrower covenants and agrees that, until payment in full of the outstanding principal and interest of the Loan to the Lender that:

3.1    Borrower shall make all payments of principal and interest under the Note as and when the same become due and payable, without notice or demand.

3.2    Borrower shall comply promptly with all laws, rules, regulations, resolutions, ordinances and codes (including, without limitation, all environmental laws and regulations) applicable to the business of the Borrower and to the conduct and operation of its business.

3.3    During the term of the Loan, Borrower shall submit the following reporting information:

(a)    Borrower's audited financial statements to be submitted within one hundred fifty (150) days of the end of Borrower's fiscal year;

(b)    Borrower's internally prepared financial statements to be submitted within forty five (45) days of the end of each calendar quarter;

(c)    A quarterly status report for the Project to be submitted within forty-five (45) days of the end of each three-month period ending March 31st, June 30th, September 30th, and December 31st. Such quarterly reports shall: Describe the progress on the Project since the last status report and identify any developments with regard to either the Project or the Borrower that might adversely affect the ability of the Borrower to repay the Loan; and

(d)    Monthly construction progress reports for the Project.

3.4    Borrower shall promptly advise Lender of any material adverse change in the condition, financial or otherwise of the Borrower or any event of default with any other lender or creditor of any kind.

3.5    Borrower shall promptly perform and comply with all other terms, conditions, covenants and prohibitions required by the terms of any of this Agreement and the Loan Documents.

3.6    Borrower shall not reorganize in any manner that would allow for the dilution of the Borrower's assets.

3.7    Borrower grants Lender permission to use information related to the Project and Loan in promotional, marketing material and/or reports produced by the Lender.

**ARTICLE IV**
**EVENTS OF DEFAULT**

4.1     Default.  Each of the following shall constitute a "Default" and, if not cured within any grace, notice and/or cure period specified below, shall constitute an "Event of Default":

(a)     Default in Payment Obligations.  Borrower shall fail to make any payment of any principal or interest due under the Loan Agreement or Note within ten (10) days of the date such payment is due.

(b)     Default Under Loan Documents.  Except as provided in Section 4.1(a), Borrower shall (i) default in the prompt performance or observance of any provision of this Agreement and/or any other Loan Document and shall fail to remedy the same within thirty (30) days after written demand by Lender is received (or deemed to be received) by Borrower, and/or (ii) any material representation or warranty made by Borrower herein, or by Borrower in any other Loan Document or in any certificate delivered pursuant hereto, or any financial statement delivered to Lender hereunder, shall be false in any material respect when made or given.

(c)     Bankruptcy/Insolvency.  Borrower shall (a)(i) become insolvent, (ii) be unable, or admit in writing an inability, to pay debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) file a voluntary petition in bankruptcy for reorganization or to effect a plan or other arrangement with creditors, (v) apply to a court for the appointment of a receiver for any of its assets, or (b)(i) be adjudicated as bankrupt in an involuntary proceeding, (ii) have any writ of attachment, garnishment, execution or similar process issued against any of its property or (iii) have a receiver appointed for any of its assets (with or without consent) which, as to any event in this clause (b), is not stayed, discharged or satisfied within a reasonable period of time under the circumstances (not to exceed, in any event, sixty (60) days after commencement of the case) so long as Borrower diligently pursues such stay, discharge or satisfaction.

(d)     Material Loss or Adverse Change.  Borrower shall suffer: (i) a material casualty as to any material asset or assets which is not, except for deductibles acceptable to Lender, fully covered by insurance, or (ii) there shall be any material adverse change in the business or financial condition of Borrower.

(e)     Failure to comply with any and all provisions of Article Three, including the failure of Borrower to submit the reporting information as required in Paragraph 3.3.

**ARTICLE V**
**RIGHTS OF LENDER IN EVENT OF DEFAULT BY BORROWER**

5.1     Lenders Rights Upon Default.  Upon the occurrence of an Event of Default, Lender shall have the following additional rights and remedies, together with such rights and

*Loan Agreement*
*NHTCDF – NEHI*
*(Revolving Line of Credit)*

remedies as are granted to Lender in the Loan Agreement, in the other Loan Documents and in any other agreement executed in conjunction with this Agreement, and all such rights and remedies shall be cumulative:

5.2     Acceleration.  Lender shall have the right to accelerate the maturity of the Promissory Note and to declare all sums advanced to Borrower under the Loan to be immediately due and payable.

5.3     Curing of Defaults.  Upon the occurrence of any Event of Default, or the threat of any such default, which may be cured by the payment of money to any person or entity other than Lender, Lender shall have the right to make any such payment for the account of Borrower with ten (10) days' prior written notice to Borrower.  Lender may take any and all actions it deems appropriate to cure any other Event of Default on behalf of Borrower.  No cure by Lender of any Event of Default on behalf of Borrower shall be deemed a cure or waiver of such Event of Default as between Lender and Borrower and Lender may, notwithstanding any cure by it of such Event of Default on behalf of Borrower, pursue any and all remedies available hereunder and under the other Loan Documents.

5.4     Other Rights.  In addition to all other rights available to Lender hereunder, Lender shall have all of the rights and remedies (i) prescribed in the Loan Documents, (ii) accorded to creditors under applicable law and (iii) accorded to a secured party under Article 9 of the District of Columbia Uniform Commercial Code and shall have the right, without resort to any other rights or remedies, to immediately pursue all rights and remedies (whether available under the Loan Documents, applicable law or otherwise) against Borrower.

5.5     Upon the occurrence of any Event of Default and at any time thereafter, Lender shall be under no further obligation to make disbursements hereunder or take any other action with respect to this Agreement.  The Loan, with all accrued interest and other amounts payable hereunder, shall, at the option of Lender, become due and payable without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Borrower.  Upon the occurrence of any Event of Default as defined in Article IV of this Agreement, the Loan with all accrued interest and other amounts payable shall automatically be due and payable in full without the need for any action by the Lender.  Lender may proceed with every remedy available at law or in equity or provided for herein or in any document executed in connection herewith, and all expenses incurred by Lender in connection with any remedy shall be deemed indebtedness of Borrower to Lender and a part of the obligations.

5.6     No delay or failure of Lender in the exercise of any right or remedy provided for hereunder shall be deemed a waiver of the right by Lender, and no exercise or partial exercise or waiver of any right or remedy shall be deemed a waiver of any further exercise of such right or remedy or any other right or remedy that Lender may have.

*Loan Agreement*
*NHTCDF – NEHI*
*(Revolving Line of Credit)*

7

## ARTICLE VI
## CLOSING AND
## DISBURSEMENT OF LOAN PROCEEDS

6.1     Closing.  The closing of the Loan shall occur upon satisfaction of the conditions set forth in this Section 6.1 (the "Closing").  The Borrower shall ensure that the following documents, agreements and certificates shall be duly executed and/or delivered to Lender:

(a)     The Loan Agreement and the Note;

(b)     Copies of the Borrower's, organizational documents as certified by the appropriate corporate officer or as otherwise reasonably required by Lender prior to Closing;

(c)     Duly adopted resolutions of the Borrower authorizing the Loan and signatories to the Loan Documents;

(d)     Executed AHTF Grant award letter;

(e)     Executed construction contract; and

(f)     Such other documents and instruments as Lender shall reasonably require pursuant to the terms of the Loan Documents.

6.2     Disbursement.  Subject to the requirements of this Agreement and the Note, Lender agrees to make Advances under the Loan up to the maximum Principal Sum set forth in the Note.  The Loan monies shall be disbursed to Borrower as drawn for costs related to the Project, less Loan and closing fees stated in Section 1.4 herein, which Borrower shall pay at the time of and as a condition of Closing.

(a)     So long as an Event of Default does not exist under the Loan Documents, and Borrower is in full compliance with the reporting requirements of Article III herein, upon Borrower's written notice to Lender, substantially in the form of the Request for Disbursement, attached hereto as Exhibit B (the "**Request for Disbursement**"), Borrower may draw Loan funds up to the maximum principal amount outstanding of $675,000.00 (each draw an "Advance") on a revolving basis in accordance with the terms of the Promissory Note.

(b)     Each Request for Disbursement must be submitted to Lender no later than five (5) business days prior to the requested date of disbursement and must include the following for review and approval by Lender:

(i)     the amount and date of the requested Advance;
(ii)     the address of the property for which the Advance is to be used;
(iii)     an updated tracking budget; and

(iv)    a copy of the submitted AHTF Grant reimbursement request(s) equivalent to the amount of the requested Advance.

(c)    Borrower may only submit one Request for Disbursement per month. Borrower may request additional Advances prior to the repayment of previous Advances provided that the outstanding principal balance shall at no time exceed the Principal Sum and Borrower has provided the documentation required under Section 6.2(b) above. Notwithstanding the foregoing, no Advances will be made by Lender within thirty (30) days of a repayment of principal by Borrower.

## ARTICLE VII
## INDEMNITY BY THE BORROWER

7.1    Borrower shall indemnify and hold Lender harmless at all times after the date hereof against and in respect of all costs, expenses, claims, suits, damages, deficiencies, liabilities and loss (including, without limitation, reasonable costs and expenses for legal and accounting services incurred in connection therewith) of any nature suffered, incurred or paid by the Lender which would not have been suffered, incurred or paid if all the representations, warranties, covenants and agreements made by the Borrower in this Agreement or in any other instrument or document furnished to Lender in connection herewith had been (with respect to representations and warranties) true, complete and correct and had been (with respect to representations and warranties) performed and fulfilled.

7.2    In addition, Borrower agrees to pay to Lender on demand all Expenses (as defined below) paid, incurred or advanced by or on behalf of Lender.  If Borrower fails to pay for any of the said Expenses following demand by Lender, Lender may, but shall not be obligated to, pay for the same and in such event any sums expended by Lender shall both (i) become additional obligations of Borrower and (ii) bear interest from the date of disbursement at the Default Rate (as defined in the Note) and shall be payable by Borrower with interest, upon demand by Lender. "Expenses" means all fees and out-of-pocket charges, costs and expenses of any nature whatsoever incurred at any time and from time to time (whether before or after an Event of Default) in making, funding, or modifying the Loan, in negotiating or entering into any "workout" of the Loan, or in exercising or enforcing any rights, powers and remedies provided in any of the other Loan Documents, including reasonable attorneys' fees, court costs, receiver's fees, and costs of recording or filing such financing statements, continuation statements, termination statements, assignments and other documents as Lender may from time to time deem reasonably necessary for the perfection of any liens granted to Lender pursuant hereto or pursuant to any of the other Loan Documents.

## ARTICLE VIII
## MISCELLANEOUS

8.1    No provision or term of this Agreement may be amended, modified, revoked, supplemented, waived or otherwise changed except by a written instrument duly executed by Borrower and Lender and designated as an amendment, supplement or waiver.

*Loan Agreement*
*NHTCDF – NEHI*
*(Revolving Line of Credit)*

8.2     Time is of the essence as to all dates set forth herein.

8.3     Any notices and payments required to be given to any party pursuant to any provision of this Agreement shall be in writing, shall be given by certified mail, return receipt requested, delivered by a nationally recognized overnight delivery service that provides written confirmation of delivery, or delivered by hand, addressed as follows:

If to Lender:    National Housing Trust Community Development Fund
                 1101 30th Street, NW, Suite 100A
                 Washington, D.C. 20007
                 Attn:  Josh Earn

If to Borrower: North East Housing Initiative, Inc.
                 P.O. Box 11762
                 5307 Belair Road/
                 Baltimore, MD 21206
                 Attn:  Garrick R. Good

All notices, shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt), (b) when received by the addressee if sent by a nationally recognized overnight delivery service (receipt requested), or (c) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Each of the Lender and Borrower may change its respective address by such notice to the other.

8.4     This Agreement and Note constitute and incorporate the entire agreement between Lender and Borrower concerning the subject matter of this Agreement, and supersede any prior agreements between Lender and Borrower concerning the subject matter thereof.

8.5     This Agreement, Note, and any other Loan Documents shall be governed by and construed in accordance with the Laws of the District of Columbia.

8.6     This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

8.7     Usury Savings Clause.  All agreements between Borrower and Lender, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand for payment or acceleration of the maturity of the Note or otherwise, shall the interest contracted for, charged or received by Lender exceed the maximum amount permissible under applicable law.  If, from any circumstance whatsoever, interest would otherwise be payable to Lender in excess of the maximum lawful amount, the interest payable to Lender shall be reduced to the maximum amount permitted under applicable law; and if from any circumstance Lender shall ever receive anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive interest shall be applied to the reduction of the principal of the Note and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal of the Note such excess shall be refunded to

*Loan Agreement*
*NHTCDF – NEHI*
*(Revolving Line of Credit)*

10

Borrower.  All interest paid or agreed to be paid to the holder of the Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full period from the date of the Note until payment in full of the principal (including the period of any renewal or extension hereof) so that the interest thereon for such full period shall not exceed the maximum amount permitted by applicable law.  This paragraph shall control all agreements between Borrower and Lender.

8.8     Continuation of Agreements.   All conditions, agreements, obligations, covenants, requirements, limitations, and undertakings imposed upon, agreed to by, or otherwise required of Borrower under any and all documents and agreements relating to the Note are affirmed and carried forward as continuing obligations of Borrower. Except as expressly modified hereby, all terms, conditions, covenants, requirements and obligations set out in the Note and all other agreements and documents relating to the loan evidenced by the Note shall remain as set out in such documents.

8.9     Severability.  The provisions of this Agreement shall be deemed independent and severable, and the invalidity or partial invalidity or unenforceability of any one provision or portion thereof shall not affect the validity or enforceability of any other provision hereof.

8.10    Construction.  The parties acknowledge that each party and its counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or exhibits hereto.

8.11    Headings.  The headings and section or paragraph numbers and references in this Agreement are for purposes of reference only and shall not be used in construing the meaning of this Agreement or any provision hereof.

8.12    Successors and Assigns; Participation. The terms of this Agreement will bind and benefit the legal representatives, successors, and assigns of the parties; provided, however, that the Borrower may not assign this Agreement or any Loan funds, or assign or delegate any of its rights, obligations, or duties to third parties without the prior written consent of Lender.  Lender shall have the right to assign this Agreement and the Loan Documents or assign or sell the Loan or participation in the Loan to any other persons or entities, or act as agent for any third party in making the Loan, without the consent of, but with notice to, the Borrower, and on any such assignment or sale, Lender shall be released of any and all liabilities, responsibilities, or potential liabilities arising out of this Agreement or any of the Loan Documents.  In the event Lender participates the Loan, the Lender, at its sole discretion, may retain all servicing of the Loan. Lender may disclose to any principal, purchaser, participants, or prospective principals, purchasers, or participants any information or other data or material in Lender's possession relating to the Borrower, the Lender and Loan, without the consent of or notice to the Borrower.

8.13    WAIVER OF TRIAL BY JURY.  BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION ARISING IN CONNECTION WITH THIS AGREEMENT, THE NOTE, OR ANY OF THE OTHER LOAN DOCUMENTS, THE LOAN OR ANY OTHER STATEMENTS OR ACTIONS OF BORROWER OR LENDER.

BORROWER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS DISCUSSED THIS WAIVER WITH SUCH LEGAL COUNSEL.  BORROWER FURTHER ACKNOWLEDGES THAT (i) IT HAS READ AND UNDERSTANDS THE MEANING AND RAMIFICATIONS OF THIS WAIVER, (ii) THIS WAIVER IS A MATERIAL INDUCEMENT FOR LENDER TO MAKE THE LOAN, ENTER INTO THIS AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS, AND (iii) THIS WAIVER SHALL BE EFFECTIVE AS TO EACH OF SUCH OTHER LOAN DOCUMENTS AS IF FULLY INCORPORATED THEREIN.

8.14    Inconsistencies.  In the event of any inconsistency between this Loan Agreement and the Promissory Note, the provisions of the Loan Agreement shall be controlling.

8.15    Nothing herein shall be construed as establishing a relationship between Lender and Borrower or any other party hereto except the Lender-Borrower relationship.

**THIS LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AS TO THE TERMS STATED HEREIN AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

*[Signatures appear on following page.]*

IN WITNESS WHEREOF, Lender and Borrower have each executed this Loan Agreement the day and year first above written.

**LENDER:**

**National Housing Trust Community Development Fund,**
a District of Columbia nonprofit corporation

By: _____
    Josh Earn
    Vice President

**BORROWER:**

**North East Housing Initiative, Inc.**
a Maryland nonprofit corporation

By: _____
    Garrick R. Good
    Executive Director

IN WITNESS WHEREOF, Lender and Borrower have each executed this Loan Agreement the day and year first above written.

**LENDER:**

**National Housing Trust Community Development Fund,**
a District of Columbia nonprofit corporation

By:    _____
       Josh Earn
       Vice President

**BORROWER:**

**North East Housing Initiative, Inc.**
a Maryland nonprofit corporation

By:    _____
       Garrick R. Good
       Executive Director

*Signature page to Loan Agreement*
*NHTCDF – NEHI*
*(Revolving Line of Credit)*

**Exhibit A**

**Property Addresses**

The Property is comprised of the following properties all located within Baltimore, MD:

1.    3165 Lyndale Avenue
2.    3444 Elmley Avenue
3.    3440 Elmely Avenue
4.    3438 Lyndale Avenue
5.    3422 Elmley Avenue

**Exhibit B**

**Form of Request for Disbursement**

To:    National Housing Trust Community Development Fund
       1101 30th Street, NW, Suite 100A
       Washington, D.C. 20007
       Attn:    Josh Earn
       Email:  jearn@nhtinc.org

Date:    _____

Re:    Disbursement Request for North East Housing Initiative, Inc. revolving line of credit

Ladies and Gentlemen:

This Request for Disbursement is executed and delivered by North East Housing Initiative, Inc., a Maryland nonprofit corporation (the "**Borrower**"), pursuant to Section 6.2 of that certain Loan Agreement (as it may be amended, modified, supplemented, restated or amended and restated from time to time, the "**Loan Agreement**") dated as of March 7, 2022, entered into by and among Borrower and the National Housing Trust Community Development Fund (the "**Lender**").  Capitalized terms not defined herein shall have the meanings assigned to such terms in the Loan Agreement.

Borrower hereby requests that Lender make a disbursement pursuant to the Loan Agreement as follows:

1.  DATE OF DISBURSEMENT:                                                     _____
    *(Lender will fund disbursement as soon as*
    *possible, but in any event no later than 5*
    *business days after receipt of Request for*
    *Disbursement)*

2.  AMOUNT OF DISBURSEMENT:                                      $_____

In connection with the Disbursement requested herein, Borrower hereby represents, warrants, and certifies to Lender that:

(a)    On and as of the date of the Disbursement requested herein, the representations and warranties set forth in (i) Article II of the Loan Agreement and (ii) the other Loan Documents, made by Borrower are true and correct in all material respects on and as of the date of such Request for Disbursement, with the same force and effect as if made on and as of such date (except to the extent such representations and warranties expressly relate to an earlier date and except to the extent of changes in facts or circumstances that have been disclosed to Lender and do not constitute an Event of Default under the Loan Agreement or any other Loan Document); and

(b)    No Event of Default or, to Borrower's knowledge, potential Event of Default exists and is continuing on and as of the date hereof;

* * *

This Request for Disbursement is executed on _____.  The undersigned hereby certifies each and every matter contained herein to be true and correct.


