# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL HOUSING TRUST COMMUNITY *
DEVELOPMENT FUND

                                            *

        *Plaintiff*

                                            *       **Case No.:** 1:26-cv-00076-MAU

v.

                                            *

NORTH EAST HOUSING INITIATIVE, INC.

                                            *

        *Defendant*

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

# DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

STANDARD OF REVIEW ................................................................................................. 3

ARGUMENT ................................................................................................................... 5

I.    PLAINTIFF'S MOTION NEVER ADDRESSES DEFENDANT'S AFFIRMATIVE
      DEFENSES ............................................................................................................5

II.   GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON
      THE GROUND THAT NHT'S CONDUCT REGARDING THE COLLATERAL
      ASSIGNMENT ESTOPS IT FROM ENFORCEMENT AND ESTABLISHES A FAILURE
      TO MITIGATE. ......................................................................................................7

III.  GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON
      THE GROUND OF EQUITABLE ESTOPPEL BASED ON NHT'S REPRESENTATIONS.
      ............................................................................................................................10

      A. NHT's Loan Administrator Represented That a Further Extension Would Be Granted, And
         The Record Contains Evidence From Which a Reasonable Factfinder Could Conclude
         That This Representation Gives Rise To Equitable Estoppel Which Operates
         Independently Of Any Contractual Anti-waiver Or Notice-waiver Provision. ...................10

      B. Even If No Enforceable Oral Modification Occurred, The Same Representation
         Independently Supports Estoppel And Reasonable Reliance. ...............................................13

      C. Zimmitti's Continuous Role Administering This Loan Supports A Finding Of His
         Authority To Bind NHT, Or At Minimum Raises A Genuine Dispute. ...............................16

      D. Any Argument That Mere Silence Or A Boilerplate Acceleration Clause Defeats Estoppel
         Misses The Point. ..................................................................................................................17

IV.   GENUINE ISSUES OF MATERIAL FACT INDEPENDENTLY PRECLUDE SUMMARY
      JUDGMENT ON THE GROUND WAIVER ............................................................................18

V.    GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON
      THE GROUND OF LACHES. ................................................................................................21

VI.   IN THE ALTERNATIVE, GENUINE ISSUES OF FACT EXIST AS TO WHETHER
      NEHI'S PERFORMANCE WAS EXCUSED. ........................................................................24

VII.  INDEPENDENT OF ANY AFFIRMATIVE DEFENSE, GENUINE ISSUES OF
      MATERIAL FACT PRECLUDE SUMMARY JUDGMENT AS TO THE AMOUNT OF
      DAMAGES CLAIMED ........................................................................................................27

CONCLUSION ...............................................................................................................31

i

## TABLE OF AUTHORITIES

**Cases**

*Accord Stancil v. First Mount Vernon Indus. Loan Ass'n,*
131 A.3d 867 (D.C. 2014) ........................................................................................................14

*Act Now to Stop War & End Racism Coalition v. District of Columbia,*
286 F.R.D. 145 (D.D.C. 2012) ..................................................................................................30

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)................................................................................................................3, 5

*Archie v. U.S. Bank, N.A.,*
255 A.3d 1005 (D.C. 2021) ................................................................................................21, 23

*Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Service,*
885 F. Supp. 2d 156 (D.D.C. 2012)...........................................................................................12

*Beck v. Test Masters Educational Services, Inc.,*
73 F. Supp. 3d 12 (D.D.C. 2014)...............................................................................................30

*Britamco Underwriters, Inc. v. Nishi, Papagjika & Assocs., Inc.,*
20 F. Supp. 2d 73 (D.D.C. 1998)...............................................................................................11

*Burt v. First American Bank,*
490 A.2d 182, 186-87 (D.C. 1985)............................................................................................29

*Camara v. Mastro's Restaurants LLC,*
952 F.3d 372 (D.C. Cir. 2020)....................................................................................................4

*CapitalKeys, LLC v. Democratic Republic of Congo,*
278 F. Supp. 3d 265 (D.D.C. 2017)...........................................................................................30

*Cassidy v. Owen,*
533 A.2d 253 (D.C. 1987) .........................................................................................................10

*Caston v. Butler,*
629 F. Supp. 2d 20 (D.D.C. 2009).............................................................................................27

*Clark v. Clark,*
535 A.2d 872 (D.C. 1987) .........................................................................................................14

*Columbia Cas. Co. v. Columbia Hosp. for Women,*
633 F. Supp. 697 (D.D.C. 1986)................................................................................................11

D.C. Court of Appeals in *Sacks v. Rothberg,*
569 A.2d 150 (D.C. 1990) .........................................................................................................10

*Electronic Privacy Information Center v. U.S. Department of Homeland Security,*
999 F. Supp. 2d 61 (D.D.C. 2013).............................................................................................30

*Entrepreneur, Ltd. v. Yasuna,*
498 A.2d 1151 (D.C. 1985) .................................................................................................11, 32

*Galioto Towing LLC v. Huntington Nat'l Bank,*
709 F. Supp. 3d 648 (E.D. Wis. 2023) ........................................................................................3

*Gelman v. Public Nat'l Bank,*
377 F.2d 166 (D.C. Cir. 1967)...................................................................................................17

*Heller v. District of Columbia,*
832 F. Supp. 2d 32 (D.D.C. 2011).............................................................................................30

*LeBlanc v. United States Privacy & Civil Liberties Oversight Bd.,*

784 F. Supp. 3d 1 (D.D.C. 2025)..................................................................................................28

*Mahajan v. Boxcar Holdings, LLC,*
  No. 18-cv-00533 (D. Colo. Jan. 31, 2019) ..................................................................................3

*Morris Commc'n, Inc. v. F.C.C.,*
  566 F.3d 184 (D.C. Cir. 2009)...................................................................................................18

*Nat'l Ass'n of Postmasters v. Hyatt Regency Washington*,
  894 A.2d 471 (D.C. 2006) .........................................................................................................23

*National R.R. Passenger Corp. v. Expresstrak, L.L.C,*
  No. 02-1773 (D.D.C. Oct. 16, 2006) .........................................................................................17

*Nat'l Red Cross v. Travelers Indem. Co. of R.I.,*
  896 F. Supp. 8 (D.D.C. 1995).......................................................................................................9

*Neponset Landing Corp. v. Nw. Mut. Life Ins. Co.,*
  279 F.R.D. 59 (D. Mass. 2011)....................................................................................................9

*New 3145 Deauville, L.L.C. v. First American Title Insurance Co*.,
  881 A.2d 624 (D.C. 2005) .........................................................................................................28

*Osseiran v. Int'l Finance Corp.,*
  889 F. Supp. 2d 30 (D.D.C. 2012)..............................................................................................12

*Pauling v. District of Columbia*,
  286 F. Supp. 3d 179 (D.D.C. 2017)..............................................................................................6

*Pulte Capital Partners, LLC v. Lush,*
  No. 23-cv-81282 (S.D. Fla. Feb. 14, 2025) .................................................................................3

*Puma v. Sullivan*,
  746 A.2d 871 (D.C. 2000) ...................................................................................................13, 14

*Puskarich v. BNSF Ry. Co.,*
  No. 19-CV-150-F (D. Wyo. Feb. 22, 2022) .................................................................................9

*Realty Assocs. v. Ades,*
  186 Misc. at 641 (1946)..............................................................................................................12

*Service Employees Int'l Union National Indus. Pension Fund v. Jersey City Healthcare Providers, LLC*,
  358 F. Supp. 3d 12 (D.D.C. 2019)..............................................................................................28

*Service Employees International Nat'l Indus. Pension Fund v. Tandem Development Grp., LLC,*
  274 F. Supp. 3d 1 (D.D.C. 2017)................................................................................................30

*Sikorsky Aircraft Corp. v. United States*,
  105 Fed. Cl. 657 (2012) ...............................................................................................................4

*Stewart v. Shannon & Luchs Co.,*
  46 A.2d 863 (D.C. 1946) ............................................................................................................12

*Tech 7 Sys., Inc. v. Vacation Acquisition, LLC,*
  594 F. Supp. 2d 76 (D.D.C. 2009).................................................................................4, 6, 12, 20

*Transatlantic Fin. Corp. v. United States*,
  363 F.2d 312 (D.C. Cir. 1966)..............................................................................................23, 25

*U.S. Equal Employment Opportunity Commission v. R&R Janitorial Painting and Building Servs.,* Inc.,
  No. CV 21-2539 (RC) (D.D.C. Aug. 20, 2025)............................................................................6