**BORROWER:**

**North East Housing Initiative, Inc.**
a Maryland nonprofit corporation



By:    _____
          Garrick R. Good
          Executive Director

*Exhibit B to Loan Agreement*
*NHTCDF – NEHI*
*(Revolving Line of Credit)*

**REVOLVING LINE OF CREDIT
PROMISSORY NOTE**

U.S. $675,000.00                                     March 7, 2022

 FOR VALUE RECEIVED **North East Housing Initiative, Inc.**, a Maryland nonprofit corporation, having an office located at P.O. Box 11762, 5307 Belair Road, Baltimore, MD 21206 ("Maker"), hereby promises to pay to the order of the **National Housing Trust Community Development Fund**, a District of Columbia nonprofit corporation (hereinafter with its successors and assigns called the "Payee"), having an address at 1101 30th Street, NW, Suite 100A, Washington, DC 20007 or at such other place as Payee from time to time may designate in writing, the maximum principal sum of up to **Six Hundred Seventy-Five Thousand and 00/100ths Dollars ($675,000.00)** or so much as may have been disbursed, not to exceed $675,000.00 (the "Principal Sum"), and interest from the date hereof on the balance of principal from time to time outstanding, in United States currency at the rates and at the times hereinafter described, less such amounts as shall have been repaid in accordance with this Promissory Note (the "Loan").

 This Promissory Note (sometimes referred to herein as this "Note") is issued by Maker pursuant to that certain Loan Agreement of even date herewith (the "Loan Agreement") entered into between Payee and Maker. Capitalized terms used but not defined in this Note have the same meaning as set forth in the Loan Agreement.

 1. Term.  The Loan Term shall begin March 7, 2022 and continue until the Maturity Date, as defined in Section 4, unless sooner accelerated pursuant the terms of this Note or the Loan Agreement.

 2. Advances.  So long as an Event of Default does not exist under the Loan Documents, Maker may borrow and repay and reborrow Advances of Loan funds provided that at any given time the total amount outstanding under the Loan does not exceed the maximum Principal Sum.  The outstanding principal amount of this Note may fluctuate from time to time, but shall be due and payable in full on the Maturity Date.  Notwithstanding the foregoing, the outstanding principal amount of each Advance, together with interest accrued and unpaid thereon, shall be due and payable on the date that is six (6) months from the date such Advance is disbursed to Borrower.  Each Advance hereunder shall bear interest from the date of such Advance, at the rate provided in Section 3 below, until repaid in full together with interest accrued and unpaid thereon.

 3. Interest.  The outstanding principal amount of the Loan shall bear interest at the rate of five and one half percent (5.5%).  During the Term of the Loan, payments of interest only shall be paid monthly in arrears on the 1st day of each month beginning May 1, 2022 and shall be calculated on the basis of a 360-day year and a 30-day month for all full months, and at a daily rate of 0.01388% for the actual number of days elapsed for partial months.

4.     Payments and Maturity.  The entire balance of unpaid principal, together with interest accrued and unpaid thereon, and all fees and costs due the Payee under this Note shall be due and payable in full on September 7, 2023 (the "Maturity Date"), unless sooner accelerated pursuant the terms of this Note or the Loan Agreement.

Each payment made by Maker shall be applied first to the payment of late charges and any other fees or charges then due, then to interest and then to principal; provided, however, that following an Event of Default, any payments may be applied, at the option of the Payee, in such order and manner as Payee may determine in its sole discretion.  If any of the aforesaid installments or any sums required to be paid under the terms of this Note or under the terms of the Loan Agreement are not paid within seven (7) days of the due date thereof, the Payee, at its option, and in addition to any remedies available to it (including the imposition of the Default Rate as hereinafter defined), may charge the undersigned a "late charge" of ten percent (10%) of each unpaid installment and/or sum, to reimburse Payee for the extra expense involved in handling delinquent payments, which the undersigned agrees is a fair and reasonable cost for such expense and not a penalty.

5     Loan Agreement.  The terms, covenants, conditions, stipulations, warranties, representations and agreements contained in the Loan Agreement are hereby made a part of this Promissory Note to the same extent as though the Loan Agreement were fully set forth herein.

6.     Prepayment.  The Maker shall have the privilege to prepay this Note in full or in part at any time without penalty or fee.

7.     General Provisions.

(a)     Maker agrees that the obligation evidenced by this Note is an exempt transaction under the Truth-in-Lending Act, 15 U.S.C. § 1601, et seq.

(b)     The parties hereto intend and believe that each provision in this Note comports with all applicable local, state and federal laws and judicial decisions.  However, if any provision or provisions, or if any portion of any provision or provisions, in this Note is found by a court of law to be in violation of any applicable local, state or federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Note to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Note shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and that the rights, obligations and interest of Maker and the holder or holders hereof under the remainder of this Note shall continue in full force and effect.

*Revolving Line of Credit Promissory Note*
*NHTCDF – NEHI*
*(Revolving Line of Credit)*

2

(c)     All agreements herein are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the holders hereof for the use, forbearance or detention of the money to be advanced hereunder exceed the highest lawful rate permissible under applicable usury laws.  If, from any circumstances whatsoever, the fulfillment of any provision hereof, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity and if from any circumstance the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest.  Any action by Payee shall not be enforced to the extent prohibited by the Truth in Lending Act as implemented by Federal Reserve Regulation Z.

(d)     This Note and all provisions hereof shall be binding upon Maker and all persons claiming under or through Maker, and shall inure to the benefit of Payee, together with its successors and assigns, including each owner and holder from time to time of this Note.

(e)     Time is of the essence as to all dates set forth herein.

(f)     Maker agrees that its liability shall not be in any manner affected by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Payee; and Maker consents to any indulgences and all extensions of time, renewals, waivers, or modifications that may be granted by Payee with respect to the payment or other provisions of this Note, and to any substitution, exchange or release of the collateral, or any part thereof, with or without substitution, and agrees to the addition or release of any makers, endorsers, guarantors, or sureties, all whether primarily or secondarily liable, without notice to Maker and without affecting its liability hereunder.

(g)     Maker hereby waives and renounces for itself, its successors and assigns, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension, redemption, appraisement, or exemption and homestead laws now provided, or which may hereafter be provided, by the laws of the United States and of any state thereof against the enforcement and collection of the obligations evidenced by this Note.

(h)     If this Note is placed in the hands of attorneys for collection or is collected through any legal proceedings, Maker promises and agrees to pay, in addition to the principal, interest and other sums due and payable hereon, all reasonable costs of collecting or attempting to collect this Note, including all reasonable attorneys' fees and disbursements.

(i)     All parties now or hereafter liable with respect to this Note, whether Maker, principal, surety, guarantor, endorsee or otherwise hereby severally waive presentment for payment, demand, notice of nonpayment or dishonor, protest and notice of protest.  No failure to accelerate the indebtedness evidenced hereby, acceptance of a past due installment following the expiration of any cure period provided by this Note, any Loan Document or applicable law, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of Payee thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted hereunder or by the laws of the State.  Maker hereby expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing.

(j)     If an Event of Default occurs under the Loan Agreement, the entire unpaid balance of the principal and interest evidenced by this Promissory Note, together with all sums of money advanced by the Payee in accordance with the terms of this Promissory Note or the Loan Agreement and all sums due and owing for any late charge or charges hereunder, shall, at the option of the Payee, become immediately due and payable, without demand made therefor and without notice to any person, notice of the exercise of said option being hereby expressly waived, and shall thereafter, while such default or Event of Default is continuing, until this Promissory Note is paid, bear interest at a per annum rate of interest equal to the maximum statutory rate allowable by the District of Columbia (the "Default Rate"), and Payee shall have all remedies of a secured party under law and equity to enforce the payment of all sums due under this Promissory Note, time being of the essence.

(k)     Successors and Assigns; Participation. The terms of this Note will bind and benefit the legal representatives, successors, and assigns of the parties; provided, however, that the Maker may not assign this Note or any Loan funds, or assign or delegate any of its rights, obligations, or duties to third parties without the prior written consent of Payee.  Payee shall have the right to assign this Note and the Loan Documents or assign or sell the Loan or participation in the Loan to any other persons or entities, or act as agent for any third party in making the Loan, without the consent of or notice to

the Maker, and on any such assignment or sale, Payee shall be released of any and all liabilities, responsibilities, or potential liabilities arising out of this Note or any of the Loan Documents. In the event Payee participates the Loan, the Payee, at its sole discretion, may retain all servicing of the Loan. Payee may disclose to any principal, purchaser, participants, or prospective principals, purchasers, or participants any information or other data or material in Payee's possession relating to the Maker, the Payee and Loan, without the consent of or notice to the Maker.

(l)     The Maker of this Promissory Note waives demand, presentment, protest, notice of dishonor and, any other type of notice with respect to this Promissory Note, including notice of any failure to perform or default of or by any person obligated thereon.

(m)     Maker specifically grants Payee permission to use information related to this Loan and Note in promotional, marketing material and/or reports produced by the Payee.

(n)     THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE DISTRICT OF COLUMBIA AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.

(o)     Maker agrees that all litigation arising out of this Note shall be in the local or federal courts located in the District of Columbia, and Maker hereby waives any defense of inconvenient forum. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, MAKER HEREBY WAIVES TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS.

*[Signature appears on following page.]*

Maker has delivered this Note as of the day and year first set forth above.

**MAKER:**

**North East Housing Initiative, Inc,**
a Maryland nonprofit corporation

By: _____
Garrick R. Good
Executive Director

*Signature page to Revolving Line of Credit Promissory Note*
*NHTCDF – NEHI*
*(Revolving Line of Credit)*

# LOAN MODIFICATION AGREEMENT

THIS LOAN MODIFICATION AGREEMENT (this "**Agreement**") is made and entered into as of September 1, 2022 (the "**Effective Date**") by and between NORTH EAST HOUSING INITIATIVE, INC., a Maryland nonprofit corporation ("**Borrower**"), having an address of 5307 Belair Road, Baltimore, MD 21206, and NATIONAL HOUSING TRUST COMMUNITY DEVELOPMENT FUND, a District of Columbia nonprofit corporation ("**Lender**"), having an address of 1101 30th Street NW, Suite 100A, Washington, D.C. 20007, each of which is sometimes referred to as a "Party" and collectively as the "Parties."

## WITNESSETH

WHEREAS, Borrower and Lender are party to that certain Loan Agreement, dated as of March 7, 2022 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), whereby Lender agreed to lend to Borrower the principal amount of $675,000.00 as a revolving line of credit (the "**Loan**") for the purpose of acquiring and/or renovating a community land trust portfolio of single-family residential properties located in Baltimore, Maryland, as more particularly shown on **Exhibit A** attached hereto (the "**Property**"), and preserving the Property as affordable housing (the "**Project**");

WHEREAS, pursuant to the Loan Agreement, Borrower executed for the benefit of Lender that certain Promissory Note, dated March 7, 2022, in the amount of Six Hundred Seventy-Five Thousand And 00/100ths Dollars ($675,000.00) (as amended, restated, supplemented, or otherwise modified from time to time, the "**Promissory Note**");

WHEREAS, the Promissory Note provided for an interest rate equal to five and one half percent (5.5%) (the "**Interest Rate**");

WHEREAS, Lender intends to sell a participation interest in the Loan to Neighborhood Impact Investment Fund, Inc. ("**NIIF**"), and, as a condition of its purchase of such participation interest, NIIF requires that the Borrower execute an Agreement Not to Transfer, Encumber, Assign or Pledge Assets (the "**Negative Pledge**") and record such Negative Pledge against the Property;

WHEREAS, Lender has agreed to reduce the Interest Rate as detailed herein; and

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to amend the Loan terms and the Loan Documents as follows:

1.      Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

2.      Commencing September 1, 2022, Section 3 of the Promissory Note is replaced in its entirety with the following:

3.     Interest.  The outstanding principal amount of the Loan shall bear interest at the rate of 5.125%.  During the Term of the Loan, payments of interest only shall be paid quarterly in arrears on the 1st day of each calendar quarter (January 1, April 1, July 1, October 1) and continuing through the Maturity Date.  Interest shall be calculated on the basis of a 360-day year and a 30-day month for all full months, and at a daily rate of 0.014236% for the actual number of days elapsed for partial months.

3.     Section 6.2(b) of the Loan Agreement is hereby replaced in its entirety with the following:

(b)     Each Request for Disbursement must be submitted to Lender no later than five (5) business days prior to the requested disbursement and must include the following for review and approval by Lender:

(i)     the amount and date of the requested Advance;
(ii)    the address of the property for which the Advance is to be used;
(iii)   if for an acquisition, a copy of the relevant purchase and sale agreement;
(iv)    invoices for any expense equal to an amount greater than $5,000; and
(v)     an updated tracking budget.

4.     The following is hereby added as Section 6.2(d) of the Loan Agreement:

(d)     Promptly following disbursement of each Advance, Borrower shall submit to Lender a copy of the submitted AHTF Grant reimbursement request equivalent to the amount of the Advance.

5.     During the Term of the Loan, there shall be no limit to the number of properties that Borrower may acquire and add to the Property using the proceeds of the Loan.  At any given time during the Term of the Loan, the proceeds of the Loan may be used for renovations with respect to no more than four (4) properties within the Property at a time; renovations on a property shall be deemed to be complete once the property has passed all relevant local building code inspections and Borrower has received a Certificate of Occupancy and/or final inspection report that does not identify any remaining open items for completion for the property.

6.     Upon execution of this Agreement, or as soon as reasonably practicable thereafter, Borrower shall execute and record the Negative Pledge, dated contemporaneously herewith, against any property within the Project as of the Effective Date, and thereafter and continuing through the Maturity Date, Borrower shall amend the Negative Pledge to encumber any property that is added to the Project.  The cost of recording the Negative Pledge and any subsequent amendments and/or releases will be paid by NIIF.

7.     (Intentionally omitted.)

8.	Except as expressly provided in this Agreement, the Loan Agreement, Promissory Note, and all other Loan Documents remain in full force and effect, unmodified.

9.	This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument and each of which shall be deemed an original.

10.	This Agreement may be duly executed and delivered by a Party by execution and delivery of the signature page of a counterpart to the other Party, and, if delivery is made by electronic format (including portable document format (.pdf)), the executing Party shall promptly deliver, via overnight delivery, a complete original counterpart that it has executed to the other Party, but this Agreement shall be binding on and enforceable against the executing Party whether or not it delivers such original counterpart.

*[Signatures on following page.]*

IN WITNESS HEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

**BORROWER**:

**North East Housing Initiative, Inc.**
a Maryland nonprofit corporation

By: _____
Garrick R. Good
Executive Director

**LENDER:**

**National Housing Trust Community Development Fund,**
a District of Columbia nonprofit corporation

DocuSigned by:

By: *Josh Earn*
DB9F7CB009CF49F...
Josh Earn
Vice President

Signature page to Loan Modification Agreement
NHTCDF – NEHI
(Line of Credit)

4

## Exhibit A

### Property Addresses

The Property is comprised of the following properties all located within Baltimore, MD:

1.    3165 Lyndale Avenue
2.    3444 Elmley Avenue
3.    3440 Elmley Avenue
4.    3438 Lyndale Avenue
5.    3307 Elmora Avenue
6.    3411 Ravenwood Avenue
7.    3413 Elmora Avenue

## SECOND LOAN MODIFICATION AGREEMENT

THIS SECOND LOAN MODIFICATION AGREEMENT (this "**Agreement**") is made and entered into as of May 11, 2023 (the "**Effective Date**") by and between NORTH EAST HOUSING INITIATIVE, INC., a Maryland nonprofit corporation ("**Borrower**"), having an address of 5307 Belair Road, Baltimore, MD 21206, and NATIONAL HOUSING TRUST COMMUNITY DEVELOPMENT FUND, a District of Columbia nonprofit corporation ("**Lender**"), having an address of 1101 30th Street NW, Suite 100A, Washington, D.C. 20007, each of which is sometimes referred to as a "Party" and collectively as the "Parties."

## WITNESSETH

WHEREAS, Borrower and Lender are party to that certain Loan Agreement, dated as of March 7, 2022, as amended by that certain Loan Modification Agreement by and between Borrower and Lender dated as of September 1, 2022 (the "**Loan Agreement**"), whereby Lender agreed to lend to Borrower the principal amount of $675,000.00 as a revolving line of credit (the "**Loan**") for the purpose of acquiring and/or renovating a community land trust portfolio of single-family residential properties located in Baltimore, Maryland, as more particularly shown on **Exhibit A** attached hereto (the "**Property**"), and preserving the Property as affordable housing (the "**Project**");

WHEREAS**,** pursuant to the Loan Agreement, Borrower executed for the benefit of Lender that certain Promissory Note, dated March 7, 2022, in the amount of Six Hundred Seventy-Five Thousand And 00/100ths Dollars ($675,000.00) (as amended, restated, supplemented, or otherwise modified from time to time, the "**Promissory Note**");

WHEREAS, Borrower has been experiencing a period of financial hardship related to the suspension of Affordable Housing Trust Fund grant funding by the City of Baltimore, Maryland (the "AHTF Grant"), and consequently, was unable to make the regular payment of interest on the Loan for the first quarter of calendar year 2023 that was due on March 1, 2023;

WHEREAS, funding under the AHTF Grant is expected to resume in June, 2023; and

WHEREAS, subject to the terms and conditions detailed herein, Lender has agreed to increase the Principal Sum of the Loan by $30,000 to reflect the amount of unpaid interest through June 30, 2023.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to amend the Loan terms and the Loan Documents as follows:

1.	Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

2.	The Principal Sum of the Loan is hereby increased by $30,000.00 (the "Loan Increase Amount") for a total of Seven Hundred and Five Thousand and 00/100ths Dollars

($705,000.00) and shall bear interest as set forth in that certain Amended and Restated Revolving Line of Credit Promissory Note, dated as of the date hereof, made by Borrower for the benefit of lender.

3.       The Loan Increase Amount may only be disbursed for the payment of accrued interest and fees on the Loan.

4.       As a condition of Lender's increase of the Principal Sum of the Loan, upon execution of this Agreement, Borrower agrees to and shall pay to Lender loan modification fee equal to one percent (1.0%) of the Loan Increase Amount ($300.00).  Borrower agrees that all costs of closing payable by Borrower may be withheld by Lender from the proceeds of the Loan Increase Amount at the time of disbursement.

5.       On and as of the date of this Agreement, the representations and warranties set forth in Article II of the Loan Agreement and in the other Loan Documents, made by Borrower are true and correct in all material respects, with the same force and effect as if made on and as of the date of this Agreement (except to the extent such representations and warranties expressly relate to an earlier date and except to the extent of changes in facts or circumstances that have been disclosed to Lender and do not constitute an Event of Default under the Loan Agreement or any other Loan Document).

6.       Except as expressly provided in this Agreement, the Loan Agreement, Promissory Note, and all other Loan Documents remain in full force and effect, unmodified.

7.       No provision or term of this Agreement may be amended, modified, revoked, supplemented, waived or otherwise changed except by a written instrument duly executed by Borrower and Lender and designated as an amendment, supplement or waiver.

8.       This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument and each of which shall be deemed an original.

9.       This Agreement may be duly executed and delivered by a Party by execution and delivery of the signature page of a counterpart to the other Party, and, if delivery is made by electronic format (including portable document format (.pdf)), the executing Party shall promptly deliver, via overnight delivery, a complete original counterpart that it has executed to the other Party, but this Agreement shall be binding on and enforceable against the executing Party whether or not it delivers such original counterpart.