*U.S. v. Honeywell Int'l, Inc.,*
  841 F. Supp. 2d 112 (D.D.C. 2012)............................................................................................18

*United Cent. Bank v. Wells St. Apartments, LLC,*

   957 F. Supp. 2d 978 (E.D. Wis. 2013) ...............................................................................3

*United States v. Mejia,*
   657 F. Supp. 3d 123 (D.D.C. 2023)....................................................................................6

*United States v. Philip Morris USA, Inc.,*
   327 F. Supp. 2d 8 (D.D.C. 2004).......................................................................................4

*Walsh v. Cooper,*
   31 A.2d 883 (D.C. 1943) .................................................................................................12

## Rules

Fed. R. Civ. P. 36(b) ...........................................................................................................7

Fed. R. Civ. P. 56................................................................................................................4, 31

Fed. R. Evid. 1006. .............................................................................................................28

Defendant, North East Housing Initiative, Inc. ("NEHI"), by and through undersigned counsel, hereby submits this Opposition to Plaintiff, National Housing Trust Community Development Fund's ("NHT") Motion for Summary Judgment ("Motion") and, in support thereof, respectfully states as follows:

## INTRODUCTION

Plaintiff, National Housing Trust Community Development Fund's ("NHT") Motion rests almost entirely on facts Defendant, North East Housing Initiative, Inc. ("NEHI") has never disputed. NEHI has consistently acknowledged the existence of the Loan Documents, its receipt of the loan proceeds, and that the loans ultimately were not repaid by their maturity dates. NHT's Motion confirms as much, repeatedly noting that "[d]efendant does not deny that it received the loaned funds, that it is obligated to repay the Loans in full[,] and that it failed to do so," and expressly relying on NEHI's Answer and 30(b)(6) testimony as admissions "relevant to liability, breach, and nonpayment."

The equities in this case run against summary judgment as strongly as the law does. NHT's own underwriting admittedly considered, at origination, the very risk that DHCD's grant disbursement might be delayed or withheld.[1] Ex. A (NHT's Resp. to RFA No. 16). NHT went further — it obtained a Collateral Assignment specifically to "provide NHTCDF legal rights to the funding source" against exactly that risk, and its own internal records candidly describe NHT as "comfortable remaining more patient" with NEHI given the nature of that funding source. Ex. B,

---

[1] NHT's use of the word "withheld" should be construed in the context of the governing documents themselves. In the disbursement provision of the AHTF Grant Agreement, "withheld" is used in connection with a specific, capped retainage — ten percent of grant funds, released upon project completion and issuance of use-and-occupancy permits — expressly distinguishing "available GRANT FUNDS" from "withheld Retainage." Ex. A to Compl., ECF No. 1-1, at 58 § 4. NEHI addresses the significance of this distinction in Section V below.

NHT000102-103, Ex. F, NHT000254. For more than three years, NHT's conduct — eight formal, individually negotiated modifications, reflected an institution that assumed, and was actively managing, the risk it now asks this Court to treat as entirely NEHI's own. What ultimately disrupted NEHI's ability to perform was not the ordinary funding delay NHT admits it foresaw, but a total, unexplained suspension of all City funding triggered by a federal investigation in which NEHI was confirmed to be a bystander, not a target, Ex. H (Sammis Rep. Ltr.); Ex. J, NEHI000113-115 (DHCD Commissioner correspondence), compounded by DHCD's mid-contract change to its certification requirements. Good Decl. ¶ 8. For more than three years, NHT's conduct reflected that it viewed this as a shared and manageable risk. It cannot now recast that same risk as entirely NEHI's to bear, immune from equitable scrutiny, simply because it has grown impatient with the consequences of circumstances neither party controlled.

NHT therefore devotes the bulk of its Statement of Undisputed Material Facts to propositions that are not, and never have been, in dispute. The Motion nevertheless fails, because NHT mistakenly assumes that establishing the elements of its breach of contract claim automatically entitles it to summary judgment. It does not. NHT must also demonstrate that no genuine dispute of material fact exists as to NEHI's properly pleaded affirmative defenses of waiver, estoppel, laches, and failure to mitigate. NHT's Motion never undertakes that analysis. It does not address NEHI's Collateral Assignment defense. That omission is telling. It is the one defense NHT cannot dispute without contradicting its own discovery responses. It does not address NHT's own admission that it never enforced that security interest. It does not address its loan administrator's representations regarding a further extension. It does not meaningfully grapple with the equitable consequences of eight negotiated loan modifications over three years. NHT proves only the elements of its claim. Rule 56 requires more. The question presented by NHT's

2

Motion is not whether NHT has established a *prima facie* breach of contract claim; it is whether NHT has shown that NEHI's affirmative defenses fail as a matter of law. It has not.

Accordingly, NHT's Motion should be denied.

## STANDARD OF REVIEW

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The Court must view the evidence in the light most favorable to NEHI as the non-moving party and draw all reasonable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

That standard governs affirmative defenses with equal force. Because a motion for summary judgment on an entire claim is necessarily also a motion for summary judgment on any affirmative defenses to that claim, the movant bears the burden of defeating those defenses regardless of the strength of its own *prima facie* showing. *See, Galioto Towing LLC v. Huntington Nat'l Bank*, 709 F. Supp. 3d 648, 655 (E.D. Wis. 2023) ("[W]hen [a party] moves for summary judgment on an entire claim, it is necessarily also moving for summary judgment on any affirmative defenses to that claim.") (quoting *United Cent. Bank v. Wells St. Apartments, LLC,* 957 F. Supp. 2d 978, 987 (E.D. Wis. 2013)); *Mahajan v. Boxcar Holdings, LLC,* No. 18-cv-00533, 2019 WL 399230, at *4 (D. Colo. Jan. 31, 2019) ("If the elements of a breach of contract claim are proven by a preponderance of the evidence, an affirmative defense may nonetheless invalidate the agreement at issue.")(citation omitted); *Pulte Capital Partners, LLC v. Lush,* No. 23-cv-81282, 2025 WL 1517440, at *5, *10 (S.D. Fla. Feb. 14, 2025) (denying summary judgment on breach of contract claim where defendant, though not disputing breach, raised genuine disputes of material fact on affirmative defenses of misrepresentation and prior material breach); *Sikorsky Aircraft*

3

*Corp. v. United States*, 105 Fed. Cl. 657, 673, 677 (2012) (genuine issues of material fact as to a contractor's affirmative defenses precluded summary judgment notwithstanding the government's showing on the underlying claim). This is a rule of federal procedure under Fed. R. Civ. P. 56, applied uniformly regardless of the substantive law governing the underlying contract. It is well established that "it is inappropriate to resolve issues of credibility, motive, and intent on motions for summary judgment," and that such questions are "ill-suited for summary judgment." *Tech 7 Sys., Inc. v. Vacation Acquisition, LLC,* 594 F. Supp. 2d 76, 84 (D.D.C. 2009) (quoting *United States v. Philip Morris USA, Inc.,* 327 F. Supp. 2d 8, 12 n.5 (D.D.C. 2004)). Applying that principle, this Court denied summary judgment on waiver, equitable estoppel, and laches defenses in the same case because genuine issues of material fact existed as to each. *Id*. at 80, 86.

NHT will likely argue that Mr. Good's testimony regarding statements made by NHT's representatives is uncorroborated and self-serving, and that such testimony cannot, standing alone, create a genuine dispute of material fact. That is not the law. A witness's sworn testimony regarding matters within his personal knowledge is competent evidence for purposes of Rule 56 regardless of whether it is corroborated by other witnesses or documents, and the absence of corroboration goes to weight and credibility. Those are questions reserved for the factfinder, not to the admissibility or sufficiency of the testimony at the summary judgment stage. A court may not discount otherwise admissible evidence merely because it is characterized as "self-serving." *Camara v. Mastro's Restaurants LLC*, 952 F.3d 372, 380 (D.C. Cir. 2020). NHT's election not to memorialize its representative's statements in writing does not transform NEHI's testimony describing those statements into something less than evidence.

To the extent NHT submits a declaration asserting that it never intended to waive its enforcement rights or to induce reliance, that assertion does not resolve this Motion; it confirms

4

why summary judgment is unavailable. A party's own characterization of its subjective intent is not competent to eliminate a genuine dispute where, as here, circumstantial and documentary evidence supports the contrary inference. *Anderson*, 477 U.S. at 255 (credibility determinations and the weighing of evidence are functions for the fact-finder, not the court on summary judgment). A bare assertion of contrary intent is itself evidence to be weighed against NEHI's showing not a basis for the Court to resolve the question in NHT's favor.