*[Signatures on following page.]*

IN WITNESS HEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

**BORROWER**:

**North East Housing Initiative, Inc.**
a Maryland nonprofit corporation

By: _____
    Garrick R. Good
    Executive Director

**LENDER:**

**National Housing Trust Community Development Fund,**
a District of Columbia nonprofit corporation

By: _____
    Josh Earn
    Vice President

IN WITNESS HEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

**BORROWER:**

**North East Housing Initiative, Inc.**
a Maryland nonprofit corporation

By: _____
        Garrick R. Good
        Executive Director

**LENDER:**

**National Housing Trust Community Development Fund,**
a District of Columbia nonprofit corporation

By: _____
        Josh Earn
        Vice President

*Signature page to Second Loan Modification Agreement*
*NHTCDF – NEHI*
*(Line of Credit)*

3

**AMENDED AND RESTATED**
**REVOLVING LINE OF CREDIT PROMISSORY NOTE**

U.S. $705,000.00                                                           May 11, 2023

FOR VALUE RECEIVED **North East Housing Initiative, Inc.**, a Maryland nonprofit corporation, having an office located at P.O. Box 11762, 5307 Belair Road, Baltimore, MD 21206 ("Maker"), hereby promises to pay to the order of the **National Housing Trust Community Development Fund**, a District of Columbia nonprofit corporation (hereinafter with its successors and assigns called the "Payee"), having an address at 1101 30th Street, NW, Suite 100A, Washington, DC 20007 or at such other place as Payee from time to time may designate in writing, the maximum principal sum of up to **Seven Hundred and Five Thousand and 00/100ths Dollars ($705,000.00**) or so much as may have been disbursed, not to exceed $705,000.00 (the "Principal Sum"), and interest from the date hereof on the balance of principal from time to time outstanding, in United States currency at the rates and at the times hereinafter described, less such amounts as shall have been repaid in accordance with this Amended and Restated Promissory Note (the "Amended Note") (the "Loan").

This Amended Note is an amendment and restatement of that certain Revolving Line of Credit Promissory Note dated March 7, 2022 issued by Maker in favor of Payee and is issued by Maker pursuant to that certain Loan Agreement by and between Borrower and Payee dated March 7, 2022, as modified by that certain Loan Modification Agreement by and between Maker and Payee dated as of September 1, 2022, and as may be further amended, restated, supplemented, or otherwise modified from time to time (the "Loan Agreement"). Capitalized terms used but not defined in this Amended Note have the same meaning as set forth in the Loan Agreement.

1.    Term.  The Loan Term shall begin May 11, 2023 and continue until the Maturity Date, as defined in Section 4, unless sooner accelerated pursuant the terms of this Amended Note or the Loan Agreement.

2.    Advances.  So long as an Event of Default does not exist under the Loan Documents, Maker may borrow and repay and reborrow Advances of Loan funds provided that at any given time the total amount outstanding under the Loan does not exceed the maximum Principal Sum.  The outstanding principal amount of this Amended Note may fluctuate from time to time, but shall be due and payable in full on the Maturity Date.  Notwithstanding the foregoing, the outstanding principal amount of each Advance, together with interest accrued and unpaid thereon, shall be due and payable on the date that is six (6) months from the date such Advance is disbursed to Borrower.  Each Advance hereunder shall bear interest from the date of such Advance, at the rate provided in Section 3 below, until repaid in full together with interest accrued and unpaid thereon.

3.    Interest.  The outstanding principal amount of the Loan shall bear interest at the rate of 5.125%.  During the Term of the Loan, payments of interest only shall be paid quarterly in

*Amended Note*
*NHTCDF – NEHI*
*(Line of Credit)*

1

arrears on the 1st day of each calendar quarter (January 1, April 1, July 1, October 1) and continuing through the Maturity Date.  Interest shall be calculated on the basis of a 360-day year and a 30-day month for all full months, and at a daily rate of 0.014236% for the actual number of days elapsed for partial months.

4.      Payments and Maturity.  The entire balance of unpaid principal, together with interest accrued and unpaid thereon, and all fees and costs due the Payee under this Amended Note shall be due and payable in full on September 7, 2023 (the "Maturity Date"), unless sooner accelerated pursuant the terms of this Amended Note or the Loan Agreement.

Each payment made by Maker shall be applied first to the payment of late charges and any other fees or charges then due, then to interest and then to principal; provided, however, that following an Event of Default, any payments may be applied, at the option of the Payee, in such order and manner as Payee may determine in its sole discretion.  If any of the aforesaid installments or any sums required to be paid under the terms of this Amended Note or under the terms of the Loan Agreement are not paid within seven (7) days of the due date thereof, the Payee, at its option, and in addition to any remedies available to it (including the imposition of the Default Rate as hereinafter defined), may charge the undersigned a "late charge" of ten percent (10%) of each unpaid installment and/or sum, to reimburse Payee for the extra expense involved in handling delinquent payments, which the undersigned agrees is a fair and reasonable cost for such expense and not a penalty.

5      Loan Agreement.  The terms, covenants, conditions, stipulations, warranties, representations and agreements contained in the Loan Agreement are hereby made a part of this Amended Note to the same extent as though the Loan Agreement were fully set forth herein.

6.      Prepayment.  The Maker shall have the privilege to prepay this Amended Note in full or in part at any time without penalty or fee.

7.      General Provisions.

(a)      Maker agrees that the obligation evidenced by this Amended Note is an exempt transaction under the Truth-in-Lending Act, 15 U.S.C. § 1601, et seq.

(b)      The parties hereto intend and believe that each provision in this Amended Note comports with all applicable local, state and federal laws and judicial decisions.  However, if any provision or provisions, or if any portion of any provision or provisions, in this Amended Note is found by a court of law to be in violation of any applicable local, state or federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Amended Note to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this

*Amended Note*
*NHTCDF – NEHI*
*(Line of Credit)*

2

Amended Note shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and that the rights, obligations and interest of Maker and the holder or holders hereof under the remainder of this Amended Note shall continue in full force and effect.

(c)     All agreements herein are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the holders hereof for the use, forbearance or detention of the money to be advanced hereunder exceed the highest lawful rate permissible under applicable usury laws.  If, from any circumstances whatsoever, the fulfillment of any provision hereof, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, _ipso facto_, the obligation to be fulfilled shall be reduced to the limit of such validity and if from any circumstance the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest.  Any action by Payee shall not be enforced to the extent prohibited by the Truth in Lending Act as implemented by Federal Reserve Regulation Z.

(d)     This Amended Note and all provisions hereof shall be binding upon Maker and all persons claiming under or through Maker, and shall inure to the benefit of Payee, together with its successors and assigns, including each owner and holder from time to time of this Amended Note.

(e)     Time is of the essence as to all dates set forth herein.

(f)     Maker agrees that its liability shall not be in any manner affected by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Payee; and Maker consents to any indulgences and all extensions of time, renewals, waivers, or modifications that may be granted by Payee with respect to the payment or other provisions of this Amended Note, and to any substitution, exchange or release of the collateral, or any part thereof, with or without substitution, and agrees to the addition or release of any makers, endorsers, guarantors, or sureties, all whether primarily or secondarily liable, without notice to Maker and without affecting its liability hereunder.

(g)     Maker hereby waives and renounces for itself, its successors and assigns, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension,

redemption, appraisement, or exemption and homestead laws now provided, or which may hereafter be provided, by the laws of the United States and of any state thereof against the enforcement and collection of the obligations evidenced by this Amended Note.

(h)     If this Amended Note is placed in the hands of attorneys for collection or is collected through any legal proceedings, Maker promises and agrees to pay, in addition to the principal, interest and other sums due and payable hereon, all reasonable costs of collecting or attempting to collect this Amended Note, including all reasonable attorneys' fees and disbursements.

(i)     All parties now or hereafter liable with respect to this Amended Note, whether Maker, principal, surety, guarantor, endorsee or otherwise hereby severally waive presentment for payment, demand, notice of nonpayment or dishonor, protest and notice of protest.  No failure to accelerate the indebtedness evidenced hereby, acceptance of a past due installment following the expiration of any cure period provided by this Amended Note, any Loan Document or applicable law, or indulgences granted from time to time shall be construed (i) as a novation of this Amended Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of Payee thereafter to insist upon strict compliance with the terms of this Amended Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted hereunder or by the laws of the State.  Maker hereby expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing.

(j)     If an Event of Default occurs under the Loan Agreement, the entire unpaid balance of the principal and interest evidenced by this Promissory Amended Note, together with all sums of money advanced by the Payee in accordance with the terms of this Amended Note or the Loan Agreement and all sums due and owing for any late charge or charges hereunder, shall, at the option of the Payee, become immediately due and payable, without demand made therefor and without notice to any person, notice of the exercise of said option being hereby expressly waived, and shall thereafter, while such default or Event of Default is continuing, until this Amended Note is paid, bear interest at a per annum rate of interest equal to the maximum statutory rate allowable by the District of Columbia (the "Default Rate"), and Payee shall have all remedies of a secured party under law and equity to enforce the payment of all sums due under this Amended Note, time being of the essence.

(k)     Successors and Assigns; Participation. The terms of this Amended Note will bind and benefit the legal representatives, successors, and assigns of the

*Amended Note*
*NHTCDF – NEHI*
*(Line of Credit)*

4

parties; provided, however, that the Maker may not assign this Amended Note or any Loan funds, or assign or delegate any of its rights, obligations, or duties to third parties without the prior written consent of Payee. Payee shall have the right to assign this Amended Note and the Loan Documents or assign or sell the Loan or participation in the Loan to any other persons or entities, or act as agent for any third party in making the Loan, without the consent of or notice to the Maker, and on any such assignment or sale, Payee shall be released of any and all liabilities, responsibilities, or potential liabilities arising out of this Amended Note or any of the Loan Documents. In the event Payee participates the Loan, the Payee, at its sole discretion, may retain all servicing of the Loan. Payee may disclose to any principal, purchaser, participants, or prospective principals, purchasers, or participants any information or other data or material in Payee's possession relating to the Maker, the Payee and Loan, without the consent of or notice to the Maker.

(l)     The Maker of this Amended Note waives demand, presentment, protest, notice of dishonor and, any other type of notice with respect to this Amended Note, including notice of any failure to perform or default of or by any person obligated thereon.

(m)     Maker specifically grants Payee permission to use information related to this Loan and Amended Note in promotional, marketing material and/or reports produced by the Payee.

(n)     THIS AMENDED NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE DISTRICT OF COLUMBIA AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.

(o)     Maker agrees that all litigation arising out of this Amended Note shall be in the local or federal courts located in the District of Columbia, and Maker hereby waives any defense of inconvenient forum. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, MAKER HEREBY WAIVES TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF THIS AMENDED NOTE OR ANY OF THE OTHER LOAN DOCUMENTS.

*[Signature appears on following page.]*

*Amended Note*
*NHTCDF – NEHI*
*(Line of Credit)*

5

Maker has delivered this Amended Note as of the day and year first set forth above.

**MAKER:**

**North East Housing Initiative, Inc.**
a Maryland nonprofit corporation

By: _____
Garrick R. Good
Executive Director

# THIRD LOAN MODIFICATION AGREEMENT

THIS THIRD LOAN MODIFICATION AGREEMENT (this "**Agreement**") is made and entered into as of September 7, 2023 (the "**Effective Date**") by and between NORTH EAST HOUSING INITIATIVE, INC. , a Maryland nonprofit corporation ("**Borrower**"), having an address of  P.O. Box 11762, 5307 Belair Road, Baltimore, MD 21206, and NATIONAL HOUSING TRUST COMMUNITY DEVELOPMENT FUND, a District of Columbia nonprofit corporation ("**Lender**"), having an address of 1101 30th Street NW, Suite 100A, Washington, D.C. 20007, each of which is sometimes referred to as a "Party" and collectively as the "Parties."

## WITNESSETH

WHEREAS, Borrower and Lender are party to that certain Loan Agreement, dated as of March 7, 2022, as amended by that certain (i) Loan Modification Agreement by and between Borrower and Lender dated as of September 1, 2022, and (ii) Second Loan Modification Agreement by and between Borrower and Lender dated as May 11, 2023 (collectively, as further amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), whereby Lender agreed to lend to Borrower the principal amount of $705,000.00 as a revolving line of credit (the "**Loan**") for the purpose of acquiring and/or renovating a community land trust portfolio of at least five (5) single-family residential real properties located in Baltimore, Maryland as more particularly described in the Loan Agreement ( the **Property**") and preserving the Property as affordable housing (the "**Project**");

WHEREAS**,** pursuant to the Loan Agreement, Borrower executed for the benefit of Lender that certain Amended and Restated Revolving Line of Credit Promissory Note, dated May 11, 2023, in the maximum principal amount of SEVEN HUNDRED AND FIVE THOUSAND AND 00/100THS DOLLARS $705,000.00 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Promissory Note**");

WHEREAS, the Promissory Note provided that the entire unpaid principal balance of the Loan, together with all accrued and unpaid interest thereon, and all other fees, costs and charges, if any, due and payable pursuant to the Loan Documents would be due and payable in full no later than September 7, 2023 (the "**Maturity Date**");

WHEREAS, payments to Borrower by the City of Baltimore, Maryland under the Affordable Housing Trust Fund grant (the "AHTF Grant") awarded to Borrower have been delayed and will not be received by Borrower in time to be used to repay the Loan by the Maturity Date;

WHEREAS, Borrower has requested modification of the Loan to extend the Maturity Date by sixty (60) days to allow additional time for Borrower's receipt of the AHTF Grant funds, and subject to the terms and conditions set forth herein, Lender has agreed to the requested modification as detailed herein;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to amend the Loan terms and the Loan Documents as follows:

1.      Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

2.      The Maturity Date of the Loan is hereby extended to November 6, 2023.

3.      As a condition of Lender's extension of the Maturity Date, upon execution of this Agreement, Borrower agrees to and shall pay to Lender a loan modification fee equal to $1,759.57.

4.      Except as expressly provided in this Agreement, the Loan Agreement, Promissory Note, and all other Loan Documents remain in full force and effect, unmodified.

5.      This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument and each of which shall be deemed an original.

6.      This Agreement may be duly executed and delivered by a Party by execution and delivery of the signature page of a counterpart to the other Party.  Each party agrees that this Agreement may be electronically signed, and that any electronic signatures appearing on this Agreement are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility.

*[Signatures on following page.]*

IN WITNESS HEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

**BORROWER**:

**North East Housing Initiative, Inc.,**
a Maryland nonprofit corporation

By: _Garrick Good_
Garrick R. Good
      Executive Director

**LENDER:**

**National Housing Trust Community Development Fund,**
a District of Columbia nonprofit corporation

By: _Josh Earn_
Josh Earn
Vice President

# FOURTH LOAN MODIFICATION AGREEMENT

THIS FOURTH LOAN MODIFICATION AGREEMENT (this "**Agreement**") is made and entered into as of November 6, 2023 (the "**Effective Date**") by and between NORTH EAST HOUSING INITIATIVE, INC. , a Maryland nonprofit corporation ("**Borrower**"), having an address of  P.O. Box 11762, 5307 Belair Road, Baltimore, MD 21206, and NATIONAL HOUSING TRUST COMMUNITY DEVELOPMENT FUND, a District of Columbia nonprofit corporation ("**Lender**"), having an address of 1101 30th Street NW, Suite 100A, Washington, D.C. 20007, each of which is sometimes referred to as a "Party" and collectively as the "Parties."

## WITNESSETH

WHEREAS, Borrower and Lender are party to that certain Loan Agreement, dated as of March 7, 2022, as amended by that certain (i) Loan Modification Agreement by and between Borrower and Lender dated as of September 1, 2022, and (ii) Second Loan Modification Agreement by and between Borrower and Lender dated as May 11, 2023 (collectively, as further amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), whereby Lender agreed to lend to Borrower the principal amount of $705,000.00 as a revolving line of credit (the "**Loan**") for the purpose of acquiring and/or renovating a community land trust portfolio of at least five (5) single-family residential real properties located in Baltimore, Maryland as more particularly described in the Loan Agreement ( the **Property**") and preserving the Property as affordable housing (the "**Project**");

WHEREAS**,** pursuant to the Loan Agreement, Borrower executed for the benefit of Lender that certain Amended and Restated Revolving Line of Credit Promissory Note, dated May 11, 2023, in the maximum principal amount of SEVEN HUNDRED AND FIVE THOUSAND AND 00/100THS DOLLARS $705,000.00 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Promissory Note**");

WHEREAS, the Promissory Note provided that the entire unpaid principal balance of the Loan, together with all accrued and unpaid interest thereon, and all other fees, costs and charges, if any, due and payable pursuant to the Loan Documents would be due and payable in full no later than September 7, 2023 (the "**Maturity Date**");

WHEREAS, the Maturity Date was extended to November 6, 2023 pursuant to that certain Third Loan Modification Agreement, dated September 7, 2023 by and between Borrower and Lender;

WHEREAS, the Parties desire to further extend the Loan term and subject to the terms and conditions set forth herein, Lender has agreed to extend the Loan accordingly; ;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to amend the Loan terms and the Loan Documents as follows:

1.      Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

2

2.	The Maturity Date of the Loan is hereby extended to January 5, 2024.

3.	Except as expressly provided in this Agreement, the Loan Agreement, Promissory Note, and all other Loan Documents remain in full force and effect, unmodified.

4.	This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument and each of which shall be deemed an original.

5.	This Agreement may be duly executed and delivered by a Party by execution and delivery of the signature page of a counterpart to the other Party.  Each party agrees that this Agreement may be electronically signed, and that any electronic signatures appearing on this Agreement are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility.

*[Signatures on following page.]*

3

IN WITNESS HEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.


**BORROWER**:

**North East Housing Initiative, Inc.,**
a Maryland nonprofit corporation

By: _Garrick Good_
       D41527A649AE42A
       Garrick R. Good
       Executive Director




**LENDER:**

**National Housing Trust Community Development Fund,**
a District of Columbia nonprofit corporation

By: _Josh Earn_
       DB9E7CB009CE49F
       Josh Earn
       Vice President

## FIFTH LOAN MODIFICATION AGREEMENT

THIS FIFTH LOAN MODIFICATION AGREEMENT (this "**Agreement**") is made and entered into as of January 5, 2024 (the "**Effective Date**") by and between NORTH EAST HOUSING INITIATIVE, INC., a Maryland nonprofit corporation ("**Borrower**"), having an address of P.O. Box 11762, 5307 Belair Road, Baltimore, MD 21206, and NATIONAL HOUSING TRUST COMMUNITY DEVELOPMENT FUND, a District of Columbia nonprofit corporation ("**Lender**"), having an address of 1101 Connecticut Avenue NW, Suite 700, Washington, D.C. 20036, each of which is sometimes referred to as a "Party" and collectively as the "Parties."

## WITNESSETH

WHEREAS, Borrower and Lender are party to that certain Loan Agreement, dated as of March 7, 2022, as amended by that certain (i) Loan Modification Agreement by and between Borrower and Lender dated as of September 1, 2022, and (ii) Second Loan Modification Agreement by and between Borrower and Lender dated as May 11, 2023 (collectively, as further amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), whereby Lender agreed to lend to Borrower the principal amount of $705,000.00 as a revolving line of credit (the "**Loan**") for the purpose of acquiring and/or renovating a community land trust portfolio of at least five (5) single-family residential real properties located in Baltimore, Maryland as more particularly described in the Loan Agreement ( the **Property**") and preserving the Property as affordable housing (the "**Project**");

WHEREAS, pursuant to the Loan Agreement, Borrower executed for the benefit of Lender that certain Amended and Restated Revolving Line of Credit Promissory Note, dated May 11, 2023, in the maximum principal amount of SEVEN HUNDRED FIVE THOUSAND AND 00/100THS DOLLARS $705,000.00 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Promissory Note**");

WHEREAS, the Promissory Note provided that the entire unpaid principal balance of the Loan, together with all accrued and unpaid interest thereon, and all other fees, costs and charges, if any, due and payable pursuant to the Loan Documents would be due and payable in full no later than September 7, 2023 (the "**Maturity Date**");

WHEREAS, the Maturity Date was extended to (i) November 6, 2023 pursuant to that certain Third Loan Modification Agreement, dated September 7, 2023 by and between Borrower and Lender, and (ii) January 5, 2024 pursuant to that certain Fourth Loan Modification Agreement, dated November 6, 2023 by and between Borrower and Lender;

WHEREAS, subject to the terms and conditions set forth herein, Lender has agreed to further extend the Maturity Date and convert the Loan from a revolving line of credit to a term loan;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to amend the Loan terms and the Loan Documents as follows:

1.    Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

2.    The Maturity Date of the Loan is hereby extended to the earlier of (i) Borrower's receipt of Affordable Housing Trust Fund grant funds, or (ii) July 5, 2024.