NEHI has never attempted to manufacture a factual dispute regarding the existence of the Loan Documents or the ultimate repayment obligation. To the contrary, NHT's own records: its modification agreements, its internal memoranda, and its discovery responses are what create the genuine disputes here — the parties' course of performance, NHT's own repeated modifications and conduct, NHT's own knowledge of the anticipated repayment structure, and whether NHT's own actions give rise to NEHI's affirmative defenses. Those issues, *not the existence of the debt*, are what preclude summary judgment. NHT's Motion never attempts to eliminate those factual disputes. Instead, it largely ignores them. The sections that follow explain why each independently precludes summary judgment.

## ARGUMENT

### I.    PLAINTIFF'S MOTION NEVER ADDRESSES DEFENDANT'S AFFIRMATIVE DEFENSES.

NHT's Motion follows a simple structure: NEHI admits the debt; NEHI admits nonpayment; therefore, judgment. That structure is legally insufficient. NHT never carries its Rule 56 burden of showing there is no genuine dispute concerning waiver, estoppel, laches, or failure to mitigate — the Motion does not mention the Collateral Assignment, does not address NHT's own admission that it never enforced that security interest, and does not address its loan

5

administrator's representations regarding a further extension. Since questions of intent and credibility underlying these defenses are ill-suited for summary judgment, an unaddressed defense supported by record evidence cannot be resolved against NEHI on this record. *See, Tech 7 Sys*., 594 F. Supp. 2d at 84, 86. Sections I through VI below identify the specific, evidence-backed disputes NHT's Motion ignores, including genuine disputes as to the amount of damages claimed independent of any affirmative defense.

Because Plaintiff elected not to address Defendant's affirmative defenses in its opening memorandum, Defendant addresses below the principal arguments Plaintiff may attempt to raise for the first time in reply.[2] NEHI does so only to preserve a meaningful opportunity to respond, not to cure Plaintiff's failure, as the movant, to carry its Rule 56 burden in the first instance. Plaintiff should not be permitted to obtain summary judgment by supplying in reply the arguments necessary to defeat affirmative defenses it ignored in its opening brief, after Defendant's ordinary briefing opportunity has passed. Courts in this District generally decline to consider arguments raised for the first time in reply because doing so deprives the opposing party of a fair opportunity to respond. *Pauling v. District of Columbia*, 286 F. Supp. 3d 179 (D.D.C. 2017); *Mejia*, 657 F. Supp. 3d 123. At minimum, any new reply argument directed to NEHI's affirmative defenses should not be considered absent a fair opportunity for NEHI to respond. *See, U.S. Equal Employment Opportunity Commission,* 2025 WL 2409751.

---

[2] By addressing anticipated reply arguments, NEHI does not concede that Plaintiff satisfied its opening Rule 56 burden, nor does NEHI waive its right to seek leave to respond to any argument Plaintiff actually raises for the first time in reply. Any anticipatory response is necessarily limited to arguments NEHI can reasonably foresee from Plaintiff's Motion and the existing record. Courts in this District recognize that where a reply raises new issues, the nonmovant may seek leave to file a surreply so the issue is fairly presented. *United States v. Mejia,* 657 F. Supp. 3d 123 (D.D.C. 2023); *U.S. Equal Employment Opportunity Commission v. R&R Janitorial Painting and Building Servs.,* Inc., No. CV 21-2539 (RC), 2025 WL 2409751 (D.D.C. Aug. 20, 2025).

## II.   GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE GROUND THAT NHT'S CONDUCT REGARDING THE COLLATERAL ASSIGNMENT ESTOPS IT FROM ENFORCEMENT AND ESTABLISHES A FAILURE TO MITIGATE.

This defense does not depend on disputed testimony, credibility, or interpretation. It arises entirely from NHT's own Rule 36 admissions. NHT admits, in response to NEHI's Request for Admission No. 9, that after executing the Collateral Assignment, it "took no steps to enforce its rights under the Collateral Assignment against the City of Baltimore or DHCD." Ex. A. NHT further admits, in response to Request No. 8, that it never provided the City of Baltimore or DHCD written notice of its security interest in the AHTF grant proceeds at all. *Id.* At a minimum, NHT's own binding admissions under Fed. R. Civ. P. 36(b) create a genuine dispute of material fact independent of any witness's credibility or characterization.

The Collateral Assignment was not incidental. It recites that the City awarded NEHI a $750,000 AHTF grant and that, as a condition of the Fifth Loan Modification, NHT required NEHI to assign all interests in and rights to disbursement of those grant funds as security for the Loan. ECF No. 26-2, at 61; Ex. A, NHT's Resp. to RFA No. 7. The instrument further provides that "[t]he assignment of Assignor's Assigned Rights and Assignee's right to enforce such assignment shall be effective upon the earlier of (i) an Event of Default under the Loan Agreement, or (ii) the Maturity Date of the Loan." ECF No. 26-2, at 62, ¶ 5. NHT's enforcement right was therefore not merely available in the abstract; it became unambiguously active no later than October 2, 2025, when NHT itself declared an Event of Default. NHT nonetheless admits it took no steps to enforce that right, at any point before or after that date. Ex. A, NHT's Resp. to RFA No. 9. NHT held a Collateral Assignment sufficient to satisfy the very obligation it now seeks to collect from NEHI directly, and its own discovery responses establish, as admitted fact, not disputed testimony, that

7

it never enforced or even asserted that security interest. Whether that election was reasonable, and whether it estops NHT from now seeking full recovery from NEHI while the underlying DHCD obligation remains uncollected, is quintessentially a question for the factfinder. *See, Tech 7 Sys.,* 594 F. Supp. 2d at 86 (equitable estoppel presents fact questions ill-suited for summary judgment).

The Collateral Assignment was not one security interest among several; it was the only one. NHT's own internal loan committee records describe the Initial Loan's security position in a single line: "Security: None; NHTCDF has an assigned pledge against the AHTF grant funds due from the City of Baltimore." Ex. D, NHT000159. NHT therefore held no other collateral, no guarantor, and no alternative recourse beyond the very instrument it admits it never enforced.

NHT will certainly argue that its non-enforcement is legally irrelevant because the City of Baltimore and DHCD were never parties to the Collateral Assignment and therefore there was nothing for NHT to enforce against them directly—a position previewed in NHT's objection to Request Nos. 8 and 9. Ex. A. But even fully credited, that argument does not explain NHT's admitted inaction; it sharpens the issue. NHT's admission is not merely that it failed to sue a non-party. NHT admits it never gave DHCD or the City written notice of its security interest, RFA No. 8, never communicated with either regarding its rights under the Collateral Assignment, and never made any demand for the assigned proceeds. *Id.* Thus, the issue is not whether NHT was required to sue DHCD or the City, but whether NHT's decision to take no step at all to assert, preserve, or leverage the specifically negotiated security interest it obtained in the identified funding source was a reasonable exercise of business judgment or a waiver of the very protection it negotiated for itself. That is a factual question that cannot be resolved in NHT's favor on summary judgment.

NHT will likely point to isolated deposition testimony of NEHI's corporate designee, Garrick Good, responding "No" when asked in conclusory form whether "the plaintiff failed to mitigate damages" and whether he was "suggesting... that plaintiff's hands were unclean." Neither exchange creates an admission binding on NEHI, and neither undermines the defenses established above. ECF No. 28, Ex. 1, Good Dep. Tr. 134:18-20; 136:2-137:15. NEHI objected to both questions at the time as calling for a legal conclusion, and Mr. Good's own testimony confirms why. ECF No. 28, Ex, 1, Good Dep. Tr. 134:21-22; 136:9-11. When asked moments earlier to "describe the factual basis" for the unclean hands defense, he expressly declined, stating "I don't know how to explain that." ECF No. 28, Ex, 1, Good Dep. Tr. 136:7-14. A lay corporate designee's inability, or reluctance, to characterize NHT's conduct using legal terminology he was never asked to master does not defeat a defense that rests on NHT's own admitted, undisputed conduct. "[D]epositions are designed to discover facts, not legal theories," and a "lay witness should not be expected to testify as to how any such facts form the basis of a legal affirmative defense." *Neponset Landing Corp. v. Nw. Mut. Life Ins. Co.,* 279 F.R.D. 59, 61 (D. Mass. 2011); *accord Puskarich v. BNSF Ry. Co.,* No. 19-CV-150-F, 2022 WL 611276, at *6 (D. Wyo. Feb. 22, 2022). Nor may a corporate deponent's failure to articulate the factual basis for an affirmative defense at deposition render that defense unprovable at trial. *Am. Nat'l Red Cross v. Travelers Indem.* Co. of R.I., 896 F. Supp. 8, 13-14 (D.D.C. 1995). The defense here does not rest on Mr. Good's characterization at all. It rests on NHT's own Rule 36 admissions, which are conclusively established regardless of any lay witness's understanding of the legal doctrines those facts support.