3.    Commencing on the Effective Date, the Loan shall no longer be revolving, and no further Advances or disbursements of Loan funds shall be made pursuant to the Loan Documents.

4.    Section 2 of the Promissory Note is hereby deleted in its entirety.

5.    Borrower shall execute and deliver to Lender a Collateral Assignment and Pledge Agreement, dated of even date herewith, assigning and pledging Borrower's rights to and interest in the award to Borrower from the City of Baltimore of certain Affordable Housing Trust Fund grant funds.

6.    Upon execution of this Agreement, Borrower shall pay to Lender a modification fee equal to one percent (1.0%) of the outstanding balance of the Loan as of the date hereof.

7.    Except as expressly provided in this Agreement, the Loan Agreement, Promissory Note, and all other Loan Documents remain in full force and effect, unmodified.

8.    This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument and each of which shall be deemed an original.

9.    Each party agrees that this Agreement may be electronically signed, and that any electronic signatures appearing on this Agreement are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility.

*[Signatures on following page.]*

IN WITNESS HEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

**BORROWER**:

**North East Housing Initiative, Inc.,**
a Maryland nonprofit corporation

By: _Garrick R. Good_
DocuSigned by:
D41527A049AF42A...
Garrick R. Good
Executive Director

**LENDER:**

**National Housing Trust Community Development Fund,**
a District of Columbia nonprofit corporation

By: _Josh Earn_
DocuSigned by:
DB9F7CB009CF49F...
Josh Earn
Vice President

# COLLATERAL ASSIGNMENT AND PLEDGE AGREEMENT

This Collateral Assignment and Pledge Agreement (this "**Assignment**") is entered into by NORTH EAST HOUSING INITIATIVE, INC., a Maryland nonprofit corporation (the "**Assignor**"), having an address of P.O. Box 11762, 5307 Belair Road, Baltimore, MD 21206, as of January 5, 2024, to and in favor of NATIONAL HOUSING TRUST COMMUNITY DEVELOPMENT FUND, a District of Columbia nonprofit corporation ("**Assignee**"), having an address of 1101 Connecticut Avenue, NW, Suite 700, Washington, D.C. 20036.

## Recitals

WHEREAS, this Assignment is made as collateral and security for a loan made by Assignee to Assignor pursuant to that certain Loan Agreement, dated as of March 7, 2022, as amended by that certain (i) Loan Modification Agreement by and between Borrower and Lender dated as of September 1, 2022, and (ii) Second Loan Modification Agreement by and between Borrower and Lender dated as May 11, 2023 (collectively, as further amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), whereby Lender agreed to lend to Borrower the principal amount of $705,000.00 as a revolving line of credit (the "**Loan**");

WHEREAS, the City of Baltimore, Maryland acting by and through its Department of Housing and Community Development (the "**City**") awarded a grant of Affordable Housing Trust Funds to Assignor in the total amount of $750,000.00 pursuant to that certain award letter dated January 25, 2022 (the "**AHTF Grant**"), the terms of which AHTF Grant are memorialized in that certain Grant Agreement by and between the City and Assignor dated as of December 13, 2022 (the "**Grant Agreement**");

WHEREAS, as a condition of executing that certain Fifth Loan Modification Agreement, dated as of the date hereof, Assignee requires that Assignor assign all of its interests in and rights to the disbursement of AHTF Grant funds under the Grant Agreement (the "**Assigned Rights**") to Assignee as security for the Loan.

## Agreement

NOW, THEREFORE, as required by the Loan and in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby covenants and agrees with and for the benefit of Assignee as set forth below:

1.    As security for the payment and performance of the Loan and the Loan Agreement, Assignor hereby grants a security interest in and assigns to Assignee, its successors and assigns, all of its right, title and interest in and to the Assigned Rights, to any and all extensions, renewals, substitutions and modifications thereof, and to all rights and options thereunder.

2.    Assignor hereby covenants and warrants to Assignee that it has not executed any

prior assignment or pledge of the Assigned Rights and that except as set forth herein, the agreements setting forth the Assigned Rights are in full force and effect.

3.      Neither this Assignment nor any action or actions on the part of Assignee shall constitute an assumption by Assignee of any of the obligations of Assignor under the Grant Agreement, and Assignor shall continue to be liable for all obligations thereunder.

4.      Assignor agrees to make, execute and deliver all such further or additional agreements, documents and other undertakings as may be necessary to satisfy the intents and purposes hereof and to perfect the assignment made hereby, and Assignor hereby covenants and agrees to facilitate in all reasonable ways Assignee's exercise of its rights under this Assignment.

5.      The security interest being granted hereunder is effective immediately. The assignment of Assignor's Assigned Rights and Assignee's right to enforce such assignment shall be effective upon the earlier of (i) an Event of Default under the Loan Agreement, or (ii) the Maturity Date of the Loan as defined in that certain Amended and Restated Revolving Line of Credit Promissory Note, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

6.      This Assignment and the agreements and undertaking of Assignor hereunder shall be binding upon Assignor and its successors and assigns and shall inure to the benefit of Assignee and its successors, nominees, assignees and any purchaser of any interest in the Loan.

7.      All notices, demands, requests or other communications to be sent by one party to the other hereunder or required by law shall be given and become effective as provided in the Loan Agreement, and shall be delivered to the following addresses:

If to Assignor:      North East Housing Initiative, Inc.
                     P.O. Box 11762
                     5307 Belair Road
                     Baltimore, MD 21206
                     Attn: Garrick R. Good
                     Email: garrick.good@nehihomes.org

If to Assignee:      National Housing Trust Community Development Fund
                     1101 Connecticut Avenue, NW, Suite 700
                     Washington, D.C. 20036
                     Attn:   Andrea Sevanto, Director of CDFI Asset Management
                     Email: asevanto@nhtinc.org
                     Copy to: Alice Hamilton Evert, Legal Counsel,
                     ahamilton@nhtinc.org

8.      No indulgence, waiver, election or non-election by Assignee under the Loan Agreement shall affect this Assignment.

9.      This Assignment shall not be modified, changed, altered or amended in any way

2

*Collateral Assignment and Pledge Agreement*
*NHTCDF – North East Housing Initiative, Inc.*

except through written amendments signed by all of the parties hereto.

10. It is agreed that the laws of the District of Columbia shall govern the construction and interpretation of this Assignment and the rights and obligations set forth herein.

11. The invalidity or unenforceability of any portion of this Assignment shall not affect the remaining provisions and portions hereof.

12. The terms and provisions of this Assignment shall terminate upon the irrevocable repayment of the Loan in full and the cancellation of record of the Loan, unless the same is earlier terminated by a termination agreement executed by Assignee and delivered to Assignor.

13. This Assignment may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument and each of which shall be deemed an original.

14. Each party agrees that this Assignment may be electronically signed, and that any electronic signatures appearing on this Assignment are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility.

[SIGNATURE PAGE TO FOLLOW]

3

IN WITNESS WHEREOF, this Assignment has been duly executed by Assignor as of the date first set forth above.


**ASSIGNOR:**

**North East Housing Initiative, Inc.,**
a Maryland nonprofit corporation

By:    *Garrick R. Good*

Garrick R. Good
Executive Director

# Exhibit A

# Grant Agreement







**AUDITS HAS REVIEWED AND HAS NO OBJECTIONS TO B/E APPROVAL** EXPIRES IN 90 DAYS

*By Gloria_Harper at 12:09:48 PM, 12/9/2022*

**TO:**     Board of Estimates, Office of the Comptroller

**FROM:** Alice Kennedy, Commissioner

**SUBMITTING AGENCY:** Department of Housing and Community Development

**DATE:**6/29/22

**SUBJECT:**  Approval of a Grant Agreement with North East Housing Initiative, Inc. (NEHI)

**CONTRACT/GRANT NUMBER:**  AHTF_RND2_CAP_012 NEHI1

**ACTION REQUESTED OF B/E:** Your Honorable Board is requested to approve the Grant Agreement between the Department of Housing and Community Development Affordable Housing Trust Fund and North East Housing Initiative, Inc. (NEHI), in the amount of Seven Hundred and Fifty-Thousand Dollars ($750,000.00), to be used for the redevelopment of ten (10) homeownership units in the Belair Edison/Four by Four community.  The term of the Agreement is twenty-four (24) months effective from the date of approval.

**PERIOD OF CONTRACT/AGREEMENT:** Twenty-Four (24) months

**AMOUNT OF MONEY AND SOURCE:**

From Acct:  9910  PRJ000706  CAP009588   Affordable Housing Trust Fund      ($750,000.00)

**BACKGROUND/EXPLANATION:**

In January 2022, the Baltimore City Department of Housing and Community Development (DHCD) made a commitment to North East Housing Initiative, Inc. (NEHI), a non-profit corporation formed and in good standing in the State of Maryland, by way of a grant in the amount of Seven Hundred and Fifty-Thousand Dollars ($750,000.00), for the rehabilitation of ten (10) homeownership units in the Belair Edison/Four by Four community, that will be designated for permanently affordable housing. These units are to be inhabited by citizens of Baltimore City with incomes at and below 50% of the Area Median Income ("AMI"), in an effort to create permanently affordable housing in Baltimore City.

In order to fully implement the permanently affordable housing, the City of Baltimore is working with NEHI, Inc. to support this project. On January 25, 2022, the Department of Housing and Community Development signed a conditional award commitment, which is pending on Board of Estimates approval to make the funds available for affordable housing to be created and support unit development.

This commitment provides $750,000.00 in funds to NEHI, Inc., to fund the construction, renovation and preparation of affordable units as is the purpose and mission of the Affordable Housing Trust Fund.

The Grantee may submit a written request to DHCD asking for (x) a one (1) year extension to the term of this Agreement and/or (y) a budget reallocation not to exceed twenty (20) percent of the Grant Funds.

The request should include an explanation for why an extension and/or budget reallocation is needed and be provided to DHCD at least thirty (30) days prior to the Termination Date. The request must include all required documentation to justify the need for an extension. The Housing Commissioner or their designee will approve or deny the request in writing.

This award is also contingent upon a signed and recorded "Declaration of Restrictive Covenants" form which has been included in this submission. This "Declaration of Restrictive Covenants" places a restriction on the use and sale of the land in order to enforce the goals of the Affordable Housing Trust Fund's purpose to create affordable housing for citizens of Baltimore City.  The "Declaration of Restrictive Covenants" is to be recorded in Maryland Land Records for each of the ten (10) properties included in the Project and will restrict the sale of each property to buyers that meet income requirements as specified in the "Declaration of Restrictive Covenants".

**MBE/WBE PARTICIPATION:** The Grantee has signed a Commitment to Comply

**AFFECTED COUNCIL DISTRICT:** 13th District

**EMPLOY BALTIMORE:** N/A

**LIVING WAGE:** Applicable

**LOCAL HIRING:** Applicable

**1% FOR PUBLIC ART:** N/A

*The headers below are for use by reviewing departments ONLY.  Please leave them as blank spaces for official endorsements and signatures.*

**FINANCE HAS REVIEWED:**

**LAW DEPARTMENT HAS REVIEWED:**

**MWBOO HAS REVIEWED:**

**AUDITS HAS REVIEWED:**

**APPROVED BY THE BOARD OF ESTIMATES:**

Clerk, Board of Estimates

1/11/2023

GRANT AGREEMENT
BETWEEN
MAYOR AND CITY COUNCIL OF BALTIMORE
AND
NORTH EAST HOUSING INITIATIVE, INC.

THIS GRANT AGREEMENT (this "Agreement"), made on the Effective Date (defined below), by and between the **MAYOR AND CITY COUNCIL OF BALTIMORE**, a Maryland Municipal Corporation, (the "CITY"), acting by and through its Department of Housing and Community Development ("DHCD") and **NORTH EAST HOUSING INITIATIVE, INC.,** a non-profit corporation formed and in good standing in the State of Maryland ("GRANTEE").

WHEREAS, on September 1, 2021, DHCD released a Notice of Funding Availability (NOFA) for its Affordable Housing Trust Fund Community Land Trust- Single Family Homeownership Program;

WHEREAS, GRANTEE submitted an Application, the Application was evaluated by DHCD, and determined to satisfy the goals and objectives of DHCD's Affordable Housing Trust Fund Community Land Trust Program;

WHEREAS, GRANTEE was notified on January 25, 2022 that it had received an award of Affordable Housing Trust Fund, Community Land Trust Capital Funds in the amount of Seven Hundred Fifty Thousand Dollars ($750,000.00) (the "GRANT FUNDS"), as set forth in the Award Letter attached hereto as **Exhibit A** and incorporated herein;

WHEREAS, the CITY and GRANTEE desire to formalize the use of GRANT FUNDS subject to the terms and conditions of this Agreement; and

NOW, THEREFORE, in consideration of the foregoing recitals and mutual covenants set forth below and for other good and valuable consideration receipt and sufficiency of which is hereby acknowledged, the CITY, GRANTEE agree as follows:

1. The RECITALS are hereby made a part of this Agreement.

2. **GRANT CONDITIONS**
   A. Grant Amount. The CITY hereby awards a grant of GRANT FUNDS to GRANTEE in an amount not to exceed Seven Hundred Fifty Thousand Dollars ($750,000.00) to be used solely for GRANTEE'S Community Land Trust Program to develop and sell ten (10) of its low-income Community Land Trust properties in Baltimore City, which may include 3438 Lyndale Avenue, 3143 and 3307 Elmora Avenue, 3411 Ravenwood Avenue, 3440 Elmley Avenue[1] (the "Project"), pursuant to an approved ground lease as referenced in the Declaration of Restrictive Covenants, generally in the form attached hereto as **Exhibit B** and incorporated herein ("Declaration of Covenants"), and as further described in the Approved Project Budget attached hereto as **Exhibit C** and incorporated herein. The GRANT FUNDS shall be made payable to GRANTEE. Any expenses/costs incurred by GRANTEE in excess of this amount shall be the sole responsibility of GRANTEE.

---

[1] Property addresses are subject to change and/or be added as they are identified by the GRANTEE. Prior to any GRANT FUNDS being reimbursed for a particular property, such property addresses must be identified and approved by the Commissioner and attached only to DHCD'S and the GRANTEE'S copies of the fully executed Agreement.

**B.** <u>Term of Agreement</u>.  The term of this Agreement shall begin upon approval by the Board of Estimates of Baltimore City (the "Effective Date") and shall expire twenty-four (24) months thereafter (the "Termination Date").  It is understood that while the term of this Agreement ends on the Termination Date, the reporting obligations and payments terms set forth in this Agreement shall continue until such time as the reporting and payment obligations are satisfied by the parties in accordance with this Agreement. In no event shall the reporting and payment obligations extend more than one (1) month past the Termination Date. The termination of this Agreement does not in any way impact the term and GRANTEE obligations set forth in the Declaration of Covenants recorded for each of the properties covered by the Project. Any obligations of the GRANTEE set forth in the Declaration of Covenants survive the termination of this Grant Agreement.

**C.** <u>Amendments and Term Extension</u>.

   i. GRANTEE may submit a written request to DHCD asking for (x) a one (1) year extension to the term of this Agreement; and/or (y) a budget reallocation not to exceed twenty (20) percent of the Grant Funds.  The request should include an explanation for why an extension and/or budget reallocation is needed and be provided to DHCD at least thirty (30) days prior to the Termination Date.  The request must include all required documentation to justify the need for an extension.  The Housing Commissioner or their designee will approve or deny the request in writing.  GRANTEE may not expend GRANT FUNDS under a reallocated budget until such time they have received written approval from the Housing Commissioner.  Such unapproved expenditure of GRANT FUNDS could result in a failure to approve GRANT FUNDS for payment.  No additional funds or other modifications may be added to this Agreement without approval from the Board of Estimates of Baltimore City (the "BOARD").

   ii. In all other instances, including, but not limited to, modifications to this Agreement or GRANT FUNDS increases, this Agreement may be extended or revised <u>only</u> by a written amendment signed by both parties and approved by the BOARD.

**D.** <u>Acknowledgement of City Support</u>.  GRANTEE agrees that the CITY's support shall be acknowledged in all literature, signage, written materials and at events as follows: "Funding has been made possible through the Affordable Housing Trust Fund Community Land Trust Program from the Mayor and City Council of Baltimore."

**E.** <u>Errors/Omissions of Work</u>.  In the event the CITY is not reasonably satisfied with the work performed or with the invoices submitted for payment, GRANTEE shall require its contractor(s), architect(s), engineer(s), employee(s), or agent(s) to promptly correct any errors, omissions or to perform additional work as may be necessary to the City's reasonable satisfaction.  City shall provide written notice to GRANTEE of the work to which the CITY is not reasonably satisfied promptly upon the CITY's determination that the work is not satisfactory.

**F.** <u>Prohibited Use of Funds</u>.  GRANTEE agrees that GRANT FUNDS shall not be used for any partisan political activity, to further the election or defeat of any candidate for public office or to provide programmatic support to organizations or activities associated with or promoting a religious institution or affiliation.

**G.** <u>No Additional Funds</u>.  GRANTEE agrees that any additional funds needed to fund the Project shall be provided from its own source of funds.

**H.** <u>Latest Date for Eligible Expenditures</u>.  Expenditures made after the Termination Date shall not be eligible for reimbursement.

**I.** <u>Sales Requirement</u>.  GRANTEE agrees to sell all ten (10) properties included in the Project by no later than the Termination Date in accordance with the terms of the Declaration of Covenants (**Exhibit B**).

3.  **CONDITIONS PRECEDENT TO RECEIVING GRANT FUNDS**
    A.  In order to receive a disbursement of GRANT FUNDS for each of the ten (10) properties included in the Project, GRANTEE shall first provide DHCD with the following related to the applicable property:
        i.    Copy of the fully executed finalized HUD-1 settlement sheet for the applicable property;
        ii.   Deed showing proof of sale to Grantee for the applicable property;
        iii.  Copy of executed contracts with GRANTEE'S general contractor and consultant;
        iv.   Construction schedule for the Project;
        v.    An executed and recorded Declaration of Covenants for the applicable property, generally in the same form as **Exhibit B**;
        vi.   Proof of builder's risk or commercial property insurance for the applicable property, as appropriate;
        vii.  Copy of Insurance Certificate in accordance with the requirements set forth in Section 9 below;
        viii. Proof of sufficient approved financing, including fully executed applicable loan documents, to sufficiently fund the total Project;
        ix.   Detailed invoices and proof of payment by GRANTEE;
        x.    Evidence that work subject to inspection has been approved and passed such inspection; and
        xi.   Copy of the GRANTEE'S Contractor's Performance and Payment Bonds, if any;
        xii.  Copies of all necessary building permits, licenses and approvals as required by federal, state and local law and regulations to undertake work funded by the GRANT FUNDS.

4.  **DISBURSEMENT OF GRANT FUNDS**
    A.  Retainage withheld from Disbursements. DHCD shall retain ten percent (10%) of the total GRANT FUNDS in the amount of Seventy-Five Thousand Dollars ($75,000.00) (the "Retainage") until Project completion and the DHCD's receipt of a copy of the Use and Occupancy Permit for all ten (10) properties included in the Project.
    B.  Subsequent Reimbursement Payments. On or before the Termination Date, GRANTEE may submit up to four (4) Requests for Payment using the Request for Payment Form, attached hereto as **Exhibit D** and incorporated herein, for the available GRANT FUNDS, not withheld Retainage, for expenses incurred by GRANTEE between January 25, 2022 and the Termination Date. DHCD will only reimburse payments made for work that is included in the Approved Project Budget **(Exhibit C)**, and only after (DHCD has verified that GRANTEE satisfied all Conditions Precedent identified in Section 3 above and all other terms of the Agreement. Following DHCD'S review and approval of each of GRANTEE'S Request for Payment and DHCD'S verification that GRANTEE has satisfied all Conditions Precedent set forth in Section 3 above for the applicable property(ies) for which GRANT FUNDS are being disbursed, DHCD shall disburse the applicable portion of GRANT FUNDS to GRANTEE.
    C.  Retainage Payment.    On or before the Termination Date following Project completion and the issuance of the Use and Occupancy Permit for all ten (10) properties included in the Project, GRANTEE may submit a Request for Payment of the Retainage, using the Request for Payment Form (**Exhibit D**).  Following DHCD's review and approval of GRANTEE'S Request for Payment and DHCD's verification that GRANTEE has (i) satisfied the Conditions Precedent set forth in Section 3 above; (ii) completed the Project

to DHCD's satisfaction; and (iii) submitted copies of all ten (10) Use and Occupancy Permits to DHCD, DHCD shall disburse the Retainage to GRANTEE.