Unlike the defenses addressed below, this one requires the Court to weigh nothing. NHT has already admitted, in its own sworn discovery responses, that it did not notify DHCD or the City of Baltimore of its security interest, did not communicate with them regarding its rights under

9

the Collateral Assignment, did not demand the assigned proceeds, and took no steps to enforce the security interest it negotiated for that purpose. Those admissions alone create a genuine dispute as to whether NHT failed to mitigate its damages, waived the benefit of the Collateral Assignment, or is estopped from seeking full recovery from NEHI without first attempting to pursue the assigned funding source.

### III.   GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE GROUND OF EQUITABLE ESTOPPEL BASED ON NHT'S REPRESENTATIONS.

#### A. NHT'S LOAN ADMINISTRATOR REPRESENTED THAT A FURTHER EXTENSION WOULD BE GRANTED, AND THE RECORD CONTAINS EVIDENCE FROM WHICH A REASONABLE FACTFINDER COULD CONCLUDE THAT THIS REPRESENTATION GIVES RISE TO EQUITABLE ESTOPPEL WHICH OPERATES INDEPENDENTLY OF ANY CONTRACTUAL ANTI-WAIVER OR NOTICE-WAIVER PROVISION.

The Amended and Restated Note and the Enterprise Note each provide that no indulgence, extension, or failure to accelerate "shall be construed... as a waiver" of NHT's right to insist upon strict compliance, and that NEHI expressly waived notice before acceleration. ECF No. 1-3 at 18; ECF No. 26-3 at 129,  Those provisions govern waiver by conduct and contractual notice; they do not and cannot foreclose equitable estoppel arising from NHT's affirmative representations, which is a distinct doctrine under District of Columbia law.

The elements of equitable estoppel under D.C. law are: (1) a false representation or concealment of material fact, (2) made with actual or constructive knowledge of the true facts and with the intention that another act in reliance upon it, (3) the other party's lack of knowledge of the truth, (4) reliance upon the representation, and (5) a resulting prejudicial change of position. *Cassidy v. Owen*, 533 A.2d 253, 255 (D.C. 1987). Applying these elements, the D.C. Court of Appeals in *Sacks v. Rothberg*, 569 A.2d 150 (D.C. 1990), held that a creditor was estopped from

accelerating a note based on its own prior practice of notifying the debtor of deficient payments — expressly rejecting the creditor's argument that the absence of any contractual duty to give notice defeated the estoppel claim. *Id.* at 156-57. The court emphasized that the debtor's immediate tender of the amount due upon finally receiving notice demonstrated actual, reasonable reliance. *Id*. Even a substantially shorter course of dealing than the eight modifications at issue here has been held sufficient to raise a genuine estoppel question; a three-month delay in reserving rights has been held to present a genuine issue of material fact as to estoppel. *Britamco Underwriters, Inc. v. Nishi, Papagjika & Assocs., Inc.*, 20 F. Supp. 2d 73, 78 n.4 (D.D.C. 1998) (citing *Columbia Cas. Co. v. Columbia Hosp.* for Women, 633 F. Supp. 697, 699 (D.D.C. 1986)).

The evidence supports the same conclusion here, on stronger facts. During his deposition, Garrick Good testified that, based on his contemporaneous dialogue with NHT's loan administrator Ben Zimmitti, he understood that NHT would grant a further extension of the loan if the AHTF grant funds were not received by July 5, 2024 notwithstanding the absence of that contingency in the written text of the Sixth Loan Modification Agreement. ECF No. 28, Ex. 1 (Good Dep. Tr.) 78:4-79:18. A fact-finder could conclude this was an affirmative representation by NHT's own representative, not mere silence or passive acceptance of late payment. NHT's anti-waiver clauses address the latter; *Entrepreneur, Ltd. v. Yasuna,* 498 A.2d 1151, 1163 (D.C. 1985), holds that a contractual no-waiver provision "has no effect" on the independent estoppel analysis where a party's conduct establishes a course of dealing and then attempts to enforce a term literally and strictly without fair notice. A party cannot "sit back over a period of" time knowing full well the nature of the other party's conduct and then "at long last determine that" the conduct is a violation warranting forfeiture; in such circumstances the party asserting the right is "estopped now from claiming" a violation, since "[a]ny other result would constitute an entrapment of and

11

work a fraud upon" the other party. *Id*. at 1163 (quoting *405 Realty Assocs. v. Ades,* 186 Misc. at 641, 59 N.Y.S.2d 240-41 (1946)). This principle is not unique to New York; District of Columbia courts have long applied the same rule. Notwithstanding a non-waiver provision, acceptance of performance over a long period with clear knowledge of a breach and without objection constitutes waiver of the right to insist on strict compliance. *Walsh v. Cooper,* 31 A.2d 883, 884 (D.C. 1943); *accord Stewart v. Shannon & Luchs Co.,* 46 A.2d 863, 864 (D.C. 1946) (course of conduct constituted waiver of the non-waiver clause itself as applied to the particular covenant at issue). Whether Mr. Zimmitti's statement was made, what NEHI understood it to mean, and whether NEHI reasonably relied on it are precisely the kind of fact-intensive questions *Tech 7 Systems* held inappropriate for resolution on summary judgment. 594 F. Supp. 2d at 86.

NHT may argue that Mr. Zimmitti's statement, describing what would happen if a future date passed, is a promise rather than a representation of existing fact, and that any claim resting on a promise sounds in promissory estoppel rather than the equitable estoppel doctrine addressed above. At a minimum, the evidence creates a genuine dispute of material fact under either doctrine. Promissory estoppel is an equitable doctrine available where refusal to enforce a promise would result in injustice, and it requires a promise, reasonable inducement of reliance, and detrimental reliance by the promisee. *Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Service,* 885 F. Supp. 2d 156 (D.D.C. 2012). Because reliance on an indefinite promise is unreasonable, the promise must have definite terms on which the promisor would expect the promisee to rely, although it need not be as specific and definite as an enforceable contract. *Osseiran v. Int'l Finance Corp.,* 889 F. Supp. 2d 30 (D.D.C. 2012); *Ascom*, 885 F. Supp. 2d 156. The Zimmitti statement — that NHT would grant a further extension if the AHTF grant funds were not received by a date certain — was definite as to the event, consequence, and timing, and a reasonable factfinder could conclude that

12

NEHI reasonably relied on it to continue the parties' modification/workout course rather than treating NHT's accommodation as at an end. Whether the statement was merely a prediction of future action or a definite commitment is itself a factual dispute regarding what was said and what a reasonable listener would have understood, not a basis to resolve the issue against NEHI as a matter of law.

The record contains a second, independent instance of NHT's continued accommodation immediately preceding its declaration of default. Mr. Good provides that on or about August 2, 2025, Andrea Sevanto, a new NHT representative, introduced herself to him and stated that NHT wanted to do everything they can to work with us and that NHT was in business to support organizations like ours, and requested time to review NEHI's file. Good Decl. ¶6. No default was declared during this period, and NEHI received no communication indicating that NHT's position had changed before it received the October 2, 2025 default notice without any intervening warning. Whether NHT's introduction of new relationship staff, expressing continued goodwill and requesting time to get up to speed, two months before an abrupt pivot to default, is consistent with the reasonableness and fair-dealing questions already before the Court in this Section, or independently supports NEHI's waiver and laches defenses addressed below, is a question for the factfinder, not this Court.

## B. Even If No Enforceable Oral Modification Occurred, The Same Representation Independently Supports Estoppel And Reasonable Reliance.

Separately, and more simply, it is settled District of Columbia law that a written contract may be orally modified or rescinded by a subsequent oral agreement even where the contract expressly prohibits oral modification. *Puma v. Sullivan*, 746 A.2d 871 (D.C. 2000), reversed summary judgment on this exact basis, holding that a genuine issue of material fact existed as to

13

whether a note's maturity date was orally extended notwithstanding the written instrument's terms; NEHI need only establish the oral modification by a preponderance of the evidence. *Id*. at 875. *Accord Stancil v. First Mount Vernon Indus. Loan Ass'n*, 131 A.3d 867, 874 (D.C. 2014) (quoting *Clark v. Clark*, 535 A.2d 872, 876 (D.C. 1987)) ("the existence of an express bar against oral modification does not remove the parties' continuing rights to contract anew on the subject"). Mr. Zimmitti's statement, at minimum, raises a genuine factual dispute as to whether the parties reached such an oral understanding regarding the consequence of a missed July 5, 2024 deadline.