**D.** <u>Liquidation of Funds</u>.   The CITY reserves the right to reallocate any unexpended GRANT FUNDS remaining upon the expiration of this Agreement.

**E.** <u>Review of payment requests</u>.  DHCD shall review a Request for Payment within ten (10) business days from receipt of the request and respond with follow up questions, issues or approval.

**F.** <u>Distribution of payment</u>. The CITY shall make best efforts to distribute payment within thirty (30) calendar days from approval of the payment request.

**G.** <u>Misuse of GRANT FUNDS</u>. In the event GRANTEE applies GRANT FUNDS to an unapproved expenditure, GRANTEE agrees to immediately refund the CITY such amount from other sources.  In the event GRANTEE fails to sell all ten (10) properties included in the Project on or before the Termination Date, in accordance with the terms of the Declaration of Covenants (**Exhibit B**), then GRANTEE agrees to immediately refund the CITY such portions of the GRANT FUNDS allocated to the unsold property(ies).

## 5.   **REPORTING REQUIREMENTS**

**A.** <u>Final Report</u>.  Within thirty (30) days of the Termination Date or earlier termination of this Grant Agreement, GRANTEE shall submit to the CITY a final report, indicating all invoices, expenditures, activities, and income verification of the buyers of all ten (10) properties.

**B.** <u>Report Information</u>.  Reports should include a brief description of the Project, general project progress and obstacles, status of financing, and status of development partnerships.  Reports should include an update on project schedule.  Failure to submit the report may result in withholding payment.

**C.** <u>Additional Reports.</u> At such times and in such formats as the CITY may require, there shall be furnished to the CITY such statements, records, reports, data and information the CITY may request pertaining to matters covered by this Agreement.

## 6.   **RECORDS/AUDITS**

A. <u>Establishment and Maintenance of Records.</u>  GRANTEE shall maintain books, records, documents, and other evidence and adopt accounting procedures and practices that sufficiently and properly reflect all direct and indirect costs of any nature expended in the performance of this Agreement, and in accordance with all applicable regulations that have been or will be provided by the CITY to GRANTEE.  Records will be retained for a period of at least three (3) years after the expiration or termination of this Agreement or three (3) years after any audit pertaining to this Agreement.  If the GRANTEE should cease to exist as a corporate entity, custody of the records will be transferred to the CITY.

B. <u>Availability of Records</u>.  GRANTEE agrees that they will make such records available for inspection, reproduction, transcription, or audit by the CITY, its auditors or monitors at reasonable intervals whenever GRANTEE'S office is open for the normal conduct of business.

C. <u>Audit</u>.  At any time during business hours and as often as the CITY may deem necessary, there shall be made available to the CITY for examination, GRANTEE'S records with respect to matters covered by this Agreement. GRANTEE shall permit the CITY to audit, examine and make excerpts or transcripts from such records, and to make audits of all contracts, invoices, materials, records of personnel, conditions of employment and other data relating to matters covered by this Agreement.

D. <u>Overpayment.</u>  If determined by an audit that the CITY overpaid GRANTEE, GRANTEE shall be responsible for repayment of any and all audit exceptions. GRANTEE shall be

billed by the CITY for the amount of the audit exceptions and shall promptly submit payment. Notwithstanding the foregoing, the CITY must ensure not to collect more than the amount of the audit exception in total when collecting from GRANTEE.

E. <u>Survival of Obligation.</u>    These obligations shall survive the expiration or earlier termination of this Agreement.

## 7. <u>INDEMNIFICATION</u>

GRANTEE shall indemnify, defend and hold harmless the CITY, its elected/appointed officials, departments, employees, agents and servants from any and all claims, demands, suits and actions, including attorney's fees and court costs connected therewith, brought against the CITY, its elected/appointed officials, employees, agents, and servants arising as a result of any direct or indirect, willful, or negligent act or omission of GRANTEE, its employees, agents and servants arising out of this Agreement. This indemnification provision shall survive termination of this Agreement.

## 8. <u>COMPLIANCE WITH LAWS</u>

GRANTEE shall comply with all federal, state, and local laws, ordinances, rules and regulations, and applicable codes of ethics pertaining to or regulating the services to be performed pursuant to this Agreement, including those now in effect and hereafter adopted. This obligation shall include, but not be limited to, responsibility for confidentiality of protected information. Any violation of such laws, ordinances, rules and regulations, and applicable codes of ethics shall constitute a material breach of this Agreement and shall entitle the CITY to terminate this Agreement immediately upon delivery of written notice of termination to GRANTEE.

## 9. <u>INSURANCE</u>

A. GRANTEE shall not be approved for payment until GRANTEE has obtained all the insurance required under this Section. Further, such insurance must remain in force during the life of this Agreement.

B. GRANTEE will name the Mayor and City Council of Baltimore City as an additional insured on all policies. GRANTEE, at its sole expense, shall procure and maintain during the life of this Agreement the following required insurance coverage set forth below:

  i. <u>Commercial General Liability Insurance</u> at limits of not less than One Million Dollars ($1,000,000.00) per occurrence for claims arising out of bodily injuries or death, and property damages. With those policies with aggregate limits, a minimum limit of Three Million Dollars ($3,000,000.00) is required. Such insurance shall include contractual liability insurance;

  ii. <u>Business Automobile Liability</u> at limits of not less than One Million Dollars ($1,000,000.00) per occurrence for all claims arising out of bodily injuries or death and property damages. The insurance shall apply to any owned, non-owned, leased, or hired automobiles used in the performance of this Agreement; and

  iii. <u>Worker's Compensation</u> coverage as required by the State of Maryland, as well as any similar coverage required for this work by applicable Federal or "Other States" State Law;

  iv. <u>Blanket Commercial Crime Coverage</u> or <u>Employment Dishonesty Insurance</u> at a limit of Twenty-Five Thousand Dollars ($25,000.00) per occurrence is required. The Mayor and City Council of Baltimore is to be named as Loss Payee; and

  v. <u>Directors and Officers Insurance</u> at a limit of not less, than One Million Dollars ($1,000,000.00) and name the City as an additional insured, in the event that services delivered pursuant to this Agreement, either directly or indirectly

involve or require professional services. "Professional Services" for the purpose of this Agreement shall mean any services provided by a licensed professional.

C. Additionally, GRANTEE shall require its consultants and contractors performing work on the Project to procure and maintain during the life of this Agreement the following required insurance coverage set forth below and name the Mayor and City Council of Baltimore City as an additional insured on all applicable policies:

   i. Commercial General Liability Insurance at limits of not less than One Million Dollars ($1,000,000.00) per occurrence for claims arising out of bodily injuries or death, and property damages. With those policies with aggregate limits, a minimum limit of One Million Dollars ($1,000,000.00) is required. Such insurance shall include contractual liability insurance;

   ii. Errors and Omissions Insurance at a limit of not less, than One Million Dollars ($1,000,000.00) and name the City as an additional insured, in the event that services delivered pursuant to this Agreement, either directly or indirectly involve or require professional services. "Professional Services" for the purpose of this Agreement shall mean any services provided by a licensed professional;

   iii. Business Automobile Liability at limits of not less than One Million Dollars ($1,000,000.00) per occurrence for all claims arising out of bodily injuries or death and property damages. The insurance shall apply to any owned, non-owned, leased, or hired automobiles used in the performance of this Agreement; and

   iv. Builders Risk Insurance at limits of not less than One Million Dollars ($1,000,000.00) per occurrence for all claims arising out of bodily injuries or death and property damages.

D. Coverage of CITY Officials. The Mayor and City Council of Baltimore, its elected/appointed officials, employees, agencies, and agents, shall be covered, by endorsement, as additional insured as respect to liability arising out of activities performed by or on behalf of GRANTEE in connection with this Agreement.

E. Application of Insurance. GRANTEE'S insurance shall apply separately to each insured against whom claim is made and/or lawsuit is brought, except with respect to the limits of the insurer's liability.

F. Negligence. To the extent of GRANTEE'S negligence, GRANTEE'S insurance coverage shall be primary insurance with respects to the CITY, its elected/appointed officials, employees, agencies and agents. Any insurance and/or self-insurance maintained by the CITY, its elected/appointed officials, employees, agencies or agents shall not contribute with GRANTEE'S insurance or benefit GRANTEE in any way.

G. Cancellation of Coverage. Coverage shall not be suspended, voided, canceled, reduced, in coverage or in limits, except by the reduction of the applicable aggregate limit by claims paid, until after forty-five (45) days' prior written notice has been given to the CITY. There will be an exception for non-payment of premium, which is ten (10) days' notice of cancellation.

H. Rating of Insurance. Insurance is to be placed with insurers with a Best's rating of no less than A:VII, or, if not rated with Best's with minimum surpluses the equivalent of Best's surplus size VII and must be licensed/approved to do business in the State of Maryland.

I. Certificate of Insurance. GRANTEE shall each furnish the CITY with a "Certificate of Insurance" and copies of the additional insured endorsement as verification that coverage is in force. The CITY reserves the right to require complete copies of insurance policies.

J.  <u>Failure to Obtain Insurance</u>.  Failure to obtain insurance coverage as required or failure to furnish Certificate(s) of Insurance as required may render this Agreement null and void; provided, however, that no act or omission of the CITY shall in any way limit, modify or affect the obligations of GRANTEE under any provision of this Agreement.

## 10. MINORITY BUSINESS ENTERPRISE/WOMEN'S BUSINESS ENTERPRISES

The CITY has an interest in and policy of encouraging the equitable utilization of Minority-Owned Businesses (MBEs) and Women-Owned Businesses (WBEs).  Article 5, Subtitle 28 of the Baltimore City Code (the "City Code") is incorporated into this Agreement by reference.  In identifying available City-certified MBEs and WBEs, GRANTEE is encouraged to use the MBE/WBE Directory available from the Minority and Women's Business Opportunity Office, (410) 396-4355.  A signed copy of the GRANTEE'S Commitment to Comply is attached hereto as **Exhibit E** and incorporated herein.

## 11. EMPLOY BALTIMORE

Notwithstanding any provisions, GRANTEE shall comply with the terms of the Executive Order dated June 9, 2011 promulgated by Stephanie Rawlings-Blake, Mayor of the City of Baltimore, as amended from time to time and incorporated herein by reference.  This Executive Order implements the Employ Baltimore Program established by the Mayor's Office of Employment Development ("MOED") designed to create opportunities for businesses that receive CITY contracts to meet their workforce needs; to access qualified City job seekers; and to ensure that City dollars contribute to the local economy.  For additional information, please contact MOED at 443-984-3014.

## 12. LOCAL HIRING

GRANTEE shall comply, to the extent applicable, with the terms of the Local Hiring Law (Council Bill 12-0159) promulgated by the Mayor and City Council of Baltimore as amended from time to time and incorporated herein by reference, Article 5, Subtitle 27 of the Baltimore City Code, as amended (the "Local Hiring Law") and its rules and regulations apply to all CITY contracts and agreements that are greater than Three Hundred Thousand Dollars ($300,000.00) executed by the CITY on or after the Local Hiring Law's effective date of December 23, 2013.  If applicable, the Local Hiring Law as well as its applicable Rules and Regulations shall be attached hereto as **Exhibit F** and incorporated herein.

## 13. NATIONAL LABOR RESOLUTION ACT

Notwithstanding any other provisions in this Agreement, GRANTEE shall comply with the terms of the Board Resolution dated June 29, 1994 (if applicable) which states as follows:

A.    Contractors, subcontractors, and their agents and employees may not engage in unfair labor practices as defined under The National Labor Relations Act and applicable Federal regulations and State laws.

B.    Contractors, subcontractors, and their agents may not threaten, harass, intimidate or in any way impede persons employed by them who on their own time exercise their rights to associate, speak, organize, or petition governmental officials with their grievances.

C.    If the Board determines that a contractor, subcontractor, or their agents have violated the policy set forth in this Resolution, said contractor, or subcontractor will be disqualified from bidding on CITY contracts, and if they are currently completing contracts, they will be found in default of their contracts.

## 14. GOVERNING LAW

This Agreement is made in the State of Maryland and Maryland law shall govern its interpretations, performance and enforcement, exclusive of Maryland's conflict of laws rules. Furthermore, the parties agree that any suits or actions brought by either party against the other shall be brought in a court of appropriate jurisdiction in Baltimore City.

**15. <u>TERMINATION FOR CAUSE</u>**

If through any cause, GRANTEE materially fails to comply with any term of this Agreement, fails to fulfill in a timely and proper manner its obligations under this Agreement, or violates any of the covenants, agreements or stipulations of this Agreement, the CITY shall thereupon have the right to terminate this Agreement by giving written notice to GRANTEE of such termination and specifying the reason and the effective date thereof, at least five (5) days before the effective date of such termination.  All finished or unfinished documents, data, surveys, drawings, maps, models, photographs and reports prepared by GRANTEE under this Agreement shall, at the option of the CITY, become CITY property and GRANTEE shall be entitled to receive just and equitable compensation for any work satisfactorily completed hereunder.  Notwithstanding the above, GRANTEE shall not be relieved of liability to the CITY for damages sustained by the CITY by virtue of any breach of the Agreement by GRANTEE, and the CITY may withhold payments to GRANTEE for the purpose of set-off until such time as the exact amount of damages due the CITY from GRANTEE is determined.  Payment to GRANTEE shall cease upon the date of termination.  The CITY shall not be subject to or liable for any damage as a result of any such termination.

**16. <u>TERMINATION FOR CONVENIENCE</u>**

This Agreement may be terminated or suspended by the CITY or by GRANTEE, by giving the other party forty-five (45) days written notice, whenever it is determined that such termination is in the best interest of either party. GRANTEE shall receive payment in accordance with this Agreement for all disbursement requests approved by DHCD on or before the date of termination. The CITY shall not be subject to or liable for any damage as a result of any such termination.

**17. <u>NOTICES</u>**

All notices, requests, claims, demands and other communications required or permitted under this Agreement (collectively, "Notices") shall be in writing and be given (i) by delivery in person, (ii) by a nationally recognized next day courier service, (iii) by registered or certified mail, postage prepaid, to the address of the party specified in this Agreement or such other address as either party may specify in writing to the following:

| Communications to DHCD shall be mailed to: <br> Department of Housing and Community Development <br> Attention:  Director of Grants Management <br> 417 East Fayette Street, <br> Baltimore, Maryland 21202 <br><br> AND <br> Deputy Commissioner for Development <br> Department of Housing and Community Development <br> 417 East Fayette Street, 14th Floor <br> Baltimore, Maryland  21202 | Communications to GRANTEE shall be mailed to: <br><br> North East Housing Initiative, Inc. <br> Garrick Good, Executive Director <br> 5307 Belair Road <br> Baltimore, Maryland 21206 |

All Notices shall be effective upon receipt by the party to which notice is given.

18. **PERSONNEL**

    A. <u>Personnel.</u> Personnel selected by GRANTEE shall not be employees of or have any contractual relationship with the CITY.  GRANTEE shall notify the CITY in writing of all personnel changes, i.e., hiring, firing, etc. as part of GRANTEE'S reporting obligations.

    B. <u>Qualified Personnel.</u> All of the services required hereunder will be performed by GRANTEE or under its supervision and all personnel engaged in the work shall be fully qualified and shall be authorized or permitted under State and local law to perform such services.  No person who is serving a sentence in a penal or correctional institution shall be employed or work under this Agreement.

    C. <u>Withholding of Salaries.</u> If in the performance of this Agreement, there is any underpayment of salaries by GRANTEE or by any subcontractor thereunder, the CITY shall withhold from GRANTEE payments due to him/her in an amount sufficient to pay employees underpaid the difference between the salaries required hereby to be paid and the salaries actually paid such employees for the total number of hours worked.  The amounts withheld shall be disbursed by the CITY for and on account of GRANTEE or subcontractor to the respective employees to whom they are due.

    D. <u>Discrimination Because of Certain Labor Matters.</u> No person employed on the work covered by this Agreement shall be discharged or in any way discriminated against because he has filed any complaint or instituted or caused to be instituted any proceeding or has testified or is about to testify in any proceeding under or relating to the labor standards.

19. **GENERAL PROVISIONS AND CONDITIONS**

    A. <u>Acts and Omissions</u>. GRANTEE shall be fully responsible to the CITY for the acts and omissions of its consultants and by persons employed by said consultants as it is for the acts and omissions of persons directly employed by GRANTEE.

    B. <u>Final Interpretations.</u> In the event of any question regarding the meaning of any of the provisions of this Agreement, the interpretation placed thereon by the CITY shall be final and binding on the parties hereto, provided that any such interpretation shall not be unreasonable.

    C. <u>Representations</u>. GRANTEE is a tax-exempt nonprofit corporation, duly organized, validly existing and in good standing under the laws of Maryland, fully qualified to do business in the State of Maryland and has the legal capacity and full power and authority to consummate this Agreement.  GRANTEE represents and warrants that all information it has provided and will provide has been, and for the duration of this Agreement, will at all times continue to be true, accurate and compete in all material respects.

    D. <u>Headings.</u> The heading and subheadings in the Agreement are for convenience of reference only and shall not limit or otherwise affect any of the terms hereof.

    E. <u>Drug Free Workplace.</u> GRANTEE and their contractors, subcontractors, and agents shall comply with 24 C.F.R. Subpart F, Drug Free Workplace Requirements.

    F. <u>Assignability.</u> GRANTEE shall not assign any interest in this Agreement and shall not transfer any interest in the same (whether by assignment or novation), without the prior written consent of the CITY hereto.

    G. <u>Conflict of Interest of Members of CITY</u>

        i. No elected official, officer, employee or agency of the CITY that exercises any functions or responsibilities in connection with the planning and carrying-out of this Agreement, shall have any financial interest, direct or indirect, in this Agreement.  GRANTEE shall take reasonable steps to ensure compliance with

this Conflict of Interest provision, including notifying any contractors of the provision.  In addition, the provisions of the Baltimore City Public Ethics Law Article 8, of the Baltimore City Code, as amended, also apply to this Agreement.

ii. <u>Interest of GRANTEE and Employees</u>. GRANTEE individually certifies that no persons described in Paragraph i of this Subsection who exercises or has exercised any functions or responsibilities with respect to programs assisted under this part or who are in a position to participate in a decision making process or gain inside information with regard to such programs, may obtain a financial interest or benefit from a program assisted under this Agreement, or have a financial interest in any contract, subcontract, or agreement with respect to a program assisted, or with respect to the proceeds of a program assisted, either for themselves or those with whom they have business or immediate family ties, during their tenure or for one (1) year thereafter.

iii. <u>Applicability</u>. The conflict of interest provisions of this paragraph apply to any person who is an employee, agent, consultant, officer, or elected official or appointed official of the CITY or of any designated public agencies or of GRANTEE.

iv. <u>GRANTEE Has No Interest</u>. GRANTEE individually covenants that it presently has no interest and shall not acquire any interest, direct or indirect, in the target area of any parcels herein, which would conflict in any manner or degree with the performance of its services hereunder. GRANTEE further individually covenants that in the performance of this Agreement no person having any conflicting interest shall be employed.  Any interest on the part of GRANTEE or its employees must be disclosed to the CITY. Provided, however, that this paragraph shall be interpreted in such a manner so as not to unreasonably impede the statutory requirement that maximum opportunity be provided for employment of and participation by residents of the area.  GRANTEE assures that they will incorporate the above provisions into every contract required to be in writing.