The detriment NEHI identifies here is not the mere continuation of payments already owed under the Loans. Rather, NEHI's reliance rests on its continued forbearance from treating NHT's course of dealing as at an end — reasonably continuing to negotiate and defer to counsel rather than immediately treating the relationship as terminated — precisely because Mr. Zimmitti's sustained conduct gave no indication that a different posture was coming.

NHT will most certainly invoke the integration clause found in the Loan Agreement and repeated in each modification — that the agreement "constitutes and incorporates the entire agreement between Lender and Borrower" and supersedes prior understandings — to argue the parol evidence rule bars consideration of the Zimmitti conversation. This argument mistakes the timing of the evidence at issue. The parol evidence rule bars extrinsic evidence of agreements predating or contemporaneous with a written contract; it does not bar evidence of a subsequent oral modification made after the written instrument was executed. *Puma* and *Sullivan* address exactly this scenario, and both hold that an integration clause and a no oral modification clause do not foreclose proof of a later oral agreement to modify the contract's terms. An integration clause freezes the deal as of signing; it does not immunize a party from its own later, separate representations.

14

Even if the Court concludes that no enforceable oral modification arose, the same evidence remains independently relevant and admissible to NEHI's waiver and estoppel defenses below and to the reasonableness of NEHI's reliance on NHT's course of dealing. The oral modification theory does not stand or fall alone; NHT's Motion must defeat all three theories this evidence supports, not merely the one it chooses to address.

NHT cites Mr. Good's deposition testimony to establish that the written Loan Documents contain no provision expressly making repayment contingent upon NEHI's receipt of AHTF grant funds. ECF No. 26-2, Ex. 5 (Good Dep. Tr. 65:18–83:5). But that testimony establishes only a proposition NEHI does not dispute. NEHI does not contend that the Loan Documents contain an express provision making repayment contingent on receipt of the grant. NHT therefore uses Mr. Good's testimony to defeat an argument NEHI has not made, while ignoring what the Loan Documents and the parties' course of dealing actually show. The relevant inquiry is not whether the words "repayment is contingent upon receipt of AHTF funds" appear in a single provision. The documents must be considered as a whole and in the context of the parties' subsequent conduct, including the Collateral Assignment specifically directed to the AHTF proceeds, the repeated written extensions while those proceeds remained outstanding, NHT's contemporaneous recognition of City funding delays and the anticipated grant-funded takeout, and NHT's continued accommodation while NEHI pursued that funding and refinancing. Taken together, that evidence, at minimum, permits a reasonable factfinder to infer that the anticipated AHTF proceeds were integral to the parties' ongoing repayment arrangement and to NHT's decisions concerning enforcement.

NEHI's defenses therefore arise not from an asserted express contingency in the Note, but from the written agreements viewed as a whole and NHT's subsequent conduct and

15

representations: its repeated course of dealing, its admitted decision not to exercise or even assert the Collateral Assignment, and its loan administrator's representation concerning a further extension. The absence of an express written contingency does not erase that evidence. Nor does it entitle NHT to isolate the repayment provision from the remainder of the parties' documented relationship and ask the Court to draw the only inference favorable to NHT. At most, Mr. Good's testimony establishes the absence of an express written contingency; it does not establish the absence of a genuine dispute concerning the waiver, estoppel, and subsequent oral-modification defenses actually before the Court.

### C.   ZIMMITTI'S CONTINUOUS ROLE ADMINISTERING THIS LOAN SUPPORTS A FINDING OF HIS AUTHORITY TO BIND NHT, OR AT MINIMUM RAISES A GENUINE DISPUTE.

To the extent NHT argues that Mr. Zimmitti lacked authority to bind NHT to an extension, NHT's records, at minimum, raise a genuine dispute requiring trial. NHT's internal records establish that Mr. Zimmitti was not a peripheral or low-level employee, but NHT's designated loan administrator on this specific loan continuously from at least September 2023 through the period at issue: he authored internal memoranda recommending the September 27, 2023, November 6, 2023, and January 25, 2024 maturity extensions as "Loan Fund Administrator"; co-submitted the December 2023 loan restructure memorandum with NHT's Senior Director of Lending; and authored the April 25, 2025 term-extension memorandum as "Sr Asset Manager," addressed to NHT's own Loan Committee. Ex. C, NHT000099-101; Ex. L, NHT000247-249; Ex. B, NHT000102-107; Ex. D, NHT000159; *see also,* Ex. E, NHT000267. In each instance, the NHT Loan Committee adopted his staff recommendation, and NHT's Vice President Josh Earn executed the operative modification. NHT's public description of Mr. Zimmitti's role is consistent with those internal records: NHT holds him out as its Senior Asset Manager responsible for managing

16

credit risk across NHT's loan portfolio, preparing and presenting loan-modification memoranda, and working directly with borrowers to restructure loans. A reasonable factfinder could conclude from this principal-ratified course of dealing that NHT placed Mr. Zimmitti in a role that made NEHI's reliance on his modification-related statements reasonable.

*National R.R. Passenger Corp. v. Expresstrak, L.L.C* does not compel summary judgment on this record. There, the alleged oral modification failed in part because the contract required written modifications or waivers by duly authorized signatories, and the alleged agreement was made by lower-level employees whom the court found lacked authority to bind their principals. No. 02-1773, 2006 WL 2947555 (D.D.C. Oct. 16, 2006). Here, by contrast, NEHI relies on statements by the NHT representative who repeatedly administered this specific loan, prepared and presented modification memoranda, and whose recommendations were repeatedly acted upon by NHT's Loan Committee and authorized signatories. A reasonable factfinder could therefore conclude that NHT placed Mr. Zimmitti in a role that made NEHI's reliance on his modification-related statements reasonable.

### D.  ANY ARGUMENT THAT MERE SILENCE OR A BOILERPLATE ACCELERATION CLAUSE DEFEATS ESTOPPEL MISSES THE POINT.

To the extent NHT argues that a lender may accelerate without notice where the note so provides, that argument addresses only contractual notice and acceleration procedures. It does not answer the distinct question presented here—whether NHT's own representative made an affirmative statement inconsistent with strict enforcement, on which NEHI reasonably relied. Acceleration language should not be expanded beyond its procedural function. *See, Gelman v. Public Nat'l Bank*, 377 F.2d 166 (D.C. Cir. 1967). And, equitable estoppel turns on representations, reliance, and prejudice; the difference between silence or non-action and an

affirmative representation is legally material. *See, Morris Commc'n, Inc. v. F.C.C.,* 566 F.3d 184 (D.C. Cir. 2009); *U.S. v. Honeywell Int'l, Inc.,* 841 F. Supp. 2d 112 (D.D.C. 2012). Similarly, to the extent NHT relies on general assurances or a lenient collection history divorced from a specific representation tied to a specific date and consequence, that is not this case. NEHI relies on a specific, dated statement by NHT's loan administrator addressing a specific contractual contingency which is a materially different footing than mere accommodation or forbearance standing alone.