H. <u>Subcontractors</u>. None of the services covered by this Agreement shall be subcontracted without the prior written consent of the CITY.  GRANTEE shall be fully responsible to the CITY for its acts and omissions and its respective subcontractors, and of persons employed by said subcontractors.  GRANTEE shall insert in each subcontract appropriate provisions requiring compliance with the labor standard's provisions of this Agreement.

I. <u>Default.</u> A default under this Agreement shall consist of using GRANT FUNDS for a purpose other than as authorized by this Agreement, any noncompliance with legislative, regulatory, or other requirements applicable to this Agreement, any other material breach of this Agreement, or any material misrepresentation in the application, program description, and/or budget submission.

J. <u>Merger Clause</u>. This Agreement including all attachments and exhibits hereto contains the entire agreement between the parties, there are no other promises, conditions, or terms than those expressly set forth in this Agreement and any agreement hereafter made shall be ineffective to modify or terminate this Agreement or constitute a waiver of any of the provisions hereof unless such agreement is in writing and signed by the party against whom enforcement of the modification, termination or waiver is sought.

K. <u>Independent Agency.</u> It is agreed by the parties that, at all times and for all purposes hereunder, that GRANTEE is an independent agency and not employed by the Mayor and City Council of Baltimore.  No statement contained in the Agreement shall be construed as to find GRANTEE or any of their employees, subcontractors, vendors, servants or agents to be employees of the Mayor and City Council of Baltimore, and they shall not be entitled to any of the rights, privileges, or benefits of employees of the Mayor and City Council of Baltimore.

L.  <u>Nonwaiver/Cumulative Remedies.</u> No failure by the CITY to exercise and no delay in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement and have caused the respective corporate seals to be affixed hereto on the Effective Date.

**ATTEST**                                    **MAYOR AND CITY COUNCIL OF BALTIMORE**

Clerk, Board of Estimates

_____
Custodian of City Seal

By: _____
Alice Kennedy, Housing Commissioner
Department of Housing & Community Development
Date: 12/01/2022

**WITNESS**                                   **NORTH EAST HOUSING INITIATIVE, INC.**

_____

By: _____ (SEAL)
Name: Garrick Good
Title: Executive Director
Date: 11/07/2022

**APPROVED FOR LEGAL FORM**                   **MBE/WBE APPROVED**
**AND SUFFICIENCY**

_____            _____
Hana Rose Kondratyuk                       Christopher Lundy, Chief
Chief Solicitor                            Minority and Women's Business Opportunity Office
Date:        11/14/2022                    Date: 11/15/2022

**APPROVED BY THE BOARD OF ESTIMATES OF BALTIMORE CITY**

_____
Clerk                         Date        1/11/2023

List of Exhibits:
Exhibit A – Award Letter
Exhibit B – Declaration of Covenants Form
Exhibit C – Approved Project Budget
Exhibit D – Request for Payment Form
Exhibit E – GRANTEE's Commitment to Comply
Exhibit F – Local Hiring Law and Rules and Regulations

## EXHIBIT A – Award Letter



BALTIMORE CITY
DEPARTMENT OF HOUSING &
COMMUNITY DEVELOPMENT

Date:        January 25, 2022

From:        City of Baltimore Department of Housing and Community Development

To: NorthEast Housing Initiative, Inc. (NEHI)
Garrick R. Good
Executive Director
5307 Belair Rd.
Baltimore, MD 21206

Subject:        Baltimore City's – COMMUNITY LAND TRUST SINGLE FAMILY
HOMEOWNERSHIP NOTICE OF FUNDING AVAILABILITY AWARD NOTIFICATION

Dear NorthEast Housing Initiative Inc.,

The Department of Housing and Community Development (DHCD) is pleased to inform you that your application for the Community Land Trusts – Single Family Homeownership NOFA will be receiving a conditional award of Affordable Housing Trust Funds in the amount of Seven Hundred and Fifty-Thousand Dollars ($750,000.00).

Funds will be made available subject to the approval of a funding agreement by the City's Board of Estimates and satisfactory completion of the conditional steps presented below. Prior to executing a funding agreement, NEHI will be required to submit final budgets, schedules, evidence of financing commitments, and other documentation as determined necessary by DHCD. All funds must be spent on housing that benefits households earning 50 percent or less of the Area Median Income as established by HUD. **Expenditures of funds prior to this approval will not be available for reimbursement.**

John Mobley, Affordable Housing Trust Fund Manager, will be contacting you to arrange a kick-off meeting. Meanwhile, please indicate your acceptance of this award by signing and returning this letter not later than February 28, 2022.

**Award conditions to receive funds include:**
- Satisfactory progress of any prior award as notified via email from Alice Kennedy (or the Acting Housing Commissioner) to receive current award.
- An in-place capital stack and funding partners for the current project
- Site Control of location where project will take place.

If you have any questions, please feel free to contact Kate Edwards, DHCD Acting Deputy Commissioner for Development by email at Kate.Edwards@baltimorecity.gov.

Congratulations and we look forward to working with you on this project!

Sincerely,

Alice Kennedy
Acting Commissioner

Cc: Kate Edwards
    John Mobley

Brandon M. Scott, Mayor  ·  Alice Kennedy, Acting Housing Commissioner
417 East Fayette Street  ·  Baltimore, MD 21202  ·  443-984-5757  ·  dhcd.baltimorecity.gov

Page 13 of 28 of a Grant Agreement Between the Mayor and City Council and North East Housing Initiative, Inc.(1)

DocuSign Envelope ID: A3D6BFC9-EE3D-4315-A450-B46D33E9F230

**Community Land Trust Single Family Homeownership NOFA, Award Signature Page**

I___Garrick R. Good___(name), representative for___North East Housing Initiative(organization), accept the City of Baltimore's Department of Housing and Community Development, Affordable Housing Trust Fund award from the Community Land Trust Single Family Homeownership Notice of Finding Availability ("NOFA") mentioned above.

Name:_____

Title:_____Executive Director_____

Date:_01-26-2022_____

Page | 2

Page 14 of 28 of a Grant Agreement Between the Mayor and City Council and North East Housing Initiative, Inc.(1)

**EXHIBIT B – Declaration of Covenants Form**

FORM OF DECLARATION OF RESTRICTIVE COVENANTS

THIS DECLARATION OF RESTRICTIVE COVENANTS (the "Declaration"), is made this _____ day of _____, 2022, by and between NORTH EAST HOUSING INITIATIVE, INC., a private, non-profit corporation incorporated in the State of Maryland ("Declarant"), and the MAYOR AND CITY COUNCIL OF BALTIMORE, a municipal corporation in the State of Maryland ("City"), acting by and through its DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT ("HCD").

EXPLANATORY STATEMENT

A.    Declarant has a fee simple interest in a parcel[s] of land known as [3438 Lyndale Avenue, 3440 Elmley Avenue, 3143 and 3307 Elmora Avenue and 3411 Ravenwood Ave. and _____] and which is/are more fully described in **Exhibit A** attached to and made a part hereof (the "Property" or "Properties").

B.    Declarant has requested that City provide a grant in an amount not to exceed Seven Hundred Fifty Thousand Dollars ($750,000)  (the "Grant") to acquire and rehabilitate 10 properties  to provide affordable housing located upon the Properties for sale  of the leasehold interest in such Properties to owner occupants of Low Income under an arrangement as outlined in Section 14 -505 of the Real Property Article of the Annotated Code of Maryland the terms of which are to be approved by HCD; at approved purchase prices as set forth in or by calculation as set forth in the approved Land Trust Ground Lease (Affordable Purchase Prices"); (the "Project"), and Declarant and City have or intend to enter into an agreement evidencing the Grant (the "Grant Agreement"). "Low Income" shall mean incomes at or less than fifty percent (50 %) of Area Median Income (AM1) adjusted for family size for the Baltimore PMSA, as amended annually by the U.S~ Department of Housing and Urban Development, Office of Policy Development & Research. All capitalized terms used herein, but not specifically defined herein, shall have the meanings given such terms in the Grant Agreement.

C.    Declarant is willing to subject the Properties to the covenants and restrictions contained in this Declaration in order to induce City to make the Grant.

NOW, THEREFORE, in consideration of the premises set forth in the Explanatory Statement and for other good and valuable consideration, the receipt and sufficiency of which the parties acknowledge, the parties agree as follows:

1.    Covenants Running with the Land.   Declarant declares that the Property and every part of it is and, during the Use Term, shall be owned (legally and beneficially), leased, or otherwise conveyed, transferred, developed, constructed, rehabilitated, improved, built upon, occupied, or otherwise used, subject to the covenants and restrictions set forth in Section 2 below (collectively, the "Restrictive Covenants"). The Restrictive Covenants shall run with the Property

and every part of it for all purposes and shall be binding upon Declarant and all property owners, tenants, licensees, occupants, and their successors in interest with respect to the Property and shall inure to the benefit of Declarant and City and their respective successors and assigns during the Use Term (as hereinafter defined).

2.    Use Requirement.

(a)    From the date of this Agreement until December 31, 2062 (the "Use Term"), Declarant shall maintain and use the Properties and improvements located thereon. solely for Low Income individuals who will use the property as their primary residence under an HCD approved Land Trust Ground Lease transaction for sale at approved affordable purchase prices.

(b)    Declarant shall not: (i) transfer the title, and/or beneficial interest to the reversionary interest in the Properties to any person, corporation, partnership, or other entity by way of sale of corporate shares, limited or general partnership interests, master lease or in any other manner without the prior written consent of City; (ii) sell or otherwise dispose of the Project without the written consent of City; (iii) fail to exercise a repurchase option as provided in the HCD approved Land Trust Ground Lease  or (iv) maintain its Non-Profit status..

3.    Duration: Modification. The Restrictive Covenants shall continue and remain in full force and effect at all times with respect to the Properties until the expiration of the Use Term.

This Declaration of Restrictive Covenants, or any provisions of it, may be terminated, extended, modified, or amended only in writing and shall be effective only after execution by City and the Declarant, and recordation among the Land Records of Baltimore City. For purposes of execution of the instrument evidencing such termination, extension, modification or amendment, the Declarant irrevocably appoints the Department its attorney-in-fact, with full power and authority to execute all documents and do all acts necessary or desirable to give effect to such termination, extension, modification, or amendment.

4.    Legal Action Upon Violation. Violation of any of these Restrictive Covenants may be enjoined, abated, restrained, or otherwise remedied by appropriate legal or equitable proceedings. Proceedings to restrain violation of these Restrictive Covenants may be brought at any time that such violation appears reasonably likely to occur in the future. In the event of proceedings brought by City or any person acting on behalf of City to enforce or restrain violation of any of these Restrictive Covenants, or to determine the rights or duties of any person under this Declaration, City or any person acting on behalf of City, if it or they prevail in such proceedings, may recover reasonable attorneys' fees to be fixed by the court, in addition to court costs and any other relief awarded by the court in such proceedings. Additionally, enforcement of these Restrictive Covenants shall not prevent the City from  declaring all or a portion of the Grant Funds to be due and payable back from the Declarant, its successors and assigns, as to the amount of the total Grant Funds expended for on each of the properties as stated in Explanatory Statement B above upon which a default has been declared, due to its failure to observe its

obligations under this Declaration or enforce its rights under an approved Land Trust Ground Lease. If the City requires repayment of the Grant or any portion thereof, the Declarant, its successors and assigns shall receive a credit of 20% against the full amount of the Grant Funds the City demands repayment of for every full 10 years that such property was occupied by Low Income owner occupants under the terms of an approved Land Trust Ground Lease .

5.    Enforceability. The Restrictive Covenants shall bind Declarant and its respective, successors, and assigns, and shall inure to the benefit of and be enforceable by City and its successors and assigns through the Use Term. The failure of City to enforce any of the Restrictive Covenants shall not be deemed a waiver of the right to enforce them thereafter. There shall be no waiver of any of the Restrictive Covenants.

6.    Grantee's Covenants. Grantee [Each grantee accepting title to the leasehold interest under an approved Land Trust Ground Lease transaction in any of the Properties, whether or not it incorporates or refers to this Declaration of Restrictive Covenants, covenants for itself, and its heirs, successors, and assigns to observe, perform and be bound by the Restrictive Covenants and, unless otherwise specifically permitted by City, to incorporate them by reference in any instrument of conveyance. Each grantee accepting title to the leasehold interest under an approved Land Trust Ground Lease transaction in the Property, whether or not it incorporates or refers to this Declaration of Restrictive Covenants], covenants for itself, and its heirs, successors, and assigns to observe, perform and be bound by the Restrictive Covenants and, unless otherwise specifically permitted by City, to incorporate them by reference in any instrument of conveyance.

7.    Governing Law. This Declaration shall be governed by and construed in accordance with the laws of the State of Maryland.

8.    Effect of Headings. The headings of the Sections in this Declaration are for convenience only and do not affect the meanings or interpretation of the contents.

9    Severability. If any provision of this Declaration shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining portions shall not in any way be affected or impaired.

IN WITNESS WHEREOF, Declarant has executed this Declaration the day and year above written.


ATTEST:                                   NORTH EAST HOUSING INITIATIVE, INC.


_____              By:_____(SEAL)
                                   Name:
                                   Title:

STATE OF MARYLAND:
CITY OF BALTIMORE:

I HEREBY CERTIFY that on this ____ day of _____, 2022, before me, the Subscriber, a Notary Public of the State of Maryland in and for the City of Baltimore, personally appeared _____, who acknowledged himself to be the duly serving _____ , of North East Housing Initiative, Inc., a Maryland corporation, who acknowledged the foregoing Declaration of Covenant to be the corporate act of North East Housing Initiative, Inc., and being duly authorized to do so, in my presence signed and sealed the same.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____

Notary Public

My Commission Expires: _____


Approved for form and legal sufficiency this ____ day of _____, 2022.

_____
Chief Solicitor

<u>Exhibit A</u>
Legal Description of Properties

### 3440 Elmley Avenue

| Map: | Grid: | Parcel: | Neighborhood: | Subdivision: | Section: | Block: | Lot: |
|------|-------|---------|---------------|--------------|----------|--------|------|
| 0008 | 0000 | 0000 | 8010227.03 | 0000 | 25 | 4178K | 021 |

BEGINNING FOR THE SAME thereof on the north side of Elmley Avenue at the distance of three hundred fifty three feet easterly from the east side of Highview Avenue as now laid out and at a point in line with the center of a partition wall there situate thence running easterly binding on the north side of Elmley Avenue 16 feet 6 inches to the west side of Longview Avenue thence northerly binding on the west side of Longview Avenue 80 feet to the north side of a 10 foot alley there situate, thence westerly binding on the north side of said 10 foot alley with the use thereof in common with others 16 feet 6 inches and thence southerly to and through the center of said partition wall and continuing the same course in all 80 feet to the place of beginning.

### 3438 Lyndale Avenue

| Map: | Grid: | Parcel: | Neighborhood: | Subdivision: | Section: | Block: | Lot: |
|------|-------|---------|---------------|--------------|----------|--------|------|
| 0008 | 0000 | 0000 | 8010227.03 | 0000 | 25 | 4178K | 065 |

BEGINNING FOR THE SAME on the north side of Lyndale Avenue at the distance of 205 feet easterly from the east side of Greenview Avenue and at a point in a line with the center of the partition wall there situate and running thence easterly binding on the north side of Lyndale Avenue 17 feet to a point in line with the center of another partition wall there situate thence northerly to and through the center of said last mentioned partition wall and continuing the same course parallel with Greenview Avenue in all 70 feet to the south side of a 10 foot alley there situate thence westerly binding on the south side of said alley with the use thereof in common with other 17 feet and thence southerly to and through the center of said first mentioned partition wall and continuing the same course in 79 feet to the place of beginning.

1

**3411 Ravenwood Avenue**

Beginning for the same on the south side of Ravenwood Avenue at the distance of 81 feet easterly from the east side of Highview Avenue and at a point in a line with the center of the partition wall there situate and running thence easterly binding on the south side of Ravenwood Avenue 16 feet to a point in line with the center of another partition wall there situate thence southerly to and through the center of said last mentioned partition wall and continuing the same course in all 74 feet to the north side of a 10 foot alley there situate thence westerly binding on the north side of said 10 foot alley with the use thereof in common with others 16 feet thence northerly to and through the center of said first mentioned partition wall in all 74 feet to the place of beginning.

For informational purposes only:
The improvements thereon being known as 3411 Ravenwood Avenue.

Being the same property which by assignment dated October 3, 2018, and recorded among the Land Records of Baltimore City, Maryland on October 11, 2018, in Liber 20569, in Folio 356, was granted and assigned by WTCK Properties, LLC unto Davonne Coleman, the within Grantor.

*Legal Descriptions for 3143 Elmora Avenue, 3307 Elmora Avenue and the remaining 5 properties to be added as they become available.

**EXHIBIT C – Approved Project Budget**

AFFORDABLE HOUSING TRUST FUND BUDGET WORKSHEET

## North East Housing Initiative, Inc.

Please complete only those categories that apply to your project. Additional categories can be added as needed. Costs should be realistic and associated with the final project.