## IV.  GENUINE ISSUES OF MATERIAL FACT INDEPENDENTLY PRECLUDE SUMMARY JUDGMENT ON THE GROUND OF WAIVER.

For more than three years, NHT repeatedly chose accommodation over acceleration. Rather than declaring default after missed maturity dates and payment failures, it repeatedly negotiated, documented, and approved formal extensions while continuing to work with NEHI toward repayment through refinancing and anticipated grant proceeds. That sustained course of conduct, not any single extension, is the evidence from which a reasonable factfinder could conclude that NHT waived strict enforcement. The record reflects eight modifications to the Initial Loan and five to the Enterprise Loan over that period. Initial Loan: First Modification (Sept. 1, 2022); Second Modification (May 11, 2023, increasing principal); Third Modification (Sept. 7, 2023, extending maturity to Nov. 6, 2023); Fourth Modification (Nov. 6, 2023, extending maturity to Jan. 5, 2024); Fifth Modification (Jan. 5, 2024, extending maturity to July 5, 2024 and creating the Collateral Assignment); Sixth Modification (July 5, 2024, extending maturity to Jan. 5, 2025); Seventh Modification (Jan. 5, 2025, extending maturity to May 15, 2025); and Eighth Modification (effective June 1, 2025, extending maturity to Aug. 15, 2025). ECF No. 1-1 at 2-33, 40-48, 91-99. Enterprise Loan: First Modification (Sept. 30, 2023, extending maturity to Nov. 29, 2023); Second

18

Modification (Nov. 29, 2023, extending maturity to Jan. 28, 2024); Third Modification (Jan. 28, 2024, extending maturity to July 28, 2024); Fourth Modification (July 28, 2024, extending maturity to Jan. 28, 2025); and Fifth Modification (Jan. 28, 2025, extending maturity to July 28, 2025). ECF No. 1-3 at 21-35. NHT's internal decision memorandum for the Enterprise Loan's Second Modification states candidly that, "given the source of funding used to extend this enterprise loan, NHTCDF is comfortable remaining more patient with this loan." Ex. F., NHT000254. This is not NEHI's characterization of the pattern — it is NHT's own contemporaneous business record of its own reasoning. That accommodation was not the practice of any single employee. NEHI dealt with a succession of NHT representatives over the life of these Loans — Klade Hare, then Alexandra Cabal, then Ben Zimmitti — and NHT's pattern of accommodation continued unbroken across that turnover. Good Decl. ¶3.

NHT's pattern of accommodation extended to payment failures as well, not merely maturity extensions: in November 2024, NEHI delivered a check for $464,187.94 that was returned for insufficient funds, Compl., ECF No. 1, ¶ 20; Answer, ECF No. 10, ¶ 20 (admitted). Rather than declare a default, NHT's response was to negotiate and enter into the Seventh Loan Modification Agreement. Ex. A, NHT's Resp. to RFA No. 12. Significantly, NHT's pattern of accommodation continued even after a second payment failure: a personal check from Mr. Good in the amount of $16,379.46, intended as interest service on both loans, was deposited April 8, 2025 and returned for insufficient funds on April 11, 2025. Ex. G, NHT024885, NHT024912. NHT's own Senior Accountant flagged the returned check to Mr. Zimmitti on April 22, 2025, prompting his reaction: "You've got to be kidding me. This was meant to be interest service on both loans we have out to NEHI." *Id*. Even that expression of frustration did not prompt immediate default. Instead, NHT continued treating the matter as an extension/workout issue, including

through May 2025 communications reflecting loan-committee approval of an extension to August 15, 2025 and the need to paper the modification. Ex. K. Waiver focuses on NHT's conduct and intent, not on any specific representation to NEHI, and is therefore a separate inquiry from the estoppel defense addressed above — the two defenses should be evaluated independently, and a genuine dispute as to either independently precludes summary judgment. *See Tech 7 Sys.*, 594 F. Supp. 2d at 86 (evaluating waiver and equitable estoppel as separate defenses, each independently precluding summary judgment).

These modifications were not ministerial extensions or isolated indulgences. Rather, they reflected repeated, formal underwriting decisions to continue the lending relationship, extend maturity dates, restructure repayment expectations, and pursue repayment through accommodation rather than immediate enforcement. The internal memoranda repeatedly acknowledge the anticipated funding source, the City's funding delays, and NHT's willingness to remain patient while NEHI pursued refinancing and anticipated grant proceeds. Ex. B, NHT000102-107; Ex. D, NHT000159; Ex. F, NHT000254. A reasonable factfinder could conclude that this sustained course of conduct is evidence of NHT's intent regarding whether strict compliance would be demanded.

NHT is expected to point to the Notes' anti-waiver language stating that indulgences and modifications "shall [not] be construed... as a waiver" of NHT's right to strict compliance. ECF No. 1-3 at 18; ECF No. 26-3 at 129. That language may preserve NHT's ability to insist on strict compliance after isolated indulgences or routine accommodations, but it does not eliminate the factual significance of NHT's broader course of conduct here: repeated formal modifications, credit-committee review, continued workout treatment, admitted non-use of the Collateral Assignment, and specific modification-related representations. A reasonable factfinder could

20

conclude that conduct of this specific character and duration falls outside what the clause contemplates, particularly where, as addressed above, that same conduct is independently corroborated by NHT's admitted non-enforcement of the Collateral Assignment and its representative's specific representation regarding a further extension.

*Expresstrak* does not require a different result. There, the court enforced anti-waiver provisions where the asserted waiver rested primarily on acceptance of three late payments over a short period, in a time-sensitive financing arrangement, and the court found that course of performance insufficiently pervasive to overcome the anti-waiver language. 2006 WL 2947555. Here, by contrast, NEHI does not rely on a few accepted late payments alone. It relies on years of formal, written modifications; repeated loan-committee-approved extensions; NHT's continued treatment of the relationship as an extension/workout matter; NHT's admitted non-use of the Collateral Assignment; and specific modification-related statements by the NHT representative administering the loan. That record is materially broader than the limited late-payment course of performance rejected in *Expresstrak*.

## V.    GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE GROUND OF LACHES.

To establish laches, a party must show "an undue and unexplained delay ... which works an injustice on the other party." *Archie v. U.S. Bank, N.A.,* 255 A.3d 1005, 1021 n.15 (D.C. 2021). In *Archie*, the D.C. Court of Appeals reversed summary judgment because genuine issues of fact existed as to whether delay hindered the borrower's ability to prove her defenses — rejecting the argument that incidental benefit from the delay defeats the defense. *Id*. at 1022 n.16. The prejudice inquiry is evidentiary and reliance-based, not simply the passage of time.

21

NHT's internal memoranda confirm that it knew of, and extended around, NEHI's ongoing refinancing efforts throughout the relevant period. Mr. Good testified that National Capital Bank was the primary institution NEHI worked with toward consolidation, that National Capital Bank "took us through the process for an entire year," and that NEHI separately pursued refinancing through JPMorgan Chase and U.S. Bank. ECF No. 28, Ex. 1, Good Dep. Tr. at 138:17. NHT's March 20, 2025 memorandum recommended an extension specifically to allow NEHI to pursue debt consolidation with National Capital Bank. Ex. E , NHT000267. The record therefore supports a finding that NHT knowingly continued granting modifications while a nearly year-long refinancing process remained pending, and that its abrupt shift to default after years of extending around an effort it tracked in its own records worked exactly the kind of injustice laches is designed to address.

NHT's participant NIIF was pressing NHT on precisely this pattern as late as May 2025 — five months before the October default notices. NIIF's President wrote to NHT's loan administrator that the loan needed to be "papered for our auditors," that "we don't have an extension in place," and that NHT needed to either formalize a further extension or "close out this loan and get paid," adding that "my principal concern at this point is audit as much or more than credit." Ex. K, NHT025824-826. NHT's own records thus confirm that, months before declaring default, NHT was still treating this relationship as an unresolved extension to be papered, not a completed default to be enforced.

NHT's own doubt about this loan's recoverability continued through the fall of 2025, well after the events NHT now points to as justifying default. As of September 19, 2025, two weeks before the default notices, NHT's own Director of CDFI Asset Management placed this loan "on watch," was "currently reserving 20%," and anticipated downgrading to a reserve of "at least

22

35%" the following month. Ex. M, NHT004479. NIIF's own President, reviewing the file independently, described NHT's position as "still basically unsecured" and characterized any recovery estimate as "a finger in the air." *Id.* This is not the language of a lender confident in a clear, uncured default; it is NHT's own contemporaneous acknowledgment, in an internal communication never intended for litigation, that the loan's status remained genuinely uncertain up to the moment NHT declared default.

Had NHT intended to insist upon immediate enforcement rather than continued accommodation, a reasonable factfinder could also conclude that NEHI would have pursued different financing, restructuring, or workout alternatives at an earlier stage rather than continuing to rely on NHT's repeated willingness to extend the loans.

NHT may argue that its October 2025 default decision was prompted by its discovery of judgments and liens held by other creditors, not by any change in the grant status or NEHI's refinancing efforts. Even if accepted, that explanation does not resolve laches or waiver at summary judgment. It may explain why NHT finally chose to accelerate, but it does not negate NEHI's evidence that NHT had spent the preceding years extending the Loans, tracking NEHI's refinancing efforts, treating the relationship as an ongoing workout, and inducing reliance on continued accommodation. Whether NHT's delay and course of dealing worked an injustice remains a fact-intensive question, not a basis to enter judgment for NHT as a matter of law. *Archie,* 255 A.3d at 1021 n.15.

NHT may argue laches has no application because NEHI's defenses arise within the applicable limitations period. That conflates the limitations period governing NHT's claim with the distinct equitable question of whether NHT's own delay in enforcement worked as an injustice.