**Organization Name-- North East Housing Initiative**

| DEVELOPMENT BUDGET ITEMS USES OF FUNDS | Total Project Development Budget | 3440 Elmley | 3438 Lyndale | 3143 Elmora | 3307 Elmora | 3411 Ravenwood | Houses 6-10 Addresses TBD |
|---|---|---|---|---|---|---|---|
| **ACQUISITION COSTS** | | | | | | | |
| Acquisition | $ 327,075 | $ 2,200 | $ 23,875 | $ 50,000 | $ 50,000 | $ 50,000 | $ 151,000 |
| Appraisal | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Acquisition Subtotal** | 327,075 | 2,200 | 23,875 | 50,000 | 50,000 | 50,000 | 151,000 |
| **CONSTRUCTION COSTS** | | 3161 Lyndale | 3201 Lyndale | 3163 Lyndale | 2111 Belair | 2107 Belair | Houses 8-10 |
| Rehab Construction | $ 753,504 | $ 94,188 | $ 94,188 | $ 94,188 | $ 94,188 | $ 94,188 | $ 282,564 |
| Construction Contingency @ % | $ 40,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 15,000 |
| Builders Profit @ % | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Builders Overhead @ % | $ 96,000 | $ 12,000 | $ 12,000 | $ 12,000 | $ 12,000 | $ 12,000 | $ 36,000 |
| Bond Premium | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Stabilization | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Permits | $ 8,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 3,000 |
| Site Work | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Utilities | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Elevators | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Tenant Improvements | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other (describe) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Construction Subtotal** | 897,504 | 112,188 | 112,188 | 112,188 | 112,188 | 112,188 | 336,564 |
| **PREDEVELOPMENT/PROFESSIONAL FEES/SOFT COSTS** | | 3161 Lyndale | 3201 Lyndale | 3163 Lyndale | 2111 Belair | 2107 Belair | Houses 6-10 |
| Design/Architecture | $ 19,200 | $ 2,400 | $ 2,400 | $ 2,400 | $ 2,400 | $ 2,400 | $ 7,200 |
| Architectural Reimbursement | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Engineering | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Environmental/Soil Borings | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Market Studies | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Surveys | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Legal Fees | $ 8,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 3,000 |
| Accounting Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Consulting Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Cost certifications | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Historic Tax Credit Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Staff Costs | $ 120,000 | $ - | $ - | $ - | $ - | $ - | $ 120,000 |
| Other (describe) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **PREDEVELOPMENT COSTS** | 147,200 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 123,000 |

**North East Housing Initiative -- Phase Two**

| CARRYING COSTS | | | | | | | |
|---|---|---|---|---|---|---|---|
| Insurance | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Taxes/Assessments/Utilities | $ 5,120 | $ 640 | $ 640 | $ 640 | $ 640 | $ 640 | $ 1,920 |
| Security | $ 4,000 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 1,500 |
| Inspections: | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Tenant Fit Out | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Furnishings Fixture Equipment | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other (describe) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Project Fees Subtotal** | $ 9,120 | $ 1,140 | $ 1,140 | $ 1,140 | $ 1,140 | $ 1,140 | $ 3,420 |
| **FINANCING** | | | | | | | |
| Legal Fees- Financing | $ 8,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 3,000 |
| Acquisition | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Construction Loan Interest | $ 44,640 | $ 5,580 | $ 5,580 | $ 5,580 | $ 5,580 | $ 5,580 | $ 16,740 |
| Real Estate Taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Lendor Commitment | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Financing Subtotal** | $ 52,640 | $ 6,580 | $ 6,580 | $ 6,580 | $ 6,580 | $ 6,580 | $ 19,740 |
| **MARKETING** | | | | | | | |
| Realtor Fees | $ 32,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 12,000 |
| Marketing Materials Fee | $ 880 | $ 110 | $ 110 | $ 110 | $ 110 | $ 110 | $ 330 |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Marketing & Other Subtotal** | $ 32,880 | $ 4,110 | $ 4,110 | $ 4,110 | $ 4,110 | $ 4,110 | $ 12,330 |
| **TOTAL DEVELOPMENT COSTS** | $ 1,466,419 | $ 127,218 | $ 148,893 | $ 175,018 | $ 175,018 | $ 175,018 | $ 646,054 |

**Organization Name-- North East Housing Initiative**

| DEVELOPMENT BUDGET ITEMS | Budget Amounts | AHTF Capital Grant | NEHI LOC | Maryland Bond Bill | List other source | List other source | List other source | | Cross Check |
|---|---|---|---|---|---|---|---|---|---|
| **ACQUISITION COSTS** | | $0 | | | $ - | $ - | $ - | $ - | X-check |
| Acquisition | $ 327,075 | | $ 327,075 | $ 20,000 | $ - | $ - | $ - | $ - | $ 347,075 |
| Appraisal | $ 327,075 | $ - | $ 327,075 | $ 20,000 | $ - | $ - | $ - | $ - | $ 347,075 |
| **Acquisition** | $ 327,075 | $ - | $ 327,075 | $ 20,000 | $ - | $ - | $ - | $ - | $ 347,075 |
| **CONSTRUCTION COSTS** | | AHTF | LOC | Bond Bill | Source | Source | Source | | X-check |
| Rehab Construction | $ 753,504 | $ 630,000 | $ 761,880 | $ 180,000 | $ - | $ - | $ - | | $ 1,571,880 |
| Con. Contingency | $ 40,000 | | $ 50,000 | $ - | $ - | $ - | $ - | | $ 50,000 |
| Builder Profit | $ - | | $ - | $ - | $ - | $ - | $ - | | $ - |
| Builders Overhead | $ 96,000 | | $ - | $ - | $ - | $ - | $ - | | $ - |
| Bond Premium | $ - | | $ - | $ - | $ - | $ - | $ - | | $ - |
| Stabilization | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| Permits | $ 8,000 | | $ 8,000 | $ - | $ - | $ - | $ - | | $ 8,000 |
| Utilities | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| Site Work | $ - | | $ - | $ - | $ - | $ - | $ - | | $ - |
| Elevators | $ - | | $ - | $ - | $ - | $ - | $ - | | $ - |
| Tenant Improvements | $ - | | $ - | $ - | $ - | $ - | $ - | | $ - |
| Other (describe) | $ - | | $ - | $ - | $ - | $ - | $ - | | $ - |
| **Construction** | $ 897,504 | 630,000 | $ 1,696,837 | $ - | $ - | $ - | $ - | $ - | $ 8,000 |
| **PREDEVELOP** | Budget | AHTF | Source | Source | Source | Source | Source | | X-check |
| Design/Architecture | $ 19,200 | $ - | $ 24,000 | $ - | $ - | $ - | $ - | | $ 24,000 |
| Architectural Reimbursement | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| Engineering | $ - | | $ - | $ - | $ - | $ - | $ - | | $ - |
| Environmental/Soil Borings | $ - | | $ - | $ - | $ - | $ - | $ - | | $ - |
| Market Studies | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| Surveys | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| Legal Fees | $ 8,000 | $ - | $ 10,000 | $ - | $ - | $ - | $ - | | $ 10,000 |
| Accounting Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| Consulting Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| Cost certifications | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| Historic Tax Credit Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| Staff Costs | $ 120,000 | $ 120,000 | $ - | $ - | $ - | $ - | $ - | | $ 120,000 |
| Other (describe) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| **PREDEVELOP SubTotal** | | $ 120,000 | $ 10,000 | $ - | $ - | $ - | $ - | $ - | $ 130,000 |

**Organization Name-- Project Name**

| CARRYING COSTS | Budget | AHTF | Source | Source | Source | Source | Source | X-check |
|---|---|---|---|---|---|---|---|---|
| Insurance | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Taxes/Assessments/Utilities | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Security | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Inspections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Tenant Fit Out | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Furnishings Fixture Equipment | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other (describe) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Project Subtotal** | $ 9,120 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **FINANCING** | Budget | AHTF | Source | Source | Source | Source | Source | X-check |
| Legal Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Acquisition | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Construction Interest | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Real Estate Taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Lendor Commitment | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Financing Subtotal** | $ 52,640 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **MARKETING** | Budget | AHTF | Source | Source | Source | Source | Source | X-check |
| Realtor Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Marketing Materials Fee | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Marketing SubTotal** | | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | Budget | AHTF | Source | Source | Source | Source | Source | X-check |
| **ACTUAL PAIDS** | | $ 750,000 | $ 2,033,912 | $ 20,000 | $ - | $ - | $ - | $ - | $ 485,075 |
| **Budget Funding Sources** | | $0 | | | | | | |
| **$$ Excess over Expenses** | | $ (750,000) | $ (2,033,912) | $ (20,000) | $ - | $ - | $ - | $ (2,803,912) |

| | | | | |
|---|---|---|---|---|
| R-Loan | $0 | | R-Loan | $ (2,803,912) |
| Pay-off | $ (2,803,912) | | Owners | $ - |
| Gap | $2,803,912 | | Excess $$ | $ (2,053,912) |

**EXHIBIT D – Request for Payment Form**



## PAYMENT REQUEST

| | |
|---|---|
| Grantee Name | North East Housing Initiative, Inc. (NEHI#1) |
| Mailing Address | |
| Internal Control # | AHTF_RND2_CAP_012 |
| Total Grant Amount | $750,000.00 |
| Grantee Invoice # | |
| Invoice Date Range | |
| Date of Request | |
| Type of Draw Request? Advance or Reimbursement? | |

*Budgeted items should correspond with your approved, previously submitted budget*

| Item ( Please list ALL budgeted items) | Approved Budget Line Item Amount | Previous Bill Date | Previously Approved Bill Amount | Available Balance | Amount Requested | Retainage Withheld (where applicable) | Total Funds Requested THIS INVOICE (less retainage) |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Total | | | $       - | | $       - | | $       - |

This is certify that the above figures are true and correct and allocable to the grant agreement, supported by actual payment by grantee and that grantee is entitled to disbursement of funds by the City. I certify that the above information and attached supporting documentation and quarterly report is accurate.

| | |
|---|---|
| Prepared By: | |
| Signature: | |
| Title | |

UPDATED 10/28/21

**EXHIBIT E - GRANTEE's Commitment to Comply**

COMMITMENT TO COMPLY
WITH THE
MINORITY AND WOMEN'S BUSINESS ENTERPRISE PROGRAM
OF THE CITY OF BALTIMORE

In consideration for receiving fiscal assistance from or through the City of Baltimore, the Developer covenants and agrees to comply with Article 5, Subtitle 28 of the Baltimore City Code (2019 Edition) regarding participation by Minority Business Enterprises (MBE) and Women's Business Enterprises (WBE) in its development of the project known as _North East Housing Initiative_. Developer covenants and agrees to use all reasonable good faith efforts to meet the following MBE and WBE participation goals for this project:

**MBE GOAL 27%**

**WBE GOAL 10%**

Prior to the commencement of construction, Developer agrees to submit to the City written documentation, including executed contracts, service agreements, or utilization commitment forms which shall identify the particular minority and women's business enterprises (i) contracting directly with the Developer, or (ii) subcontracting with prime contractors who have contracted directly with the Developer. The executed contracts, service agreements, or utilization commitment forms submitted to the City shall specify the dollar value of the participation, the type of work to be

North East Housing Initiative, Inc.                    037                    10/20

Page 18 of 28 of a Grant Agreement Between the Mayor and City Council and North East Housing Initiative, Inc.(1)

performed, and such other information as may be reasonably required by the City.

In the event that after reasonable and good faith efforts to meet the goals, Developer is able to demonstrate to the satisfaction of the City that sufficient qualified and willing MBE's and WBE's are unavailable in the market area of the project as defined by City law, then the Developer may request a waiver or reduction of the MBE and/or WBE goals.

The City's Minority and Women's Business Opportunity Office (MWBOO), or its successor, is designated to administer the provisions of the law on behalf of the City. Developer shall comply with the rules and regulations of the MWBOO or its successor in meeting the requirements of the law.

THE UNDERSIGNED DO SOLEMNLY DECLARE AND AFFIRM THAT THEY ARE AUTHORIZED TO MAKE THIS COMMITMENT.

FOR: _North East Housing Initiative_

BY: _____

BY: _Garnett R. Good_

DATE: _10/19/2020_

North East Housing Initiative, Inc.                    036                    93/29

Page 19 of 28 of a Grant Agreement Between the Mayor and City Council and North East Housing Initiative, Inc.(1)

4/18/22

Chief, Minority and Women's Business Opportunity Office

Anticipated Starting Date of Construction

Date: _TBD_

North East Housing Initiative, Inc.                039                10/29

**EXHIBIT F** – **Local Hiring Law and Rules and Regulations**

Page 20 of 28 of a Grant Agreement Between the Mayor and City Council and North East Housing Initiative, Inc.(1)

CITY OF BALTIMORE
ORDINANCE ____
Council Bill 12-0159

Introduced by: President Young, Councilmembers Henry, Branch, Middleton, Curran, Kraft,
Spector, Welch, Clarke, Stokes, Mosby, Scott, Cole, Reisinger
Introduced and read first time: November 19, 2012
Assigned to: Taxation, Finance and Economic Development Committee
Committee Report: Favorable, and amended by a Floor Amendment
Council action: Adopted
Read second time: May 13, 2013

AN ORDINANCE CONCERNING

Finance and Procurement – Local Hiring

FOR the purpose of requiring employers benefitted by City contracts and subsidies to take measures to hire Baltimore City residents; making certain exceptions; defining certain terms; requiring employment reports; establishing certain penalties; and generally relating to employment in furtherance of City contracts and City-subsidized projects.

BY adding
Article 5 - Finance, Property, and Procurement
Section(s) 27-1 to 27-10 to be under the new subtitle,
"Subtitle 27.  Local Hiring"
Baltimore City Code
(Edition 2000)

SECTION 1. BE IT ORDAINED BY THE MAYOR AND CITY COUNCIL OF BALTIMORE, That the Laws of Baltimore City read as follows:

Baltimore City Code

Article 5.  Finance, Property, and Procurement

Subtitle 27.  Local Hiring

§ 27-1. DEFINITIONS.

(A) IN GENERAL.

IN THIS SUBTITLE, THE FOLLOWING TERMS HAVE THE MEANINGS INDICATED.

(B) BENEFICIARY.

"BENEFICIARY" MEANS ANY PERSON WHO:

EXPLANATION: CAPITALS indicate matter added to existing law.
[Brackets] indicate matter deleted from existing law.
Underlining indicates matter added to the bill by amendment.
Strike-out indicates matter stricken from the bill by
amendment or deleted from existing law by amendment.

**Council Bill 12-0159**

(1) HAS A CONTRACT WITH THE CITY FOR MORE THAN $300,000; OR

(2) WILL BENEFIT FROM MORE THAN $5,000,000 IN ASSISTANCE FOR A CITY-SUBSIDIZED PROJECT.

(C) *CITY-SUBSIDIZED PROJECT.*

"CITY-SUBSIDIZED PROJECT" MEANS ANY PROJECT FOR WHICH THE CITY OR ANY OF ITS AGENTS OR CONTRACTORS PROVIDES FUNDS, RESOURCES, OR FINANCIAL ASSISTANCE, INCLUDING:

(1) THE SALE OR TRANSFER OF LAND SUBSTANTIALLY BELOW ITS APPRAISED VALUE;

(2) PAYMENT IN LIEU OF TAXES;

(3) TAX INCREMENT FINANCING;

(4) GRANTS OR LOANS THAT EQUAL OR EXCEED 15% OF TOTAL PROJECTED PROJECT COSTS; OR

(5) INSTALLATION OR REPAIR OF PHYSICAL INFRASTRUCTURE DIRECTLY RELATED TO THE PROJECT AND WITH VALUE EQUAL TO OR EXCEEDING 5% OF TOTAL PROJECTED PROJECT COSTS.

(D) *MOED.*

"MOED" MEANS THE MAYOR'S OFFICE OF EMPLOYMENT DEVELOPMENT.

(E) *PERSON.*

"PERSON" MEANS:

(1) AN INDIVIDUAL;

(2) A PARTNERSHIP, FIRM, ASSOCIATION, CORPORATION, OR OTHER ENTITY OF ANY KIND; OR

(3) A RECEIVER, TRUSTEE, GUARDIAN, PERSONAL REPRESENTATIVE, FIDUCIARY, OR REPRESENTATIVE OF ANY KIND.

**§ 27-2. SCOPE OF SUBTITLE.**

(A) *CITY CONTRACTS OVER $300,000.*

THIS SUBTITLE APPLIES TO EVERY CONTRACT FOR MORE THAN $300,000 MADE BY THE CITY, OR ON ITS BEHALF, WITH ANY PERSON.

LHL- 2

dlr12-0278-3rd/14May13
art5/cb12-0159-3rd/twcabr

- 2 -

Page 22 of 28 of a Grant Agreement Between the Mayor and City Council and North East Housing Initiative, Inc.(1)

## Council Bill 12-0159

(B) *CITY-SUBSIDIZED PROJECTS RECEIVING ASSISTANCE OVER $5,000,000.*

THIS SUBTITLE APPLIES TO EVERY AGREEMENT AUTHORIZING ASSISTANCE VALUED AT MORE THAN $5,000,000 TO A CITY-SUBSIDIZED PROJECT.

§ 27-3. *{RESERVED}*

§ 27-4. EMPLOYMENT ANALYSIS.

BEFORE THE DISBURSEMENT OF ANY CITY FUNDS, THE BENEFICIARY MUST PERFORM AN EMPLOYMENT ANALYSIS WITH MOED TO DETERMINE HOW MANY JOBS WILL BE REQUIRED TO COMPLETE THE CONTRACT OR PROJECT AND HOW MANY OF THOSE JOBS WILL REQUIRE NEW HIRING.

§ 27-5. INITIAL HIRING TO BE THROUGH MOED.

ALL NEW JOBS NEEDED FOR THE CONTRACT OR PROJECT MUST BE POSTED THROUGH MOED FOR A PERIOD OF 7 DAYS BEFORE BEING PUBLICALLY ADVERTISED.

§ 27-6. NEW EMPLOYEES TO BE BALTIMORE CITY RESIDENTS.

(A) *IN GENERAL.*

AT LEAST 51% OF THE NEW JOBS REQUIRED TO COMPLETE THE CONTRACT OR PROJECT MUST BE FILLED BY BALTIMORE CITY RESIDENTS.

(B) *EXCEPTIONS.*

MOED MAY WAIVE OR LOWER THE REQUIREMENT OF SUBSECTION (A) OF THIS SECTION IF IT FINDS THAT:

(1) A GOOD FAITH EFFORT TO COMPLY HAS BEEN MADE BY THE BENEFICIARY;

(2) THE BENEFICIARY IS LOCATED OUTSIDE THE BALTIMORE STANDARD METROPOLITAN STATISTICAL AREA AND NONE OF THE CONTRACT WORK IS PERFORMED INSIDE THE BALTIMORE STANDARD METROPOLITAN STATISTICAL AREA;

(3) THE BENEFICIARY HAS ENTERED INTO A SATISFACTORY SPECIAL WORKFORCE DEVELOPMENT TRAINING OR PLACEMENT ARRANGEMENT WITH MOED; OR

(4) THERE ARE INSUFFICIENT NUMBERS OF BALTIMORE CITY RESIDENTS IN THE LABOR MARKET WHO POSSESS THE SKILLS REQUIRED BY THE NEW JOBS NEEDED TO BE FILLED FOR THE CONTRACT OR PROJECT.

LHL-3

Page 23 of 28 of a Grant Agreement Between the Mayor and City Council and North East Housing Initiative, Inc.(1)

Council Bill 12-0159

§ 27-7. RULES AND REGULATIONS.

(A) *MOED TO ADOPT.*

MOED MAY ADOPT RULES AND REGULATIONS TO CARRY OUT THIS SUBTITLE OR TO CLARIFY ANY TERMS OR PHRASES IN THIS SUBTITLE.

(B) *FILING.*

A COPY OF ALL RULES AND REGULATIONS ADOPTED UNDER THIS SUBTITLE MUST BE FILED WITH THE DEPARTMENT OF LEGISLATIVE REFERENCE BEFORE THEY BECOME EFFECTIVE.

§ 27-8. REQUIRED REPORTS.

IN EACH MONTH OF THE CONTRACT OR PROJECT THE BENEFICIARY MUST SUBMIT A REPORT TO MOED, ON THE FORM DESIGNATED BY MOED, THAT INCLUDES THE FOLLOWING:

(1) THE NUMBER OF EMPLOYEES NEEDED FOR THE CONTRACT OR PROJECT;

(2) THE NUMBER OF CURRENT EMPLOYEES TRANSFERRED;

(3) THE NUMBER OF NEW JOB OPENINGS CREATED;

(4) THE NUMBER OF JOB OPENINGS LISTED WITH MOED;

(5) THE TOTAL NUMBER OF BALTIMORE CITY RESIDENTS HIRED FOR THE REPORTING PERIOD AND THE CUMULATIVE TOTAL NUMBER OF BALTIMORE CITY RESIDENTS HIRED;

(6) TOTAL NUMBER OF ALL EMPLOYEES HIRED FOR THE REPORTING PERIOD AND THE CUMULATIVE TOTAL OF EMPLOYEES HIRED; AND

(7) FOR EACH NEW HIRE DURING THE REPORTING PERIOD, THE NEW HIRE'S:

(1) NAME;

(2) SOCIAL SECURITY NUMBER;

(3) JOB TITLE;

(4) HIRE DATE;

(5) RESIDENCE; AND

(6) REFERRAL SOURCE.

§ 27-9. *{RESERVED}*

LHL-4

dlr12-0278~3rd/14May13
art5/cb12-0159~3rd/twzslr

- 4 -

Page 24 of 28 of a Grant Agreement Between the Mayor and City Council and North East Housing Initiative, Inc.(1)

**Council Bill 12-0159**

### § 27-10. PENALTIES.

(A) DEBARMENT FOR 1 YEAR.

IF THE BOARD OF ESTIMATES, ON RECOMMENDATION FROM MOED, AND AFTER NOTICE AND HEARING, DETERMINES THAT ANY BENEFICIARY HAS VIOLATED THE PROVISIONS OF THIS SUBTITLE AND THAT THE FAILURE WAS INTENTIONAL, NO CONTRACT MAY BE AWARDED TO THAT BENEFICIARY, OR TO ANY FIRM, CORPORATION, OR PARTNERSHIP IN WHICH THAT BENEFICIARY HAS AN INTEREST, UNTIL 1 YEAR HAS ELAPSED FROM THE DATE OF THE DETERMINATION.