23

*Archie* itself involved a timely-filed action, and the court still found laches presented a triable issue. *Id.* Timeliness and undue delay in enforcement are not the same inquiry.

## VI.    IN THE ALTERNATIVE, GENUINE ISSUES OF FACT EXIST AS TO WHETHER NEHI'S PERFORMANCE WAS EXCUSED.

NEHI reserves, in the alternative, the doctrines of commercial impracticability and frustration of purpose. No District of Columbia court has applied either doctrine to a loan repayment obligation, and this would accordingly be a matter of first impression. The governing test asks whether the non-occurrence of the event rendering performance impracticable "was a basic assumption on which the contract was made," and whether the risk of that event was allocated to the party seeking excuse. *Transatlantic Fin. Corp. v. United States*, 363 F.2d 312, 315-316 (D.C. Cir. 1966); *Nat'l Ass'n of Postmasters v. Hyatt Regency Washington*, 894 A.2d 471 (D.C. 2006). NHT's admissions that NHT's underwriting considered the risk of DHCD delay at origination, and that NHT's own loan committee memoranda approving successive modifications repeatedly identified "City delays in funding" as a known risk, cut against treating that risk as unallocated or unforeseen, and this Court need not resolve whether that knowledge instead supports NEHI's position under the same estoppel and waiver theories addressed above rather than as an independent basis for excuse. Ex. A (NHT's Resp. to RFA No. 16), Ex. B., NHT000103.

To the extent this doctrine is reached, a genuine dispute exists as to whether the risk NHT foresaw and the event that actually occurred are the same risk in kind, not merely in degree. NHT's own admissions establish, at most, that its underwriting considered a defined category of risk: ordinary delay, or a bounded, contractually-specified retainage, in DHCD's disbursement of grant funds. Ex. A, NHT's Resp. to RFA No. 16. NHT's use of the word "withheld" should be construed in the context of the governing documents themselves. In the disbursement provision of the Grant

24

Agreement, "withheld" is used in connection with a specific, capped retainage: DHCD's retention of ten percent of the grant funds, $75,000, until project completion and receipt of use-and-occupancy permits. That same provision expressly distinguishes "available GRANT FUNDS" from "withheld Retainage." Ex. A to Compl., ECF No. 1-1, at 58 § 4. Nothing in the NHT loan documents or the Collateral Assignment expands that term to mean an indefinite, City-wide suspension of all grant activity. At most, the documents show that NHT contemplated ordinary disbursement conditions, a capped retainage, and administrative payment review — not a complete cessation of City funding caused by an external event. (Ex. A to Compl., ECF No. 1-1, at 58 § 4). What actually occurred was a total suspension of all funding, triggered by a federal inquiry into conduct unrelated to NEHI's housing programs and entirely outside NEHI's control. The triggering event, in other words, did not arise from anything within the funding relationship NHT underwrote; it arose from an external circumstance beyond NEHI's control, a materially different risk in kind from the ordinary disbursement delay NHT admits it foresaw. DHCD's own Commissioner confirmed this causal link directly, in writing: "[t]he City has been made aware of an investigation by federal law enforcement authorities involving NEHI. As a result, the City will be pausing further grant activities related to NEHI pending the outcome of that investigation," and that "the pause covers all grant activity across any city agency, and for the duration of the investigation." Ex. J, NEHI000113-115 (Feb. 9-10, 2026 correspondence) not merely a more severe version of the same risk: the former arises from within the funding relationship itself; the latter is the product of a discrete, external triggering event entirely outside it. Foreseeability of the first does not establish assumption of the risk of the second. *Transatlantic Fin. Corp.,* 363 F.2d at 315-16 (foreseeability or even recognition of a risk does not necessarily prove its allocation, because parties are not always able to provide for every possibility of which they are aware). What

actually occurred was a total, ***indefinite suspension of all funding***, triggered by a federal inquiry into conduct unrelated to NEHI's housing programs and entirely outside NEHI's control. The triggering event, in other words, did not arise from anything within the funding relationship NHT underwrote. It arose from an external circumstance beyond NEHI's control, a materially different risk in kind from the ordinary disbursement delay NHT admits it foresaw. DHCD's Commissioner confirmed this causal link directly, in writing: "[t]he City has been made aware of an investigation by federal law enforcement authorities involving NEHI. As a result, the City will be pausing further grant activities related to NEHI pending the outcome of that investigation," and that "the pause covers all grant activity across any city agency, and for the duration of the investigation." Ex. J, NEHI000113-115 (Feb. 9-10, 2026 correspondence). NHT may attempt to characterize the underlying federal inquiry as attributable to NEHI's own conduct, in an effort to recharacterize the funding freeze as self-inflicted rather than external. The record forecloses that argument. NEHI's federal counsel has confirmed NEHI is not a target of that matter and has no connection to the underlying conduct at issue, Ex. H (Sammis Repr. Letter, Feb. 20, 2026), and NEHI's contemporaneous correspondence to DHCD states NEHI had received no notice of any formal allegations, findings, or determinations of wrongdoing and had not been contacted directly by any federal authority. *Id*. NEHI was a bystander to that matter, not its cause, and the triggering event accordingly remains an external circumstance beyond NEHI's control rather than a risk of NEHI's own making. Whether a complete standstill triggered by an external event beyond NEHI's control falls outside the risk NHT actually assumed is a question for the fact-finder, not a question this Court can resolve as a matter of law on this record.

Separately, DHCD itself attributed a compliance shortfall to NEHI during the relevant period that was, in fact, of DHCD's own making. Mr. Good provides that DHCD changed its

26

family-certification process in the middle of the grant term requiring the City itself to certify household eligibility going forward, rather than accepting NEHI's certification based on supporting documentation as it had previously, and that this unilateral change, not any conduct by NEHI, caused the shortfall that DHCD later cited, in turn delaying reimbursement and closeout of the grant. Good Decl. ¶ 8. This is a further, independent respect in which the delay NHT now points to was driven by DHCD's own shifting requirements rather than by any risk NEHI or NHT assumed at origination.

NEHI raises this doctrine to preserve it, not as its primary theory, and does not ask the Court to resolve it unless the arguments addressed in Sections I through IV leave a gap this Court is otherwise inclined to fill.

## VII.  INDEPENDENT OF ANY AFFIRMATIVE DEFENSE, GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT AS TO THE AMOUNT OF DAMAGES CLAIMED.

Even if the Court were to resolve every affirmative defense addressed above in NHT's favor, NHT would still not be entitled to summary judgment in the specific amount it seeks, because that amount is not supported by evidence sufficient to eliminate a genuine dispute. NHT's claimed principal and interest balance of not less than $631,854.89, and its claimed attorneys' fees of $55,449.63, rest entirely on a single conclusory paragraph each of the ECF No. 26, Ex. 8, Declaration of Ms. Evert. (Evert Decl.) ¶¶ 6-8. Neither the Complaint, Compl. ¶¶ 29-30, 42, nor the Notices of Default, ECF No. 26-2, Ex. 6 (Notice of Default for Initial Loan,); ECF No. 26-2, Ex. 7 (Notice of Default for Enterprise Loan) nor NHT's own Statement of Undisputed Material Facts, ECF No. 26-3 ¶¶ 31, 32, 34, contain or reference any amortization schedule, payment history, accrual calculation, or underlying accounting record supporting either figure. No invoice, billing statement, time entry, or rate documentation accompanies the claimed attorneys' fees

27

anywhere in the record. A movant's own conclusory declaration cannot establish the absence of a genuine dispute, even as to the movant's own claim. *Caston v. Butler,* 629 F. Supp. 2d 20, 22-23 (D.D.C. 2009). In *Caston*, the court denied a movant's motion for summary judgment because the movant's supporting affidavit was "replete with conclusory statements" and "set forth no facts at all," holding that the affidavit established neither the absence of a genuine issue of material fact nor entitlement to judgment as a matter of law. 629 F. Supp. 2d 20, 22-23 (D.D.C. 2009). The same is true here: NHT's declaration is the sole support for its damages figures, and it suffers from the identical deficiency.