(B) CRIMINAL PENALTIES.

AN INTENTIONAL VIOLATION OF ANY PROVISION OF THIS SUBTITLE IS A MISDEMEANOR, AND, ON CONVICTION, IS SUBJECT TO A FINE OF NOT MORE THAN $500 FOR EACH OFFENSE.

SECTION 2. AND BE IT FURTHER ORDAINED, That the catchlines contained in this Ordinance are not law and may not be considered to have been enacted as a part of this or any prior Ordinance.

SECTION 3. AND BE IT FURTHER ORDAINED, That this Ordinance takes effect on the ~~30th~~ 180th day after the date it is enacted.

Certified as duly passed this _____ day of _____, 20____

_____

President, Baltimore City Council

Certified as duly delivered to Her Honor, the Mayor,

this _____ day of _____, 20____

_____

Chief Clerk

Approved this _____ day of _____, 20____

_____

Mayor, Baltimore City

LHL- 5

- 5 -

dlr12-0278-3rd/14May13
art5/cb12-0159-3rd/tw:nbr

Page 25 of 28 of a Grant Agreement Between the Mayor and City Council and North East Housing Initiative, Inc.(1)

## BALTIMORE CITY LOCAL HIRING LAW

### Rules and Regulations

1.The Local Hiring Law (Council Bill 12-0159) (the "Law") is applicable to all City contracts that are greater than $ 300,000.00, or agreements authorizing assistance that are within the terms of §27-2 of the Law executed by the City on or after the Law's effective date, December 23, 2013.  The Law requires compliance by vendors/contractors and their subcontractors regardless of the subcontractor award amount and by all persons benefitting from an agreement involving more than $ 5,000,000.00 in assistance for a City subsidized project.

2. The Law applies to the original term of the contract award greater than $300,000.00, in addition to any contract modification (amendment, renewal, extra work or change order). Whether a City subsidized project is subject to the Law shall be finally determined when an agreement authorizing assistance valued at more than $5,000,000.00 is executed by the City.

3. Any contract that was originally subject to the Employ Baltimore Executive Order and the dollar amount of the contract increases to over 300K, will become subject to the Local Hiring Law.

4. All City bids, RFP's and requests for bid packages and final contracts must include reference to the requirements of the Law.  All bid documents and contracts subject to the Law will include a section referencing the requirements of the Law. The bidder's signature will verify a commitment to abide by the Law.

5.Upon contract award or approval of an agreement for subsidy covered by the Law, the contracting city agencies or agencies entering into an agreement for the City subsidized project must immediately complete the Mayor's Office of Employment Development (MOED) Vendor Contact form, providing contact information for each vendor/contract awarded and each beneficiary of a qualifying City subsidized project.  MOED will contact the vendor or beneficiary upon receipt of the completed form from the city agency.

6. Within two weeks of the contract award or agreement for a City subsidized project covered by the Law, the awardee must work with a representative of the Mayor's Office of Employment Development (MOED) to complete an Employment Analysis that will project the total workforce and the "new hires" in the Baltimore area needed to fulfill the contract/agreement.  That Analysis shall include all information reasonably required by MOED showing at a minimum general location (Baltimore area or not) of all workforce positions required to complete the contract/agreement.

7. Vendors who report that they do not have any "employees needed for the contract" at the initial workforce meeting or on the required monthly Employment Report form must meet with the City Agency to discuss how the work is getting done and how the funding is being utilized.

8. A Local Hiring Review Committee ("LHRC") will be established. The LHRC will be comprised of representatives/designees from the following:

- Office of the City Council President

## BALTIMORE CITY LOCAL HIRING LAW

- Office of the Deputy Chief of Economic Development and Neighborhoods
- Mayor's Office of Employment Development
- Office of the Director of Finance
- Baltimore City's Procurement Office- Bureau of Purchases
- Baltimore City Department of Transportation
- Baltimore City Department of Public Works
- Baltimore Development Corporation
- Baltimore City Law Department
- Baltimore City Department of General Services
- Community Resident to be appointed by the President of the City Council

The LHRC will appoint a chair and meet no less than quarterly and as frequently as needed. Its primary role will be to review the monthly Employment Reports and to make recommendations to MOED regarding the approval or denial of any waiver requests made. The LHRC will also recommend to the Board of Estimates potential penalties and debarment for persons and others subject to the Law that has not complied with the Law. MOED will coordinate the materials to be presented to the LHRC and provide it with administrative staff support.

9. Vendors and others subject to the Law must submit Monthly Employment Reports by the fifth business day of the month for the preceding month beginning no later than 90 days after the Board of Estimates has awarded the contract or approved the agreement. City agency directors will be notified of persons or others subject to the Law that do not submit reports by the due date; continued delinquent persons or others subject to the Law will be reported to the LHRC.

10. Vendors and others subject to the Law that have binding collective bargaining agreements with unions will be granted a waiver from only utilizing MOED recruitment services, since they are bound by union regulations to utilize union halls. However, the persons or others subject to the Law must still meet the 51% residency requirement on new hires and must submit the monthly Employment Reports as required by the Law.

11. If MOED cannot fill a job posting provided by a vendor or others subject to the Law within the seven-day period, the person or others subject to the Law must still meet the 51% residency requirement on new hires. This requirement will only be waived if : 1) the person or others subject to the Law requests a waiver in writing and can provide documentation that they made good faith efforts in the form of job posting and other recruitment methods and that there were insufficient qualified applicants to fill the available new positions or ; 2) the bidder is able to confirm in the bid process that the contract will be only for services that will be performed or for products that will be manufactured outside the Baltimore Metropolitan Area and as such, no new positions will be called for in Baltimore area.

12. The Law is not applicable to a contract or an agreement that is made by the City, or on its behalf with any person in the event of an emergency pursuant to Article VI, § 11 (e)(ii) of the Baltimore City Charter.

---

Rev 12/2018                    Baltimore City Local Hiring Law| Rules and Regulations    2

Page 27 of 28 of a Grant Agreement Between the Mayor and City Council and North East Housing Initiative, Inc.(1)

## BALTIMORE CITY LOCAL HIRING LAW

13. Definitions:

a.      *Good Faith Effort* is defined as a set of activities conducted by the contractor/vendor or other person which demonstrate multiple types of outreach efforts have been made to City residents including, but not limited to:  ads in local papers, paid local job boards, information to local educational and workforce organizations, as well as an objective review and rating of resumes of city residents. (§ 27-6 (B) (1)

b.      *Substantially below appraised value* is the sale or transfer of land applicable to property that has been approved and sold for an amount below 30% of the appraised value. (§ 27-1 (C) (1))

c.      *"Satisfactory Special Workforce Development Training or Placement Arrangement"* is defined as a written agreement with MOED or a recognized workforce partner for a customized training or On-The-Job-Training opportunity leading to unsubsidized employment.  (§27-6(B) (3))

# SIXTH LOAN MODIFICATION AGREEMENT

THIS SIXTH LOAN MODIFICATION AGREEMENT (this "**Agreement**") is made and entered into as of July 5, 2024 (the "**Effective Date**") by and between NORTH EAST HOUSING INITIATIVE, INC., a Maryland nonprofit corporation ("**Borrower**"), having an address of P.O. Box 11762, 5307 Belair Road, Baltimore, MD 21206, and NATIONAL HOUSING TRUST COMMUNITY DEVELOPMENT FUND, a District of Columbia nonprofit corporation ("**Lender**"), having an address of 1101 Connecticut Avenue NW, Suite 700, Washington, D.C. 20036, each of which is sometimes referred to as a "Party" and collectively as the "Parties."

## WITNESSETH

WHEREAS, Borrower and Lender are party to that certain Loan Agreement, dated as of March 7, 2022, as amended by that certain (i) Loan Modification Agreement by and between Borrower and Lender dated as of September 1, 2022, and (ii) Second Loan Modification Agreement by and between Borrower and Lender dated as May 11, 2023 (collectively, as further amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), whereby Lender agreed to lend to Borrower the principal amount of $705,000.00 as a revolving line of credit (the "**Loan**") for the purpose of acquiring and/or renovating a community land trust portfolio of at least five (5) single-family residential real properties located in Baltimore, Maryland as more particularly described in the Loan Agreement ( the **Property**") and preserving the Property as affordable housing (the "**Project**");

WHEREAS, pursuant to the Loan Agreement, Borrower executed for the benefit of Lender that certain Amended and Restated Revolving Line of Credit Promissory Note, dated May 11, 2023, in the maximum principal amount of SEVEN HUNDRED FIVE THOUSAND AND 00/100THS DOLLARS $705,000.00 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Promissory Note**");

WHEREAS, the Promissory Note provided that the entire unpaid principal balance of the Loan, together with all accrued and unpaid interest thereon, and all other fees, costs and charges, if any, due and payable pursuant to the Loan Documents would be due and payable in full no later than September 7, 2023 (the "**Maturity Date**");

WHEREAS, the Maturity Date was extended to (i) November 6, 2023 pursuant to that certain Third Loan Modification Agreement, dated September 7, 2023 by and between Borrower and Lender, (ii) January 5, 2024 pursuant to that certain Fourth Loan Modification Agreement, dated November 6, 2023 by and between Borrower and Lender, and (iii) July 5, 2024 pursuant to that certain Fifth Loan Modification Agreement dated January 5, 2024 by and between Borrower and Lender;

WHEREAS, Borrower has requested modification of the Loan to extend the Maturity Date by six (6) months, and subject to the terms and conditions set forth herein, Lender has agreed to the requested modification as detailed herein;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to amend the Loan terms and the Loan Documents as follows:

1.      Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

2.      The Maturity Date of the Loan is hereby extended to January 5, 2025.

3.      As a condition of Lender's extension of the Maturity Date, upon execution of this Agreement, Borrower agrees to and shall pay to Lender a loan modification fee equal to $1,635.00.

4.      On and as of the date if this Agreement, the representations and warranties set forth in Article II of the Loan Agreement, and in the other Loan Documents, made by Borrower are true and correct in all material respects, with the same force and effect as if made on and as of the date of this Agreement (except to the extent such representations and warranties expressly relate to an earlier date and except to the extent of changes in facts or circumstances that have been disclosed to Lender and do not constitute an Event of Default under the Loan Agreement or any other Loan Document).

5.      Except as expressly provided in this Agreement, the Loan Agreement, Promissory Note, and all other Loan Documents remain in full force and effect, unmodified.

6.      This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument and each of which shall be deemed an original.

7.      Each party agrees that this Agreement may be electronically signed, and that any electronic signatures appearing on this Agreement are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility.

*[Signatures on following page.]*

IN WITNESS HEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

**BORROWER**:

**North East Housing Initiative, Inc.,**
a Maryland nonprofit corporation

By: _Garrick Good_
D41527A649AF42A
Garrick R. Good
Executive Director

**LENDER:**

**National Housing Trust Community Development Fund,**
a District of Columbia nonprofit corporation

By: _Josh Earn_
DB9F7CB009CF49F...
Josh Earn
Vice President

## SEVENTH LOAN MODIFICATION AGREEMENT

THIS SEVENTH LOAN MODIFICATION AGREEMENT (this "**Agreement**") is made and entered into as of January 5, 2025 (the "**Effective Date**") by and between NORTH EAST HOUSING INITIATIVE, INC., a Maryland nonprofit corporation ("**Borrower**"), having an address of  P.O. Box 11762, 5307 Belair Road, Baltimore, MD 21206, and NATIONAL HOUSING TRUST COMMUNITY DEVELOPMENT FUND, a District of Columbia nonprofit corporation ("**Lender**"), having an address of 1101 Connecticut Avenue NW, Suite 700, Washington, D.C. 20036, each of which is sometimes referred to as a "Party" and collectively as the "Parties."

## WITNESSETH

WHEREAS, Borrower and Lender are party to that certain Loan Agreement, dated as of March 7, 2022, as amended by that certain (i) Loan Modification Agreement by and between Borrower and Lender dated as of September 1, 2022, and (ii) Second Loan Modification Agreement by and between Borrower and Lender dated as May 11, 2023 (collectively, as further amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), whereby Lender agreed to lend to Borrower the principal amount of $705,000.00 as a revolving line of credit (the "**Loan**") for the purpose of acquiring and/or renovating a community land trust portfolio of at least five (5) single-family residential real properties located in Baltimore, Maryland as more particularly described in the Loan Agreement ( the **Property**") and preserving the Property as affordable housing (the "**Project**");

WHEREAS**,** pursuant to the Loan Agreement, Borrower executed for the benefit of Lender that certain Amended and Restated Revolving Line of Credit Promissory Note, dated May 11, 2023, in the maximum principal amount of SEVEN HUNDRED FIVE THOUSAND AND 00/100THS DOLLARS $705,000.00 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Promissory Note**");

WHEREAS, the Promissory Note provided that the entire unpaid principal balance of the Loan, together with all accrued and unpaid interest thereon, and all other fees, costs and charges, if any, due and payable pursuant to the Loan Documents would be due and payable in full no later than September 7, 2023 (the "**Maturity Date**");

WHEREAS, the Maturity Date was extended to (i) November 6, 2023 pursuant to that certain Third Loan Modification Agreement, dated September 7, 2023 by and between Borrower and Lender, (ii) January 5, 2024 pursuant to that certain Fourth Loan Modification Agreement, dated November 6, 2023 by and between Borrower and Lender, (iii) July 5, 2024 pursuant to that certain Fifth Loan Modification Agreement dated January 5, 2024 by and between Borrower and Lender, and (iv) January 5, 2025 pursuant to that certain Sixth Loan Modification Agreement dated July 5, 2024 by and between Borrower and Lender;

WHEREAS, the Parties desire to further extend the Loan term, and subject to the terms and conditions set forth herein, Lender has agreed to extend the Loan accordingly;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to amend the Loan terms and the Loan Documents as follows:

1.      Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

2.      The Maturity Date of the Loan is hereby extended to May 15, 2025.

3.      On and as of the date if this Agreement, the representations and warranties set forth in Article II of the Loan Agreement, and in the other Loan Documents, made by Borrower are true and correct in all material respects, with the same force and effect as if made on and as of the date of this Agreement (except to the extent such representations and warranties expressly relate to an earlier date and except to the extent of changes in facts or circumstances that have been disclosed to Lender and do not constitute an Event of Default under the Loan Agreement or any other Loan Document).

4.      Except as expressly provided in this Agreement, the Loan Agreement, Promissory Note, and all other Loan Documents remain in full force and effect, unmodified.

5.      This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument and each of which shall be deemed an original.

6.      Each party agrees that this Agreement may be electronically signed, and that any electronic signatures appearing on this Agreement are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility.

*[Signatures on following page.]*

IN WITNESS HEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

**BORROWER**:

**North East Housing Initiative, Inc.,**
a Maryland nonprofit corporation

By: _____
       Garrick R. Good
       Executive Director

**LENDER:**

**National Housing Trust Community Development Fund,**
a District of Columbia nonprofit corporation

By: _____
       Josh Earn
       Vice President

**EIGHTH LOAN MODIFICATION AGREEMENT**

THIS EIGHTH LOAN MODIFICATION AGREEMENT (this "**Agreement**") is made and entered into as of May __, 2025 (the "**Effective Date**") by and between NORTH EAST HOUSING INITIATIVE, INC., a Maryland nonprofit corporation ("**Borrower**"), having an address of  P.O. Box 11762, 5307 Belair Road, Baltimore, MD 21206, and NATIONAL HOUSING TRUST COMMUNITY DEVELOPMENT FUND, a District of Columbia nonprofit corporation ("**Lender**"), having an address of 1101 Connecticut Avenue NW, Suite 700, Washington, D.C. 20036, each of which is sometimes referred to as a "Party" and collectively as the "Parties."

**WITNESSETH**

WHEREAS, Borrower and Lender are party to that certain Loan Agreement, dated as of March 7, 2022, as amended by that certain (i) Loan Modification Agreement by and between Borrower and Lender dated as of September 1, 2022, and (ii) Second Loan Modification Agreement by and between Borrower and Lender dated as May 11, 2023 (collectively, as further amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), whereby Lender agreed to lend to Borrower the principal amount of $705,000.00 as a revolving line of credit (the "**Loan**") for the purpose of acquiring and/or renovating a community land trust portfolio of at least five (5) single-family residential real properties located in Baltimore, Maryland as more particularly described in the Loan Agreement ( the **Property**") and preserving the Property as affordable housing (the "**Project**");

WHEREAS, pursuant to the Loan Agreement, Borrower executed for the benefit of Lender that certain Amended and Restated Revolving Line of Credit Promissory Note, dated May 11, 2023, in the maximum principal amount of SEVEN HUNDRED FIVE THOUSAND AND 00/100THS DOLLARS $705,000.00 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Promissory Note**");

WHEREAS, the Promissory Note provided that the entire unpaid principal balance of the Loan, together with all accrued and unpaid interest thereon, and all other fees, costs and charges, if any, due and payable pursuant to the Loan Documents would be due and payable in full no later than September 7, 2023 (the "**Maturity Date**");

WHEREAS, the Maturity Date was extended to (i) November 6, 2023 pursuant to that certain Third Loan Modification Agreement, dated September 7, 2023 by and between Borrower and Lender, (ii) January 5, 2024 pursuant to that certain Fourth Loan Modification Agreement, dated November 6, 2023 by and between Borrower and Lender, (iii) July 5, 2024 pursuant to that certain Fifth Loan Modification Agreement dated January 5, 2024 by and between Borrower and Lender, (iv) January 5, 2025 pursuant to that certain Sixth Loan Modification Agreement dated July 5, 2024 by and between Borrower and Lender, and (v) May 15, 2025 pursuant to that certain Seventh Loan Modification Agreement dated January 5, 2025 by and between Borrower and Lender;

WHEREAS, the Parties desire to further extend the Loan term, and subject to the terms and conditions set forth herein, Lender has agreed to extend the Loan accordingly;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to amend the Loan terms and the Loan Documents as follows:

1.      Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

2.      The Maturity Date of the Loan is hereby extended to August 15, 2025.

3.      Effective June 1, 2025, Section 2 of the Promissory Note is hereby amended and replaced in its entirety by the following:

> Interest.  The outstanding principal amount of the Loan shall bear interest at the rate of six percent (6.0%). During the Term of the Loan, payments of interest only shall be paid quarterly arrears on the 1st day of each calendar quarter (January 1, April 1, July 1, October 1) and continuing through the Maturity Date. Interest shall be calculated on the basis of a 360-day year and a 30-day month for all full months, and at a daily rate of 0.016667% for the actual number of days elapsed for partial months.

4.      On and as of the date if this Agreement, the representations and warranties set forth in Article II of the Loan Agreement, and in the other Loan Documents, made by Borrower are true and correct in all material respects, with the same force and effect as if made on and as of the date of this Agreement (except to the extent such representations and warranties expressly relate to an earlier date and except to the extent of changes in facts or circumstances that have been disclosed to Lender and do not constitute an Event of Default under the Loan Agreement or any other Loan Document).

5.      Except as expressly provided in this Agreement, the Loan Agreement, Promissory Note, and all other Loan Documents remain in full force and effect, unmodified.

6.      This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument and each of which shall be deemed an original.

7.      Each party agrees that this Agreement may be electronically signed, and that any electronic signatures appearing on this Agreement are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility.

*[Signatures on following page.]*

IN WITNESS HEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

**BORROWER**:

**North East Housing Initiative, Inc.,**
a Maryland nonprofit corporation

By:  *Garrick Good*
        D41527A649AF42A

Garrick R. Good
Executive Director

**LENDER:**

**National Housing Trust Community Development Fund,**
a District of Columbia nonprofit corporation

By:  *Josh Earn*
        DB9F7CB009CF49F...

Josh Earn
Vice President