Summary judgment on damages requires a nonconclusory evidentiary basis showing both the amount claimed and the method by which it was calculated. In *New 3145 Deauville, L.L.C. v. First American Title Insurance Co.*, summary judgment was affirmed only after the movant supported the claimed balance with both an affidavit and the underlying ledger reports; the opposing affidavit failed because it supplied only conclusory assertions and no specific contrary facts. 881 A.2d 624 (D.C. 2005). The D.C. Court of Appeals has applied the same principle to reverse summary judgment on the specific amount owed even where liability itself was conceded, as discussed further below. The same principle appears in ERISA damages cases: in *Service Employees Int'l Union National Indus. Pension Fund v. Jersey City Healthcare Providers, LLC*, 358 F. Supp. 3d 12 (D.D.C. 2019), the movant supported damages through declarations explaining the calculation methodology and spreadsheets summarizing underlying records, while the court rejected an opposing declaration that lacked personal knowledge and factual foundation. Rule 1006 likewise permits summaries or calculations of voluminous admissible materials only where the underlying originals or duplicates are made available for examination or copying. Fed. R. Evid. 1006. NHT has not cited or submitted with its motion any comparable record establishing the

28

amount sought—no admissible ledger, accrual schedule, payment-application history, default-interest calculation, principal-base calculation, or attorney-fee billing records.

A declaration that merely recites a bottom-line figure, without the underlying data from which that figure was derived, does not eliminate a genuine dispute as to the amount owed; it is the kind of conclusory assertion the Court's own Summary Judgment Procedures Order permits it to disregard. *See*, ECF No. 20 ¶ 5(a); *LeBlanc v. United States Privacy & Civil Liberties Oversight Bd.,* 784 F. Supp. 3d 1 (D.D.C. 2025) (a declaration must be made on personal knowledge, set out admissible facts, and show the declarant's competence to testify; conclusory statements are an exception to the rule that a party's evidence is credited on summary judgment). The deficiency is compounded here because the claimed figure is not merely undocumented but internally dependent on a disputed legal predicate. NHT's Statement of Facts asserts that default-rate interest has continued to accrue since October 2, 2025. That assertion presupposes an uncured, unexcused default — the very question NEHI disputes throughout Sections I through V above. Even if the underlying accounting existed, the Court could not verify the claimed interest figure without first resolving whether default-rate interest applies at all, when it would have begun to accrue, and for what duration. Those are disputed questions of fact, not matters this Court can resolve on summary judgment in order to credit NHT's damages figure. *Burt* is directly analogous on the narrower but important point that liability on a debt instrument does not automatically establish entitlement to summary judgment on the amount owed where the movant's own damages showing leaves the interest calculation unexplained. In *Burt v. First American Bank,* the court affirmed summary judgment on a borrower's liability under a promissory note, where the borrower had conceded liability and failed to properly respond to admissions, but reversed summary judgment on the amount owed under a related credit agreement because the movant bank's own submissions

contained an unexplained discrepancy between the contract's stated interest rate and the figure the bank actually sought — holding that "the bank is not entitled to summary judgment as a matter of law on the question of the amount owed" where the record contains an unreconciled conflict over the applicable rate. 490 A.2d 182, 186-87 (D.C. 1985). The same is true here. NHT's own Statement of Facts asserts a specific default-rate interest calculation without reconciling it to any underlying record, in a manner *Burt* holds is insufficient to support summary judgment on the amount owed even where liability itself is not genuinely disputed. Nor is the calculation methodology self-evident even if the default itself were undisputed. D.C. law likewise requires the interest methodology to be grounded in the governing contract; where the contract does not provide for compound interest, interest is calculated on the principal balance alone. *CapitalKeys, LLC v. Democratic Republic of Congo,* 278 F. Supp. 3d 265 (D.D.C. 2017). NHT's Statement of Facts does not identify how its default-rate interest is calculated, on what principal base, or for what period. Nor may the Court infer a compounding methodology or other unstated interest calculation in NHT's favor. Absent a contractual provision authorizing compound interest, prejudgment and judgment interest are ordinarily not compounded. *Id*.

At minimum, even if the Court were inclined to enter some form of liability ruling, it should deny summary judgment as to the amount of damages and attorneys' fees, or require NHT to submit competent supporting records before any sum certain is entered. A fee applicant's burden in establishing a reasonable hourly rate requires evidence of the attorneys' billing practices, their skill, experience, and reputation, and the prevailing market rates in the relevant community. *See Heller v. District of Columbia,* 832 F. Supp. 2d 32 (D.D.C. 2011); *Act Now to Stop War & End Racism Coalition v. District of Columbia,* 286 F.R.D. 145 (D.D.C. 2012). Courts in this District require contemporaneous time records reflecting the work performed by each attorney and staff

30

member; casual, after-the-fact estimates do not suffice. *Electronic Privacy Information Center v. U.S. Department of Homeland Security,* 999 F. Supp. 2d 61 (D.D.C. 2013). A sworn declaration accompanied by a contemporaneous hours log is the type of evidence normally considered. *Beck v. Test Masters Educational Services, Inc.,* 73 F. Supp. 3d 12 (D.D.C. 2014). Even where contemporaneous time records are provided, the request may remain insufficient absent information regarding each biller's experience and prevailing market rates. *Service Employees International Nat'l Indus. Pension Fund v. Tandem Development Grp., LLC*, 274 F. Supp. 3d 1 (D.D.C. 2017). NHT's declaration provides none of this — no time records, no task descriptions, no rate information, and no showing of billing practices, experience, or comparison to market rates. A total dollar figure alone, unaccompanied by any of the foregoing, does not carry NHT's burden as a matter of law, let alone eliminate a genuine dispute of fact. Rule 56 requires factual positions to be supported by particular record materials, and declarations must set out admissible facts based on personal knowledge. Fed. R. Civ. P. 56. Accordingly, NHT has not established entitlement to the specific damages and fee award it seeks, regardless of how the Court resolves NEHI's affirmative defenses.

## CONCLUSION

For the foregoing reasons, NEHI respectfully requests that the Court deny Plaintiff's Motion for Summary Judgment in its entirety. At a minimum, the record requires the Court to draw competing inferences regarding NHT's intent, evaluate the reasonableness of its conduct, determine the effect of its repeated modifications, assess the significance of its admitted decision not to enforce the Collateral Assignment, and evaluate the credibility of testimony concerning its loan administrator's representations. Rule 56 reserves those determinations for the factfinder —

31

not the Court on summary judgment. Nor has NHT established, independent of any affirmative defense, that the specific amount of damages it seeks is free of genuine dispute.

NHT underwrote this risk, built itself a remedy against it, chose not to use that remedy, and described itself in its own records as comfortable extending patience to NEHI. The circumstances that ultimately prevented repayment were not of NEHI's making, and NHT's own conduct over the life of these Loans reflects an institution that understood as much long before it filed its Motion. Whether NHT's abrupt pivot from years of accommodation to immediate enforcement reflected a genuine change in circumstances, whether its prior conduct reasonably induced NEHI to continue pursuing the funding and refinancing efforts NHT itself had repeatedly accommodated, and whether strict enforcement after that course of dealing would work an inequitable result present questions of intent, reliance, and fair dealing that cannot be resolved against NEHI on summary judgment.

This is not the straightforward unpaid note case NHT portrays. It is a case involving years of negotiated modifications, acknowledged funding delays, an unexercised Collateral Assignment, an inadequately supported damages calculation, and multiple equitable defenses supported by NHT's own records and admissions. As *Entrepreneur* recognizes, equity does not permit a party, after establishing a course of conduct upon which another reasonably relies, to "at long last determine" that strict enforcement will be demanded where doing so would operate as the kind of "entrapment" or "fraud" equitable estoppel exists to prevent. *Entrepreneur,* 498 A.2d at 1163. At a minimum, the record permits competing reasonable inferences as to whether that is what occurred here. Those inferences are for the factfinder, not for resolution on summary judgment.

32

Dated: August 10, 2026                        Respectfully submitted,

                                         /s/Dayna C. Cooper

                                         Dayna C. Cooper (Bar No. 1033851)
1 Olympic Pl., Suite 900
Towson, MD 21204
(202) 642-5470 (office)
Dayna@CooperLegalSolutions.com
*Counsel for Defendant,*
*North East Housing Initiative, Inc.*

33

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that on August 10, 2026, I caused the foregoing: (1) Defendant's Opposition to Plaintiff's Motion for Summary Judgment; (2) Defendant's Response to Plaintiff's Statement of Undisputed Material Facts; (3) Appendix of New Supporting Exhibits to Defendant's Opposition to Plaintiff's Motion for Summary Judgment; and (4) Declaration of Garrick R. Good, to be served via CM/ECF on the following:

Joel W. Ruderman
Jennifer L. Kneeland
*WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.*
jruderman@watttieder.com
jkneeland@watttieder.com

/s/Dayna C. Cooper/
Dayna C. Cooper

34